1  THOMAS B. HARVEY (CA Bar #287198)
2  LAW OFFICES OF THOMAS B. HARVEY
   365 E. Avenida De Los Arboles, #226
3  Thousand Oaks, CA 91360
   Telephone: (805) 768-4440
4  tbhlegal@proton.me

5  JENIN YOUNES* (*pro hac vice* pending)
6  DEYAR JAMIL (*pro hac vice* forthcoming)
   AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE
7  910 17th Street Northwest, Suite 1000
   Washington, DC 20006
8  Telephone: (202) 244-2990
   jyounes@adc.org
9  *Designated Counsel for Service*

10
11 MICHAEL BRACAMONTES (CA Bar # 242655)
   BRACAMONTES & VLASAK
12 220 Montgomery Street, Suite 2100
   San Francisco, CA 94104
13 Telephone: (415) 835-6777
   mbracamontes@bvlawsf.com
14

15 *Attorneys for Plaintiffs*

16          **IN THE UNITED STATES DISTRICT COURT**
17        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                 **SAN JOSE DIVISION**
18

19 **ANDREA PRICHETT;**              )
   **JONAH OLSON;**                  )
20 **DUNIA HASSAN;**                 )     **Case No. _____**
   **KAUSER ADENWALA;**             )
21 **LA EDUCATORS FOR**             )
   **JUSTICE IN PALESTINE;**        )
22 **ABDULRAHMAN JARRAR,**          )     **Complaint for Declaratory**
   on behalf of his minor child, **J. J.;**  )   **and Injunctive Relief**
23 **LINDA KHOURY-UMILI,** on       )
   behalf of her minor children, **Y. U.**  )
24 and **L. U.; ALICE FINEN,** on   )
   behalf of her minor child, **G. F.;**  )
25                                    )
26                                    )
27                                    )
           *Plaintiffs,*              )
28                                    )

1  v.                                    )
                                         )
2                                        )
   **GAVIN NEWSOM,** Governor of the State )
3  of California, in his official capacity; )
   **ROB BONTA,** Attorney General of      )
4  California, in his                      )
   official capacity; and                 )
5  **TONY THURMOND**, California           )
   Superintendent of Public Education, in )
6  his Official Capacity;                  )
                                         )
7                                        )
                                         )
8  *Defendants*.                          )


## INTRODUCTION

1.      This case is about how a hastily written and adopted law fails to define key terms, meaning that those subject to its mandate cannot know what could subject them to punishment under it, while it appears to expand the definition of antisemitism so far that its threatened application violates the First Amendment rights of teachers to teach and students to learn about Palestine, Israel, and the Middle East, in every public school across the state of California.

2.      Last month, Governor Gavin Newsom signed Assembly Bill 715 ("AB 715") into law, amending California's Education Code. AB 715 purports to strengthen antidiscrimination protections for Jewish students specifically.

3.      Despite its emphasis on protecting Jewish students from discrimination, AB 715 does not define the term "antisemitism." Since California's Education Code already prohibits discrimination on the basis of race, religion, ethnicity, and national origin, the only plausible inference to be made is that the new law seeks to alter or expand the definition.

4.      This supposition is further supported by AB 715's requirement that school districts follow former President Joseph Biden's National Strategy to Combat Antisemitism ("Biden National Strategy"). The Biden National Strategy also does not expressly define antisemitism but instead refers

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

to the International Holocaust Remembrance Alliance's ("IHRA") definition as the most prominent, implying that it guides implementation of the strategy.

5.     Both the IHRA definition of antisemitism and the Biden National Strategy conflate criticism of the State of Israel, as well as the political philosophy known as Zionism, with antisemitism.

6.     California's Education Code, as amended by AB 715, requires schools to take remedial action if a teacher uses written materials in the classroom that "subject a pupil to unlawful discrimination."

7.     Plaintiffs are teachers ("Teacher Plaintiffs") and students ("Student Plaintiffs") in California public schools who teach and seek to learn about, respectively, subjects related to Palestine, Israel, and the Middle East.

8.     By failing to define antisemitism, while requiring schools to follow the Biden National Strategy in order to identify, respond to, prevent, and counter it, the law leaves Teacher Plaintiffs with inadequate guidance as to what constitutes unlawful discrimination under the AB 715 amendments. At the same time, the new law leaves Teacher Plaintiffs fearing they will be charged with engaging in unlawful discrimination and disciplined accordingly if they expose their students to ideas, information, and instructional materials that may be considered critical of the State of Israel and the philosophy of Zionism.

9.     Furthermore, AB 715 requires teachers to provide students with only "factually accurate" information.  Since "factually accurate" instruction, in their opinions and experiences, includes ideas and information that may be interpreted as critical of the State of Israel and the project of Zionism, teachers cannot simultaneously adhere to the factual accuracy requirement while refraining from providing information that falls under the Biden National Strategy's understanding of what constitutes antisemitism.  This exacerbates AB 715's lack of clarity problem, since it imposes yet another requirement on Teacher Plaintiffs that they are unsure how to navigate.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

10.    The AB 715 amendments also do not explain what is meant by the prohibition of instructional materials that "subject a pupil to unlawful discrimination," while threatening Teacher Plaintiffs with discipline for running afoul of this requirement.

11.    It is unclear how a textbook or other written material can discriminate against a student, and whether this standard is intended to apply to fiction taught in the classroom, for example classic novels such as *The Great Gatsby* that, by modern standards, portray Jewish and other minority characters in a stereotypical and offensive manner.

12.    Because the AB 715 amendments fail to make clear what constitutes antisemitic discrimination, Teacher Plaintiffs remain unsure precisely what conduct and instructional materials they must avoid in order to comply with the law's requirements. This lack of clarity also opens the door to arbitrary and uneven enforcement, altogether rendering the law unconstitutionally vague.

13.    To the extent the AB 715 amendments leave administrators and teachers with the reasonable perception that they could be punished for antisemitic discrimination if they express certain opinions about the State of Israel and the philosophy of Zionism, the law is overbroad and viewpoint discriminatory.

14.    While the Constitution tolerates some limitations on a teacher's classroom instruction, "[t]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *See Kennedy v. Bremerton*, 597 U.S. 507, 527 (2022) (quoting *Tinker v. De Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)).

15.    As the Ninth Circuit recognizes, the First Amendment does not permit a state government to prohibit teachers from giving voice to certain viewpoints in public schools while elevating others by endowing them with protection under antidiscrimination law.  *See Cal. Teacher's Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1148 (9th Cir. 2001) (explaining that neither the Ninth Circuit

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

nor the Supreme Court has "definitely resolved whether and to what extent a teacher's instructional speech is protected by the First Amendment" but assuming such speech is entitled to some First Amendment protection). *See also Sheldon v. Dhillon*, 2009 US Dist. LEXIS 110275 (N.D. Cal. 2009) ("The Ninth Circuit has previously recognized that teachers have First Amendment rights regarding their classroom speech, albeit without defining the precise contours of those rights.").

16.    By apparently deeming certain perspectives on Israel and Palestine antisemitic under its Education Code, California has unlawfully singled out for punishment "particular views … on a subject." *Rosenberger*, 515 U.S. at 829 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). That conflicts with the constitutional requirement that government "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (citing *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 46 (1983)).

17.    Student Plaintiffs' reasonably believe Student Plaintiffs will be prevented from learning about differing perspectives on Israel, Palestine and the Middle East. Because AB 715 empowers anyone to file a complaint claiming classroom content and instructional materials criticize Israel and Zionism, and are therefore antisemitic, Student Plaintiffs believe their teachers will be deterred from freely discussing these critical issues. This behavior undermines Student Plaintiffs' rights to receive information, which the Supreme Court recognizes are encompassed in the First Amendment's free speech protections. *See Monteiro v. Tempe Union School District*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1989) ("The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting."). *See also Parents v. Liberated Ethnic Stud.*, 2024 US Dist. LEXIS 216929, slip op. at 65 (C.D. Ca. 2024) (noting that the Supreme Court has recognized "the importance of protecting the 'robust exchange of ideas'" in the context of a public-school education) (quoting *Keyshian v. Bd. of Regents*, 385 U.S. 589, 600 (1967)).

18.     In sum, California's Education Code, as amended by AB 715, is unconstitutionally vague in violation of Teacher Plaintiffs' Fourteenth Amendment Due Process rights (Count I), and overbroad and viewpoint discriminatory in violation of all Plaintiffs' First Amendment rights to free speech and to receive information (Counts II and III).

## JURISDICTION AND VENUE

19.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 133 and 42 U.S.C. § 1983, because the federal law claims arise under the Constitution and statutes of the United States.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) (2) because Plaintiffs Dunia Hassan and Kauser Adenwala reside in and teach in this district.

21.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-02.

## PARTIES

22.     Plaintiff Andrea Prichett is a middle-school history teacher at a public school in Berkeley, California.

23.     Plaintiff Jonah Olson is a middle-school science teacher at a public school in Adelanto, California.

24.     Plaintiff Dunia Hassan is a high-school Spanish teacher at a public school in Santa Clara, California.

25.     Plaintiff Kauser Adenwala is a high-school civics and economics public school teacher in Santa Clara, California, who previously taught history.

26.     Plaintiff Los Angeles Educators for Justice in Palestine (LA EJP) is a group comprised of teachers, academic counselors, school psychologists, and out-of-classroom educators.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

27.    Plaintiff Abdulrahman Jarrar brings this suit on behalf of his daughter, J.J., a 16-year-old high-school student in Granite Bay, California.

28.    Plaintiff Linda Khoury-Umili brings this suit on behalf of her minor children, Y.U. and L.U., the former of whom attends public school and the latter of whom will begin Kindergarten in 2026 at the same school in the San Francisco Bay Area of California.

29.    Plaintiff Alice Finen brings this suit on behalf of her minor child, G.F., who attends a public charter school in Arcata, California.

30.    Defendant Gavin Newsom is the Governor of California, charged with ensuring that the laws of the State are faithfully executed.  He is sued in his official capacity, and his official address is 1021 O Street, Suite 9000, Sacramento, CA 95814.

31.    Defendant Rob Bonta is the Attorney General of California, charged with enforcing the laws of the state.  He is sued in his official capacity, and his official address is 1300 I Street, Suite 125, Sacramento CA 95814.

32.    Defendant Tony Thurmond is the California State Superintendent of Public Instruction, charged with overseeing implementation of state antidiscrimination law in public schools. He is sued in his official capacity, and his official address is 1430 N. Street, Sacramento, CA 95814.

## STATEMENT OF FACTS

### I.    ASSEMBLY BILL 715 (AB 715)

33.    AB 715, which amends California's Education Code governing Elementary and Secondary education, underwent multiple amendments before its final passage.

34.    On October 7, 2025, Governor Gavin Newsom signed AB 715 into law, after it passed both houses of the state legislature on September 12, 2025.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

35.    In California, bills signed by the governor take effect on the first day of the new year unless stated otherwise.  Thus, AB 715's revisions to existing California Education Law apparently take effect January 1, 2026, although the bill is unclear on the timing since it requires "[c]orrective action … be implemented as soon as possible and no later than the beginning of the next school year[,]" Ca. Educ. Code § 60151(a)(4), suggesting that districts may already be implementing changes in order to comply with the new law.

36.    The stated purpose of AB 715 is to buttress existing anti-discrimination law in order to combat antisemitism in the State of California, which according to the Attorney General's 2025 hate crime report, has skyrocketed in recent years.  *See* Cal. Asm. Bill No. 715 (2025-26 Reg. Sess.) (legislative counsel's digest).

37.    The preamble acknowledges that existing law "afford[s] all persons in public schools, regardless of … nationality, race or ethnicity, religion … or any other specified characteristic, equal rights and opportunities in the educational institutions of the state." *See id.*

38.    According to the Legislature, additional protections are needed because of a surge of antisemitic discrimination, harassment, and bullying in schools that includes the *use of antisemitic tropes and conspiracy theories*; *discriminatory slurs, symbols and expressions*; physical and verbal assaults; *discrimination by proxy and through the use of coded language*; collective blame and vilification of Jews and Israelis; and *distortions of Jewish religion, ancestry, history and identity*.  *See id.*, §1(d) (emphases added).

39.    The Legislature claims that this discrimination has included "the use of inappropriate instructional materials and instruction," without further explanation or providing examples.

40.    AB 715 does not define antisemitism.

41.    However, it instructs school districts to rely on the 60-page United States National Strategy to Counter Antisemitism, published by the Biden Administration on May 25, 2023, in guiding efforts to "identify, respond to, prevent and counter antisemitism" ("Biden National Strategy").  *See*

*id.* § 1(i) (referring to White House, *The U.S. National Strategy to Combat Antisemitism* (May 2023), https://tinyurl.com/3n4sc9ca (last visited Oct. 24, 2025).

    a.    Notably, the Biden National Strategy addresses combatting antisemitism in all aspects of public life, including on social media and abroad. It is not only about antisemitism in educational settings.

    b.    The Biden National Strategy conflates antisemitism with antipathy towards or criticism of the State of Israel. For example, it states that Jewish students and educators face "derision and exclusion on college campuses" "because of their real or perceived views about the State of Israel." *Id.* at 9.[1]

    c.    In another instance, the Biden National Strategy provides as evidence of increasing antisemitism the fact that over half of Jewish students feel they pay a social cost for supporting the existence of Israel as a Jewish state. *The U.S. National Strategy to Combat Antisemitism* at 40.

    d.    Foundational to the Biden National Strategy is an "unshakeable commitment to the State of Israel's right to exist, its legitimacy, and its security" and recognition of the "deep historical, religious, cultural, and other ties many American Jews and other Americans have to Israel." *Id.* at 11.

---

[1] In fact, the data collection methods underlying the claims about skyrocketing antisemitism are also based on a conflation of antisemitism and criticism of Israel and Zionism. The Biden National Strategy–like the California Legislature–relies on Anti-Defamation League (ADL) statistics to evaluate the prevalence of antisemitic hate crimes in our nation. The ADL considers negative attitudes and speech about Israel and Zionism to constitute antisemitism. *See FBI cuts ties with two advocacy groups that track US extremism after rightwing backlash,* THE GUARDIAN (Oct. 3, 2025), available at https://tinyurl.com/59e7mvex (last visited Oct. 15, 2025) (explaining that FBI stopped collaborating with ADL for these purposes in October of 2025); *Audit of Antisemitic Incidents 2024,* Center on Extremism (April 22, 2025), https://www.adl.org/resources/report/audit-antisemitic-incidents-2024 (last visited Oct. 15, 2025) (stating that the majority of antisemitic incidents reported were related to Israel or Zionism). *See also* Shane Burley, *Examining the ADL's Antisemitism Audit,* JEWISH CURRENTS (June 17, 2024), https://tinyurl.com/2denyay3 (last visited Oct. 21, 2025) (determining that ADL audits demonstrate that their methodology involves creating a false equivalence between political expression (including criticism of Israel or Zionism) with antisemitic sentiment and conduct).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

e.     The Biden National Strategy tasks the State Department with "combat[ting] antisemitism abroad and in international fora–including efforts to *delegitimize the State of Israel.*" *Id.* at 11 (emphasis added).

f.     The Biden National Strategy does not mention Palestinians or Palestine, or Palestinians' or Palestinian Americans' ties to the land in question, their identity, their legitimacy, or their security.

g.     The Biden National Strategy includes additional examples of First Amendment protected speech it considers antisemitic: for example, comparisons between the Holocaust and public health measures during the Covid-19 pandemic. *Id.* at 9.

h.     The Biden National Strategy also surreptitiously utilizes the International Holocaust Remembrance Alliance's (IHRA) definition of antisemitism. *See id.* at 13 ("The most prominent [definition of antisemitism] is the non-legally binding 'working definition' of antisemitism adopted in 2016 by the 31-member states of the [IHRA], which the United States has embraced.").[2]

i.     The IHRA defines antisemitism broadly as, "a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."

j.     This definition includes a number of examples of attitudes and speech that may be antisemitic, including:

---

[2] Notably, even Kenneth Stern, who crafted the IHRA definition of antisemitism, believes that it should not carry the force of law. *See, e.g.,* Eyal Press, *The Problem with Defining Antisemitism*, THE NEW YORKER (Mar. 13, 2024) (explaining that Stern himself testified at a congressional hearing that he "believed that enshrining [the IHRA definition] into law would have dangerous consequences" and a bill proposing to do that posed "a clear threat to academic freedom.").

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

1        1.   "Accusing Jewish citizens of being more loyal to Israel, or to the alleged

priorities of Jews worldwide, than to the interest of their own nations."

        2.   "Denying the Jewish people their right to self-determination, e.g., by claiming

that the existence of a State of Israel is a racist endeavor."

        3.   "Applying double standards by requiring of [Israel] a behavior not expected or

demanded of any other democratic nation."

        4.   "Drawing comparisons of contemporary Israeli policy to that of the Nazis."

42.     AB 715 acknowledges that "[e]xisting law prohibits the governing board of a school district, a county board of education, or the governing body of a charter school, from adopting or approving the use of any textbook, instructional material, supplemental instructional material, or curriculum if its use would subject a pupil to unlawful discrimination[.]" *See* Cal. Asm. Bill No. 715 (2025-26 Reg. Sess.) (legislative counsel's digest); Ca. Educ. Code § 244(a)(1), (b)(1).

43.     But AB 715 adds to the prohibition by providing for the Board to "investigate and remediate" the situation in the event the above requirement is violated; remedial measures may include but are not limited to the implementation of restorative justice practices. *See* Ca. Educ. Code § 244 (a)(2), (b)(2).

44.     Any member of the public may file a complaint with the Superintendent alleging a violation of AB 715's strictures, provided there is some substantiating evidence; complaints may be anonymous. *See* Ca. Educ. Code § 244(d).

45.     AB 715 also amends existing education law to establish an Office of Civil Rights ("OCR") to "prevent and address discrimination and bias[.]" *See* Ca. Educ. Code. § 33800.

46.     The OCR is to employ an "Antisemitism Prevention Coordinator," appointed by the Governor and confirmed by the Senate, who must follow the Biden National Strategy in identifying, responding to, preventing, and countering antisemitism.  Ca. Educ. Code §§ 33803.1(a), 33803.6(c)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

(despite mentioning other anti-bias coordinators, *see* Ca. Educ, Code §33803(a), (b), the AB 715 amendments currently provide only for an Antisemitism Prevention Coordinator, and there is no timeline for appointment of other coordinators).

47.     Furthermore, the AB 715 amendments—in contrast to preexisting law—provide for a finding of discriminatory bias in instruction absent a showing of direct harm to members of a protected group; indeed, members of a protected group need not even be present during an alleged unlawful incident.  *See* Ca. Educ. Code § 51500(a)(2).

48.     While existing law requires educational materials used in schools to be "factually accurate," *see* Ca. Educ. Code § 60200(c)(3), AB 715 amends the law to require teachers' *instruction* to be "factually accurate."  *See* Ca. Educ. Code § 51500(b).

49.     AB 715 also provides for the Superintendent to evaluate complaints of discrimination, and for the applicable department to notify the local educational agency that it must take corrective action within 60 days.  Otherwise, the department may use any means authorized by law to effectuate compliance.  Ca. Educ. Code § 60151(a)(1).

50.     Corrective action may include but is not limited to the following:

a.     Requiring the local educational agency to regularly report to OCR and use alternative instructional materials;

b.     Requiring the local educational agency to develop and implement an improvement plan to address discrimination and bias at its school sites, in consultation with the OCR.  If the violation involves antisemitism, the local agency must consult with the Antisemitism Prevention Coordinator in creating an improvement plan.  Ca. Educ. Code § 60151(a)(2)(B), (C).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

51.     If the agency fails in the above, the Superintendent is to impose financial penalties. Ca. Educ. Code § 60151(a)(4)(b). The amount of such penalties remains unspecified but not to exceed the agency's total expenditure on written educational materials. *Id.*

52.     Finally, AB 715 provides for the severability of its provisions in the event one or more is deemed invalid. *See id.*, § 11.

## II.     THE PLAINTIFFS

*A.  Teachers*

<u>Andrea Prichett</u>

53.     Andrea Prichett is a middle-school United States history teacher in Berkeley, California. Her school takes pride in its efforts to combat racism and create a welcoming environment for all students, and aims to prepare them for culturally diverse environments and to understand their own cultural histories so that they can better understand other people's.

54.     In teaching U.S. history, Ms. Prichett includes discussions of the thirteen original American Colonies, the actions of Christopher Columbus, colonialism, and the process by which people from one place arrive in another and take over other people's land. Ms. Prichett has explained to her students that this framework can be applied to Puerto Rico, India, Alaska, and Palestine.

55.     Ms. Prichett's approach to teaching U.S. history is consistent with how teachers are expected to provide a framework whereby students learn to analyze what is being taught and to arrive at their own conclusions.

56.     Ms. Prichett also sponsors the culture fair, which is part of the eighth-grade history curriculum about race and culture. As part of the fair, Ms. Prichett encourages students to understand the cultural influences that shape their identities.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

57.    The skills developed through participation in this project are part of California's research and oral history standards which, for example, require students to analyze the aspirations and ideals of the people of the new nation of the United States, including territorial expansion.

58.    Ms. Prichett has many students of Palestinian origin, as well as from other Arab countries.  As part of a class project, many of these students—just like their classmates who are not from Arab backgrounds--interview their parents and do research around events that impacted the migration of their families.

59.     This project often gives rise to conversations about settlement, colonization, and genocide, including in Palestine.

60.    Many of Ms. Prichett's students are directly impacted by events in the Middle East because they have family there.

61.    Ms. Prichett has been an activist in the movement for justice in Palestine for many years.  She has traveled to Palestine twice and witnessed the Israeli system of segregation imposed on the West Bank, and how Israeli settlers steal Palestinian land and threaten Palestinians' lives on a daily basis.

62.    She is aware that Palestinian citizens of Israel do not have equal rights to travel, build homes, and access legal protections as Jewish citizens, and that Palestinians in the West Bank and Gaza under Israeli occupation have very limited rights.

63.    Her passion for this issue has led her to be active in the community, including by urging the city council to support a ceasefire resolution.  She feels compelled to raise her voice in support of Palestinian human and civil rights and to oppose the crushing occupation.

64.    Ms. Prichett helped to create the "Watermelon Society" at her school, a lunchtime club for students who need a safe space to talk about their feelings regarding Israel and Palestine, learn factual information about history and current events, and share cultural traditions.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

65.     The school's principal told her that some parents were uncomfortable with the creation of the club–even before its first meeting–and to avoid using words like "genocide" and "colonization." Ms. Prichett explained that those concepts are integral to the U.S. History curriculum as well as the Watermelon Society's purpose.

66.     Ms. Prichett believes that the pro-Israel community has targeted her with unfounded complaints because of her activism.

67.     Ms. Prichett has had two complaints raised about her–the only complaints she has ever received in her career–including once when a student raised Israel and Palestine as examples of modern-day colonialism. She stated that there are Israeli settlements in Palestine, which is an indicator of colonization.

68.     A parent of a student in the class filed a complaint accusing Ms. Prichett of teaching a one-sided, biased narrative on Israel-Palestine. Another complaint was made by a student who was not present during class when Israel and Palestine were discussed. Ms. Prichett does not know anything beyond that about the complaint.

69.     After a months-long investigation, in which Ms. Prichett's students were interviewed by a civil rights investigator, the allegations were deemed meritless. This was unsurprising to Ms. Prichett, because she makes a point of teaching appropriately and respectfully of all parties regardless of her political opinions.

70.     In Ms. Prichett's view, the fact that these complaints are made and investigated because teachers provide their students with historical facts has the effect of silencing other teachers; no one wants to endure the stress of an investigation, so many simply avoid discussing these subjects in class.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

71.     A civil rights complaint was also launched by the Louis D. Brandeis Center for Human Rights Under Law (Brandeis Center) and the Anti-Defamation League (ADL) against the school where Ms. Prichett teaches.

72.     The complaint was based on the allegation that the district failed to adequately stem antisemitism as demonstrated by the personnel complaints against Ms. Prichett and at least one other teacher.  This resulted in the superintendent being hauled to Washington, D.C. to answer questions about alleged antisemitism.

73.     Ms. Prichett says, "[o]ur district takes a lot of pride in teaching diversity and the ills of racism.  It was a slap in the face to have our district and superintendent hauled before Congress to answer to charges such as those filed by the Brandeis Center and ADL."

74.     This unprecedented event contributed to the chilling effect on teachers and students.

Jonah Olson

75.     Mr. Olson teaches seventh grade science at a public school in Adelanto, California.

76.     Mr. Olson is Jewish, but not Zionist.  He distinguishes between the two concepts and believes that Zionism is a political ideology based on the idea that Jews are superior to non-Jews, and that they have a right to a majority in a land that was inhabited primarily by Palestinians for hundreds of years and to occupy Palestine in order to preserve that majority.

77.     As someone who has been active in the movement for Palestinian freedom, Mr. Olson is keenly aware of the ways in which pro-Israel individuals have perceived any call for Palestinian freedom as antisemitic.

78.     The seventh-grade curriculum in California includes a science fair where students develop their own projects based on real-world problems and try to solve them using the scientific method. Each student is required to discuss why they selected a particular question.  Often, research questions are inspired by topics students have seen on social media.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

79.     One of Mr. Olson's current students is working on a science project designed to preserve food in war-torn areas, a subject she chose after seeing images of moldy food delivered to hungry Palestinians in Gaza.

80.     Last year, another student chose to work on distilling water after seeing social media posts about a Palestinian woman in Gaza being forced to distill her own water for lack of access to clean water during the war.

Dunia Hassan

81.     Ms. Hassan, a High School Spanish teacher in Santa Clara County, was born and raised in Spain to a Spanish mother and a Palestinian father.

82.     Ms. Hassan's father ended up in Spain because her father was driven out of Haifa, Palestine in 1948 when Israeli Haganah forces occupied his village, destroyed its homes and agriculture, and demolished what remained.

83.     Like many other children of Nakba survivors, Ms. Hassan has been impacted by her family history of lost lives and land, and their experiences as refugees.

84.     As a child, Ms. Hassan grew up hearing stories of her father's life in a refugee camp where two of his sisters died as young children.  Ms. Hassan's father's life changed when the United Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) brought shoes and schools to the refugee camp where he lived.

85.     Ms. Hassan's background and knowledge of her family's experiences have helped her to become a better educator.  She has learned to practice empathy and have compassion for students who struggle to get to school, whose families face fear in this country or their country of origin, and who feel they do not belong because of their identities.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

86.    Following the October 2023 Hamas attack on Israel, Ms. Hassan's students began seeing horrific images of violence and destruction in Gaza and the West Bank. At the same time, a significant pro-Israel bias infiltrated her school district.

87.    As an advisor to the Muslim Students Association (MSA), Ms. Hassan supported and advised students when they organized activities, including bringing a Palestinian to speak to students about life in the occupied territories of Palestine.

88.    Although the speaker was to limit his remarks to his personal journey as a Palestinian refugee, Israeli community members complained, speculating that the speaker would portray Israel negatively. His very existence was perceived as a threat to pro-Israel parents. The event was thereby postponed.

89.    When the event finally took place, students were respectful and engaged.

90.    Shortly after that, the Jewish Culture Club invited a former Israeli Defense Forces ("IDF") soldier to speak at the school. This soldier had stated on social media (referring to Gaza), that "every school, mosque, hospital, kindergarten –all– without exception is a terror camp."

91.    Although the event ended up being canceled, the statement prompted discussions with students, many of whom found the statements dehumanizing. Ms. Hassan believes that one reason AB 715 was enacted was to prevent these kinds of discussions from occurring in classrooms. She has seen how Palestinians discussing their experiences has been deemed "antisemitism."

92.    Every year, Ms. Hassan's Advanced Placement ("AP") Spanish course explores how identity shapes us, with an emphasis on the experiences of Spanish speakers. Students particularly enjoy this unit, which addresses concepts such as alienation, assimilation, and ethnic and national studies.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

93.     As part of this project, students prepare a presentation under the prompt "My Name, My Identity." Students discuss their families, countries they left behind, new languages they struggle to learn, and the experience of being singled out because of appearance, clothes, or accent.

Kauser Adenwala

94.     Ms. Adenwala is a public high school teacher in California. She currently teaches Honor Civics, Honors Economics, and Financial Literacy to students who are dually enrolled in high school and community college. In the past, she has taught U.S. History, World History, and AP European History.

95.     Ms. Adenwala is a Muslim woman who wears a hijab as an expression of her faith, identity and commitment to living with integrity and compassion. The genocide in Palestine has impacted her deeply on a personal level as a painful reminder of the suffering and injustice that persist in our world.

96.     Despite her feelings, Ms. Adenwala is committed to upholding professional standards and adhering to the district's adopted curriculum. Her role as an educator is, in her view, not to impose beliefs, but to cultivate critical thought, understanding, and empathy.

97.     She also believes that education should not be separate from reality; current events often provide opportunities to help students understand human suffering and injustice more broadly. Ms. Adenwala strives to guide discussions around these issues with sensitivity, balance, and intellectual honesty, helping students to process complex issues and to understand the broader historical and moral contexts behind them.

98.     In December of 2023, Ms. Adenwala assigned a project to her World History class designed to raise awareness about modern human rights violations. Students had been asking questions about Palestine, so she addressed the situation there as an example of modern human rights violations.

99.     The standards governing California public schools include teaching about "the significance and effects of the location and establishment of Israel on world affairs."  Further framework for this standard states that students should learn about the competing interests involved in the creation of Israel.

100.     In March of 2024, a student Ms. Adenwala did not know filed a complaint against her, alleging that she had used images and text in a slide deck that were "horrifying" and constituted religious and/or ethnic discrimination.  The slide deck included an image of the apartheid wall Israel built in the West Bank to segregate Palestinians from Jewish settlers.

101.     The investigation concluded in June of 2024, finding that there was insufficient evidence of unlawful discrimination, but that Ms. Adenwala had violated a requirement to teach diverse perspectives on controversial current events.  Ms. Adenwala has no issue with offering diverse perspectives, but she is concerned with the omission of certain perspectives.

102.     Following introduction of AB 715 at the beginning of 2025, there was increased anxiety about false allegations of antisemitism among public educators.  Ms. Adenwala believes that has impacted how complaints against her have been handled and the district felt pressure to appease a parent group that was unhappy she had not been fired.  The district provided antisemitism training, which left teachers confused.  For example, a question was posed about whether a teacher criticizing Israel would constitute discrimination, and the answer was that "it depends."  This vague standard leaves teachers unsure what could subject them to discipline, incentivizing them to avoid the topic entirely for fear of backlash.

103.     Another complaint was made against Ms. Adenwala in September of 2024.  During a lesson about the Holocaust, Ms. Adenwala played a short video of an 87-year-old Holocaust survivor protesting Israel's actions in Gaza, saying that she was inspired by her Jewish ancestry to engage in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

this activism.  The point of the video was that Jewish people should not be held accountable for Israel's actions, just as Muslims should not be held responsible for the actions of Muslim countries.

104.    The complaint accused Ms. Adenwala of blaming all Jews for what was happening in Gaza, which shocked her, because that was precisely the opposite of the point she sought to make. The complaint was not sustained.

105.    In April of 2025, two staunchly pro-Israel groups, StandWithUS and Bay Area Jewish Coalition, filed a Title VI complaint against the school district for failing to adequately combat antisemitism.  The video that Ms. Adenwala showed to the class was mentioned as an example.  The complaint described it as "horrifically equat[ing] the Holocaust to the events in Gaza in 2024 and called it "blood libel-type messaging."

106.    This resulted in yet another investigation into showing of the video.  After multiple investigative meetings with the district's attorneys, Ms. Adenwala grew frustrated with apparently never-ending tactics to force her to quit, and in fact considered leaving teaching entirely.  Although ultimately the investigation concluded that Ms. Adenwala had caused no harm to students, she was found to have violated multiple board policies because the video "promote[d] a discriminatory bias toward Jewish students."

107.    StandWithUs took credit for the outcome, putting a post on Facebook with the headline: "Advocacy Win!  School District Reprimands Teacher Following StandWithUS Complaint."

Los Angeles Students for Justice in Palestine (LA EJP)

108.    LA EJP is a professionally and ethnically diverse group of around 100 teachers, academic counselors, school psychologists, and other individuals who hold out-of-classroom positions in school districts across Los Angeles.  There are many Jewish members of LA EJP.

109.    LA EJP's mission is to unify educators in the region to defend their academic freedom, raise awareness about Palestine, and educate the public about ongoing human rights violations in

Gaza.  LA EJP is committed to ensuring that educators are protected from retaliation for exercising their rights to academic freedom and free speech.

110.    Many LA EJP members have been targeted for these efforts, and for teaching various curricula in English and Social Sciences that discuss Palestinian culture, Middle East history, and the factual events surrounding the 1948 creation of the state of Israel and the ongoing UN-recognized genocide in Gaza.

111.    That is particularly so for history and ethnic studies teachers, who engage in critical dialogue around genocide and colonialism across the world, including Israel.  For educators who teach historical times as an ongoing axis rather than a chronological timeline, the genocide in Palestine and modern histories of apartheid are windows into the legacy of colonial projects that contribute to the ongoing equalities and histories of oppression.

112.    As one example of many, LA EJP member Ron Gochez is an ethnic studies educator within the Los Angeles Unified School District (LAUSD).   In 2023, a coworker accused him of antisemitism for attending a protest against Israel's actions in Gaza.  That co-worker filed additional complaints accusing Gochez of antisemitism for teaching students about Palestine, and taking students to protests in his car.

113.    Ultimately, Gochez was vindicated—the investigators found that he did not take any students to protests and did not violate any district policies.  However, his students were negatively affected because they lost over a week of instruction.

114.    Gochez was also doxxed multiple times by a coworker and another LAUSD employee. He received more than 100 hate calls and death threats via email, social media messages, and through regular mail.

115.    Other LA EJP members have had personal information about them and their families posted online.  Administrators of their schools have received threats directed at specific educators

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

from anonymous callers, and they have experienced different forms of doxxing on local, state, and national levels, up to and including death threats.

116.    In LA EJP's experience, over the past two years, Public Record Act (PRA) requests to school districts have been weaponized by non-education groups such as the pro-Israel StandWithUs to demand that Ethnic Studies teachers across the state hand over any lesson plans or materials that use certain words, including "Palestine," "Palestinians," "Islam," "Nakba," and "Zionism."[3]  Lupe Cardona, an ethnic studies teacher, has been the target of such requests, as well as doxxing efforts by pro-Israel individuals that have left her frightened.

117.    LAUSD has complied with these legal requests, leading educators who are targets to fear disciplinary action from administrators and district supervisors.

*B. Students*
    Abdulrahman Jarrar, on behalf of J.J.

118.    J.J. is a 16-year-old high school student in Granite Bay, California.

119.    Both of her parents are Palestinian, and her ethnic background is central to her identity.  As a Palestinian, she is aware that her mere existence is considered antisemitic or offensive to some, because it requires an acknowledgment that Palestinians lived in what is now Israel before creation of the modern state, and recognition that her ancestors were expelled against their will to create a Jewish majority state.

120.    J.J. strives to be well-educated on politics, especially those relating to populations that have been the subject of discrimination, including Palestinians.  She wears a Palestine flag pin and presents herself as open to talking about Palestine and sharing sources of information.

---

[3] StandWithUS identifies itself as the "Israel Emergency Alliance dba StandWithUs" an international and non-partisan Israel education organization.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

121.    Her schoolmates approach her to discuss the matter, because they are interested in her unique perspective as a Palestinian, and because they do not hear from Palestinians in mainstream media. She has had conversations with pro-Israel students and is happy that through these discussions, they are able to reach common ground.

122.    J.J. is enrolled in the International Baccalaureate ("IB") program, in which students are required to learn about other cultures and new ideas, to become more open-minded and contribute to greater academic thought.

123.    J.J. also takes a speech and debate class, which is both a class and an extracurricular activity. She is the only Palestinian student in the class.

124.    Students prepare speeches to be given at competitions outside of school, and they are encouraged to select controversial topics to demonstrate their ability to take a stance on a specific issue. Past topics have included rape, racism, gun control, and modern-day slavery.

125.    This class allows students to engage in meaningful discussions without having to worry about getting in trouble.

126.    Last year, J.J. competed in speech at a national level. She has chosen topics relating to Palestine for multiple competitions. This year, she chose the dehumanization of Palestinians and other non-white groups. In discussing this topic, she addressed the history of Palestine, suffering of the Palestinian people, colonization, and Israel as a colony on the land of Palestine.

127.    In her AP World History course, J.J.'s teacher screened a documentary about the creation of Israel, including how the country was created on a land inhabited by other people, and that the United Kingdom ("UK") gave the land away without the consent of the Palestinians living there.

128.    In English class, J.J. is reading *The Great Gatsby*–an American classic that has been taught in high school for decades. The novel addresses important topics such as the struggle between rich and poor, capitalism, and the moral decay of society.

129.    There is a Jewish character in the novel who engages in unethical behavior.  In class, students discussed whether the character is depicted as a stereotype and whether the author had antisemitic intent when he wrote the novel.

Linda Khoury-Umili, on behalf of Y.U. and L.U.

130.    Ms. Khoury-Umili is a Palestinian-American mother of two children, 7-year-old Y.U., who currently attends public elementary school in San Mateo country and L. U., who is 4 years old and will begin Kindergarten next year at the same school as his sister.

131.    Growing up Palestinian-American, Ms. Khoury-Umili always felt hesitant and uncomfortable discussing her Palestinian ancestry, since her a homeland did not even appear on maps used in school.

132.    She also encountered feelings of marginalization, especially after the September 11, 2001, attacks on the Twin Towers in New York City, because she realized many of her classmates and teachers saw all of the Middle East as a blur of sand and terrorists, and wondered if they felt that way about her.

133.    She had been hopeful that ethnic studies courses would change things for her children.

134.    In fact, Arab heritage month was included in the list of holidays observed as part of an effort to expand ethnic studies.

135.    For Arab heritage month, Ms. Khoury-Umili did a presentation for her daughter's class that included wearing traditional Palestinian attire, serving traditional Palestinian food, and teaching the children Debkeh, a traditional Levantine folk dance.  The students and teacher loved the presentation, and they all even ended up dancing at the end.

Alice Finen, on behalf of G. F.

136.    Alice Finen is the mother of G.F., a tenth grader at a public charter school in Arcata, California.  Her good friend has children of Palestinian origin.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

137.     Before graduating high school this past May, Ms. Finen's daughter Madison delivered a presentation in her class about the apartheid regime in the West Bank of Palestine.  The presentation was received negatively by the teacher and school secretary, who apparently held different views on the subject of Israel and Palestine.

138.     In Ms. Finen's experience, textbooks in California schools already have a pro-Israel bias and do not discuss the region prior to 1948, when the modern state of Israel was created.

139.     Recently, her son's friend was shown a speech in class by Israel's Prime Minister Benjamin Netanyahu, while no voice was given to the opposing Palestinian perspective.  When Ms. Finen and the friend's parents discussed their concerns with the teacher, she appeared not to recognize that Palestine was a distinct entity from Israel, as she responded only that she would be teaching about Israel in the spring.

140.     Last year, at her daughter's high school graduation, Ms. Finen and her daughter were part of a group who wore keffiyehs, a symbol of support for Palestinians.

141.     The next day, the school principal called her to say that the police department had received a report of protestors disrupting the graduation ceremony, which shocked her because no such disruption had occurred.  The group had peacefully and lawfully exercised their right to show solidarity with the Palestinian people during a genocide.

142.     G.F. would like to learn about the Palestinian-Israeli conflict from not only the Israeli perspective, but the Palestinian one as well.  He would like to give presentations along the lines of the one his sister gave last year.

### III.     AB 715'S CHILLING EFFECT ON PLAINTIFFS

#### A.    *Teacher Plaintiffs*

143.     AB 715 will severely curtail Teacher Plaintiffs' ability to teach their students.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

144.    Teacher Plaintiffs have no way of knowing what they may and may not say under AB 715.  For example, Ms. Prichett is under the impression that, since AB 715 instructs schools and teachers to adhere to Biden's National Strategy, anti-Israel sentiment is now considered antisemitism, although she also finds the law confusing because it does not explicitly define the term and prohibitions entailed by the new law.

145.    Given what she has endured, Ms. Prichett will be reluctant in the future to teach about Israel and Palestine once AB 715 is officially in effect.  Likewise, based on her past experiences, Ms. Adenwala believes that the new law is an attempt to expand the tactics used against her to more teachers, so as to entirely censor conversation about Israel, Palestine and Gaza.

146.    Ms. Prichett also does not know what to make of the requirement that she teach only "factually accurate" information.  For example, Palestinian citizens of Israel do not have equal rights as Jewish citizens, and Palestinians in the West Bank have almost no rights at all under Israeli occupation.  The international consensus is that Israel is illegally occupying Palestine.  That is factually accurate, but also could be deemed antisemitic under AB 715, as illustrated by her previous experiences fielding complaints for saying similar things.

147.    As another example, most international human rights organizations have concluded that Israel is committing genocide in Gaza, but because some pro-Israel Jewish individuals find that offensive and antisemitic, Ms. Prichett does not know how to square the two requirements (factually accurate and AB 715's expanded scope of what can be deemed antisemitism).

148.    In her own words, "unless I create an exception to the use of standard definitions or simply abandon the topic completely, I will be at risk under the new law AB 715."

149.    She further observes that: "An exception to how Israel, Palestine, and the Middle East are taught, for fear of offending pro-Israel students, parents, and community members, would damage

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

teacher credibility because the analytical framework applied to all other subjects would be disregarded for this specific one."

150.     Ms. Prichett explains that this will make her less effective as a teacher, because when students sense that their teachers are not being honest, they lose respect for them and start disregarding everything they say.

151.     Because teachers do not know exactly what AB 715 prohibits but believe it will subject them to discipline for discussions in the classroom that are critical of Israel and Zionism, Teacher Plaintiffs explain that they will not be able to assign historically required projects to students.

152.     For example, Ms. Hassan is not sure if she will have students do the "My Name, My Identity" presentation that she has assigned in the past.

153.     Under AB 715, Palestinian students' participation in this activity could be considered antisemitic discrimination, since it often involves discussing how the creation of Israel has harmed Palestinians and deprived them of their rights to self-determination.

154.     Additionally, Ms. Hassan finds that students often ask questions based on Spanish-language news they have listened to, including on Israel, Palestine, and Gaza.  Though Ms. Hassan believes it is valuable for students to hear her perspective, her honest responses to their questions could expose her to discipline under AB 715.

155.     Similarly, Mr. Olson's ability to perform his job as a teacher will be negatively impacted by AB 715's enactment.  Often, science projects such as those discussed above–for instance the students who designed science experiments revolving around food preservation and water distillation–are prompted when students ask questions about current events, including Palestine and Gaza.  But under AB 715, Mr. Olson will be afraid to allow discussion of these topics because it could be deemed antisemitic by pro-Israel individuals.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

156.    Teaching in a rural, largely Christian community, students often ask Mr. Olson what it means to be Jewish, and Mr. Olson responds that his Judaism does not include support for the State of Israel.  Mr. Olson believes that under AB 715, he might be in violation of the law for answering this question in the manner to which he is accustomed.

157.    LA EJP is convinced that the law will prevent student inquiry about historical events that lead to critical classroom discussions about the Israeli government's actions, and chill honest classroom conversations about Palestinian and Arab history and cultures.

158.    The fact that *anyone* can allege antisemitism in a complaint filed under AB 715, reporting educators to an "Antisemitism Prevention Coordinator" also means that, in the views of Teacher Plaintiffs, AB 715 provides individuals and organizations who seek to silence negative discussion of Israel with more tools to misuse the public school system for their political purposes— as evidenced by the complaint initiated by StandWithUs after AB 715 was introduced.

159.    In the words of LA EJP, "[t]his law will violate the academic freedom of educators across the state and spread fear of job loss, the loss of the protected right to teach an age-appropriate curriculum, and embolden those who threaten violent retaliation against educators and their families."

160.    And AB 715 has implications outside of the classroom, since it applies to professional development materials and training, too.

161.    Ms. Prichett has expressed concern that the new law will discourage teachers from offering or participating in such trainings for similar reasons discussed in the context of classrooms: factual accuracy and "antisemitic discrimination" under AB 715 may be at odds with each other. Likewise, Ms. Adenwala found that following a prior training, that likely was conducted due to the legislature's introduction of AB 715, teachers were left confused because they were told only "it depends" whether they could be disciplined for unlawful discrimination for criticizing Israel.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

162.    In short, AB 715 will negatively impact Teacher Plaintiffs' ability to perform their jobs as educators, which includes candidly answering students' questions about their backgrounds and perspectives, allowing students to share their own backgrounds and experiences, and permitting free and open discussion on topics including colonization, systemic oppression, Israel, Palestine, allegations of genocide against the Palestinians of Gaza, and the political influence of pro-Israel organizations.

163.    As Ms. Prichett explains, given what happened to her in the absence of AB 715, "I have almost no doubt that I would be a target under the new law."

164.    Ms. Adenwala believes she was found to have engaged in unlawful discrimination for showing her class a video of a Holocaust survivor condemning Israel's actions though an earlier complaint made on the same basis had been dismissed. Because AB 715 had been introduced in the state legislature when the complaint was made for a second time, the district felt more pressure to appease the parents who complained. In fact, StandWithUS—the group that took credit for getting her disciplined—advocated for passage of AB 715. Had AB 715 been in effect and not only introduced in the legislature, Ms. Adenwala believes she would have been disciplined yet more harshly.

165.    Likewise, LA EJP members, based on, *inter alia*, their past experiences fielding complaints regarding their teachings on Israel and Palestine, view AB 715 as part of a larger effort to silence honest discussions on the topic and censor academic discussion of Palestine in a democratic atmosphere of open inquiry.

166.    Members like Ms. Cardona and Mr. Gochez who have already been the subject of doxxing, complaints, and records act requests fear that AB 715 will be yet another tool weaponized against them for advocating for Palestinian human rights and teaching facts surrounding the circumstances of Israel's creation, the occupation of Palestine, and the genocide in Gaza.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

167.    LA EJP explains that educators are professionals who have been trained to facilitate difficult conversations with students. But the law will create an environment in which teachers (including Jewish teachers), are afraid to perform their professional responsibilities and students (including Jewish students) will fear engaging in dialogue with their peers—an essential component of civil life.  LA EJP members do not believe the new law will make anyone safer, including Jewish students and educators who have criticized AB 715 as inaccurately representing them as an exception to a monolith.

168.    Given what Ms. Adenwala has already endured, AB 715 has created a fearful environment for her (and other teachers).  She says that she has been "left with a profound sense of disillusionment," as AB 715 "deprives students of the chance to think critically by punishing teachers who simply attempt to address the complex questions their students bring forward."

B.  *Student Plaintiffs*

169.    J.J. believes that AB 715 will significantly impede the ability of both students and teachers to freely discuss Israel and Palestine.

170.    She states that students who are interested in politics and world affairs believe that AB 715 is designed to discourage conversation about Israel and Palestine because the law does not clearly state what antisemitism is.  Without a clear understanding, students will avoid discussions, including historical facts, that could be deemed antisemitic.

171.    J.J. also thinks that students will stop asking her questions about her Palestinian background and identity, and she and others will be uncomfortable freely answering questions on the subject, because they will fear legal action or other forms of retaliation.

172.    For example, the documentary she watched in AP World History depicted some negative aspects of Israel's creation, including the commensurate displacement of at least 700,000

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

Palestinians.  Knowing that a complaint could be launched and potentially substantiated under AB 715 means that many teachers will simply refrain from showing films like this.

173.    In J.J.'s words, AB 715's strictures will inhibit "meaningful discussions that are necessary to learn about different perspectives so that common ground can be reached."

174.    She also believes that AB 715 will lead schools to prohibit debates such as the ones she has participated in about Israel and Palestine, depriving her and her classmates of an important tool for learning.

175.    The deprivation of these experiences will harm her education.  J.J. considers the discussions she has had at school about Israel and Palestine to have played an important role in her intellectual development and education, especially because such open discussions allow students to better respect one another even when they do not agree.

176.    And in J.J.'s opinion, AB 715 will have impacts beyond discussions about Israel and Palestine.  It will allow for the censorship of lessons, books, films and events because some people find them offensive, meaning that even students who are not interested in politics will be deprived of valuable learning experiences.

177.    She refers to her experience reading *The Great Gatsby*, which could be found to expose students to antisemitic discrimination under AB 715 because it has a Jewish character who is depicted in a stereotypical manner.

178.    She also points to the writing of James Baldwin about growing up Black in America. His stereotypical portrayals of Black people might offend some, but discussing the stereotypes in his literature allows students to recognize the harm those stereotypes cause.  These writings, too, could be found to subject students to unlawful discrimination under AB 715's amendments, since the new law forbids teachers to use written materials in classrooms that include stereotypes about protected groups.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

179.    Ms. Khoury-Umili also believes that AB 715 will have a significant, negative impact on her children's education. For example, she will be worried about offering the presentation she gave to her daughter's class last year once the AB 715 amendments go into effect. Ms. Khoury-Umili believes that, through no fault of her own, a teacher would think twice about allowing such a presentation, since it could get her in trouble, as Palestinians are frequently accused of being antisemitic or offensive simply for being, since their existence naturally calls into question the idea that Israel was established in a land without people.

180.    In fact, Ms. Khoury-Umili is aware of two cases, one in Marin County and one in Santa Clara, in which a teacher and parent, respectively, were targeted for wearing Palestinian cultural attire.

181.    The parent's booth at the fair was vandalized by pro-Israel parents and the school administration took no action, while the teacher was targeted with a flurry of complaints.

182.    Given these circumstances, it is reasonable to assume that under AB 715, her children's teachers will be too afraid to permit such a presentation in class, which included Ms. Khoury-Umili wearing traditional Palestinian dress, for fear of receiving complaints and being disciplined.

183.    Furthermore, Ms. Khoury-Umili would be reluctant to submit her children to controversy in the classroom that would single them out from their peers.

184.    Ms. Finen believes that under AB 715, her son, G.F., would not be able to give a presentation like the one his sister gave last year, because it could be deemed critical of Israel and thereby hostile to Jewish students, subjecting the teacher to discipline.

185.    Ms. Khoury-Umili, Ms. Finen, and Mr. Olson are extremely concerned about the ways in which AB 715 will negatively affect their children's abilities to learn factual information about Israel and Palestine, to express their own views, and to ask questions and engage in free-flowing discussions with their teachers and other students, when teachers and students alike are afraid they will be

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

complained about, investigated, and possibly disciplined for discussions that could be perceived as antisemitic under the Biden National Strategy.

186.    Mr. Olson is also worried that the new law will negatively impact his young son's sense of identity.  He believes that his son should be able to express Jewish beliefs without support for Israel, but that AB 715 considers Jewish individuals a monolith who all endorse Israel's existence and its government's actions.  He does not want his son to be taught that being Jewish is synonymous with supporting Israel.

## IV.    RELEVANT HISTORY

187.    Prior to 1948, the area that now includes Israel, the West Bank, and Gaza, was known as Palestine.  *See Israel and the Palestinians: History of the conflict explained*, BBC (Oct. 14, 2025), https://www.bbc.com/news/articles/ckgr71z0jp4o (last visited Oct. 24, 2025).

188.    Prior to 1948, the inhabitants of the land were primarily Christian and Muslim Palestinian Arabs.  A Jewish minority had also long inhabited the region, which fell under British rule after the Ottoman reign ended in 1917. *Id.*

189.    As a result of increasing antisemitism, European Jews began immigrating to Palestine in significant numbers in the 1920's, with ever more fleeing in the 1940's due to the murder of six million Jews during the Holocaust.  *Id.*

190.    In 1947, in light of growing violence between the Jewish immigrants and Palestinian Arab populations, the United Nations ("UN") proposed a partition plan:  an independent Arab state, an independent Jewish state, and the City of Jerusalem (under an international trustee).  *Id.*

191.    All Arab nations, and the Palestinians, opposed this plan because it gave Jewish inhabitants more land despite having a substantially smaller population.  *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

192.    In May 1948, the British withdrew, and Israel declared statehood, leading to war with its neighboring Arab nations. *Id.*

193.    Egypt was left occupying the Gaza Strip, while Jordan took control of the West Bank and East Jerusalem. *Id.* Altogether, these areas are currently home to about 5 million Palestinians. *Id.*

194.    The fledgling Israeli army and paramilitary groups expelled over 700,000 Palestinians from what is now Israel in 1948 (the exact number is unknown but is estimated to be this or a greater number).

195.    Militarized forces massacred people, destroyed their villages, and poisoned their wells to keep Palestinians from returning.

196.    The surviving Palestinians lost their homes forever and became refugees in Gaza, the West Bank, and adjacent Arab countries, including Jordan, Syria and Lebanon. *Id.*

197.    Palestinians call the violent dispossession and displacement that occurred on May 15, 1948, the "Nakba," which means "catastrophe" in Arabic, while Israel celebrates that date as its day of independence.

198.    In the midst of increasing tension with its neighbor, Egypt, Israel staged a preemptive strike that destroyed Egypt's air-force, which set off the 1967 six-day war. *Id.*

199.    Within days, Israel had captured the Sinai Peninsula, Gaza, the West Bank, the Golan Heights, and East Jerusalem. *Id.*

200.    Israel continues to occupy these areas. *Id.* While the Palestinian Authority runs day-to-day operations in most of the towns and cities in the West Bank, Israel maintains overall control. *Id.*

201.    About 700,000 Jewish people live in settlements in the West Bank and East Jerusalem. *Id.* These settlements are considered illegal under international law, but the Israeli government disputes this characterization and claims that the West Bank belongs to Israel. *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

202.    Many human rights organizations, including Amnesty International, Human Rights Watch, and several Israeli organizations, consider the system in the West Bank to meet the legal definition of apartheid, since "Israeli authorities maintain a two-tiered legal system: methodologically privileging Israelis, who have the same rights and privileges wherever they live, while repressing Palestinians to varying degrees wherever they live." Lama Fakih and Omar Shakir, *Does Israel's treatment of Palestinians rise to the level of apartheid?* LOS ANGELES TIMES (Dec. 5, 2023), https://tinyurl.com/3vk7pyhz (last visited Oct. 28, 2025).

203.    One feature of this system is that Israel may demolish the homes of Palestinians arbitrarily, for any or no reason.  *Id.*

204.    Another such feature is that Palestinians (but not Jewish Israelis) may be held in administrative detention indefinitely without charge and without having committed an offense on the grounds that they may break the law in the future.  *See Administrative Detention*, B'TSELEM, https://www.btselem.org/administrative_detention (last visited Oct. 28, 2025).

205.    At the end of last year, Israeli Prison Services ("IPS") was holding 3,327 Palestinians in administrative detention, including 112 minors.  *See Statistics on administrative detention in the Occupied Territories*, B'TSELEM, (Mar. 3, 2025), https://www.btselem.org/administrative_detention (last visited Oct. 28, 2025).

206.    While Israel physically withdrew from Gaza territory in 2005, it maintains control of the borders, airspace, and sea, giving it near total power over the movement of people and goods.  *See Israel and the Palestinians*, BBC, https://www.bbc.com/news/articles/ckgr71z0jp4o.

207.    Even before October 7, 2023, Gaza had one of the highest unemployment rates in the world and many people lived below the poverty line.  *Id.*

208.    In January of 2006, during the last election held in Gaza, Hamas gained a significant majority of seats and came to govern the territory.  *Id.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

209.     Since withdrawing from Gaza in 2005, Israel has engaged in numerous military assaults on the blockaded enclave, including in 2008, 2012, and 2014; every time, the vast majority of casualties were Palestinians. *Id.*

210.     The year 2023 was the deadliest year on record for Palestinian children, with at least 38 children in the West Bank and 6 in Gaza killed by Israeli forces from January 1 to September 18, 2023. *See 2023 Marks Deadliest Year on Record for Children in the Occupied West Bank*, SAVE THE CHILDREN (Sept 18, 2023), https://www.savethechildren.net/news/2023-marks-deadliest-year-record-children-occupied-west-bank (last visited Nov. 2, 2025) (explaining that 2023 was the second year in a row designated deadliest for Palestinian children, indicating that violence by Israel against Palestinian children is escalating).

211.     On October 7, 2023, Hamas launched an attack across the border from the Gaza Strip, resulting in the deaths of around 1,200 Israelis, including nearly 300 soldiers and 900 civilians, as well as the taking of around 250 Israelis hostage. *Id.*

212.     In response, Israel declared a state of war and launched a massive military operation in Gaza that has continued for more than two years.

213.     At least 70,000 Palestinians, mostly civilians, have been killed to date, although that number is almost certainly a significant undercount since it is derived from recovered bodies, and there are countless bodies trapped beneath the rubble. *See* United Nations Office for the Coordination of Humanitarian Affairs, *Humanitarian Situation Update #329*: *Gaza Strip*, UNITED NATIONS OFFICE FOR COORDINATED HUMANITARIAN AFFAIRS (Oct. 9, 2025), https://tinyurl.com/2hkbsayb (last visited Oct. 21, 2025); Seham Tantesh and William Christou, *My Heart Is Broken: Palestinians Begin Searching the Gaza Rubble for Their Dead*, THE GUARDIAN (Oct. 12, 2025), https://tinyurl.com/5n746ehb (last visited Oct. 21, 2025).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

214.    Israel's actions in retaliation for October 7, 2023, have been categorized as a genocide by many human rights organizations and scholars, including the United Nations Special Committee, the International Association of Genocide Scholars, Amnesty International, and Israeli human rights organizations B'Tselem and Physicians for Human Rights Israel.  Other groups object to this label.  *See Gaza Genocide*, WIKIPEDIA, https://en.wikipedia.org/wiki/Gaza_genocide (last visited Oct. 24, 2025); *Israel/OPT: Israeli organizations conclude Israel committing genocide against Palestinians in Gaza in another milestone for accountability efforts*, AMNESTY INTERNATIONAL (Jul. 28, 2025), https://tinyurl.com/yy5bpbuf (last visited Oct. 24, 2025).

215.    In December of 2023, South Africa brought a case in the International Court of Justice ("ICJ"), accusing Israel of committing genocide against the Palestinians of Gaza.  The ICJ ruled that the allegation is plausible and allowed the case to move forward on that basis.  *Id.*

216.    On October 10, 2025, Israel and Hamas reached a ceasefire agreement, and in accordance with its terms, Hamas returned all living hostages to Israel.  *See* Cachella Smith, *Israel launches strikes on Gaza after Netanyahu orders 'powerful' attacks*, BBC (Oct. 28, 2025), https://www.bbc.com/news/live/c891ex72nj7t (last visited Oct. 29, 2025).

217.    Just weeks later, on October 28, 2025, Israel carried out a heavy airstrike on Gaza in alleged retaliation for mishandling of body parts of a deceased hostage.  The strikes killed 104 people, including 46 children.  *Id.*

## CONSTITUTIONAL PRINCIPLES

### I.    DUE PROCESS OF LAW AND VOID-FOR-VAGUENESS DOCTRINE

218.    Due Process of law requires clear definitions of legal prohibitions.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

219.    Vague laws may trap the innocent by failing to provide adequate warning, and lead to arbitrary and discriminatory enforcement, resulting in delegations of basic policy to police officers, judges and juries. *Id.* at 109.

220.    A law is unconstitutionally vague if it "does not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108-09.

221.    Vague laws are of particular concern in the First Amendment context because they "operate to inhibit the exercise of" the freedoms safeguarded by it. *Id. See also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (explaining that when First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles); *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of specificity and clarity is required when First Amendment rights are at stake.").

222.    Where a statute "clearly implicates free speech rights," a facial vagueness challenge is appropriate, and a court may deem a law unconstitutionally vague. *Cal Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). *See also Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (explaining that a facial attack based on vagueness is proper if the challenged statute "is directed narrowly and specifically at expression or conduct commonly associated with expression.").

223.    In the vagueness inquiry, the requirement that laws be precise is aimed at preventing "chill," wherein rather than risk sanctions, individuals will steer far wider than necessary to avoid engaging in prohibited speech. *Hunt v. City of Los Angeles*, 601 F.Supp.2d 1158, 1169 (C.D. Cal 2009). *See  FCC v. Fox T.V. Stations Inc.*, 567 U.S. 239, 253-54 (2012) (explaining that the void-for-vagueness doctrine is designed to ensure that  regulated parties know what is required of them so they may act accordingly and that those enforcing the law do not act in an arbitrary or discriminatory way; "When

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.").

224.    In order to succeed on such a challenge, a plaintiff must demonstrate that the challenged statute regulates and potentially chills speech which, in the absence of any regulation, receives some First Amendment protection.  *Fox T.V.*, 567 U.S. at 253-54.

## II.    THE FIRST AMENDMENT RIGHT TO FREE SPEECH

### A.  *Viewpoint Discrimination*

225.    The First Amendment, incorporated against the States through the Fourteenth Amendment, prohibits the government from making laws that punish people for expressing certain viewpoints.  *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").  *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.").

226.    "The First Amendment gives freedom of mind the same security as freedom of conscience … . And the rights of free speech and a free press are not confined to any field of human interest."  *Thomas v. Collins*, 323 U.S. 516, 531 (1945).

227.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein."  *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

228.    On these grounds, the government may not discriminate against speech based on the ideas or opinions it conveys.  *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995).

229.    The essence of viewpoint discrimination is when a law "[r]eflects the [g]overnment's disapproval of a subset of messages it finds offensive[.]" *Matal v. Tam*, 582 U.S. 218, 221 (2017).

230.    Viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional."  *See Rosenberger*, 515 U.S. at 829-30.

231.    The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follow ineluctably from the sender's First Amendment right to send them." *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982). *See also id.* ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring)).

232.    As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

233.    The First Amendment safeguards minority perspectives, which are the views most in need of protection.  *See Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.").

234.    "The First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton*, 597 U.S. 507 (2022) (quoting *Tinker v. Des Moines Independent Community School Dist.*,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

393 U.S. 503, 506 (1969)).  *See also Keyshian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die.").

235.    While courts have restricted the rights of public school teachers when it comes to choosing curricula, *see, e.g., Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 478-80 (7th Cir. 2007), *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1014-17 (9th Cir. 2000) (describing its own decision as "narrow"), our courts do not tolerate a state government enacting laws designed to favor certain viewpoints and exclude others in public schools.  *See Epperson v. Arkansas*, 393 U.S. 97, 104-05 (1968) (holding that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom") (quoting *Keyshian*, 385 U.S. at 603).

236.    In fact, the Ninth Circuit has explicitly recognized that teachers' instructional speech is entitled to some degree of First Amendment protection, as teachers must be "given leeway to challenge students to foster critical thinking skills and develop their analytical abilities.  This balance is hard to achieve, and we must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." *C.F. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 988 (9th Cir. 2011).  *See also Cal. Teacher's Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1148 (9th Cir. 2001) (assuming that, under *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) a teacher's instructional speech receives some First Amendment protection); *Sheldon v. Dhillon*, 2009 US Dist. LEXIS 110275 (N.D. Ca. 2009) ("The Ninth Circuit has previously recognized that teachers have First Amendment rights regarding their classroom speech, albeit without defining the precise contours of those rights.").

237.    Importantly, our courts recognize that *students* have First Amendment rights both to express and receive different viewpoints, derived from the right to receive information as a corollary

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

to the right to speak.  *See Arce v. Douglas*, 793 F.3d 968, 982-83 (2015) (observing that the First Amendment requires balancing students' rights with the state's authority in educational matters).

238.    "The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting."  *Monteiro v. Tempe Union School District*, 158 F.3d 1022, 1027 n. 5 (9th Cir. 1989) (citing *Pico*, 457 U.S. 853, 912-13 (1982) (plurality op.) ("[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.").  *See also Parents v. Liberated Ethnic Stud.*, 2024 US Dist. LEXIS 216929, at *65 (C.D. Ca. 2024) (quoting *Keyshian*, 385 U.S. at 603 (noting that the Supreme Court has recognized "the importance of protecting the 'robust exchange of ideas'" in the context of a public-school education).

239.    "[T]he First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."  *Epperson*, 393 U.S. at 106.

240.    The Ninth Circuit interprets Supreme Court precedent to require that any "state limitations on school curricula that restrict a student's access to materials otherwise available may be upheld only where they are reasonably related to legitimate pedagogical concerns–especially … where the local school board has already determined that the material at issue adds value to its local school curriculum."  *See Arce*, 793 F.3d at 983 (applying *Hazelwood*, 484 U.S. at 273).

    B.    *Unconstitutional Overbreadth*

241.    A law may be invalidated under the First Amendment overbreadth doctrine if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010).  *See also United States v. Hansen*, 599 U.S. 762, 769 (2023) ("litigants mounting a facial challenge to a statute normally 'must establish that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

*no set of circumstances* exists under which the [statute] would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

242.    This doctrine is based on a recognition that the First Amendment "provides breathing room for free expression." *Hansen*, 599 U.S. at 769-770. *See also Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (explaining that overbroad laws "deter or 'chill' constitutionally protected speech," silencing potential speakers and resulting in the loss of their contributions in the marketplace of ideas).

243.    To avoid potential chill and the commensurate harm to society, "the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 769-70 (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)).

244.    "The first step in an overbreadth analysis is to construe the statute, as 'it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'" *Arce*, 793 F.3d at 984 (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011)).

245.    A statute that reaches speech should be found facially unconstitutional if its application is not limited to punishing unprotected speech but is "susceptible of application to protected expression." *Plummer v. Columbus*, 414 U.S. 2, 2-3 (1973) (*quoting Gooding v. Wilson*, 405 U.S. 518, 522 (1972)).

246.    If a plaintiff demonstrates that the statute "'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statue's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (quoting *Williams*, 553 U.S. at 292).

1

2

**CLAIMS FOR RELIEF**

3

**COUNT I: DUE PROCESS UNCONSTITUTIONAL VAGUENESS (TEACHER PLAINTIFFS)**

4

5

247.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth therein.

6

7

248.    Existing California education law prohibits discrimination on the basis of race, religion, national origin, and ethnicity.

8

9

249.    Logically, then, the Legislature intended for its definition of antisemitism to incorporate something beyond these concepts, or there would be no reason to amend Section 244 of California's Education Code.

10

11

12

250.    At the same time, AB 715 *contains no explicit definition of antisemitism.*

13

251.    The AB 715 amendments state that school districts must follow the Biden National Strategy to "identify, respond to, prevent and counter antisemitism."

14

15

16

252.    The Biden National Strategy is a 60-page document that discusses combatting antisemitism in myriad contexts, not only educational settings, for example abroad and on social media platforms.  It is not clear which parts of the Biden National Strategy California schools must incorporate, and in which contexts.

17

18

19

20

21

253.    The Biden National Strategy refers to the IHRA definition of antisemitism as the most prominent such definition, falls short of explicitly adopting it.

22

23

254.    The Biden National Strategy itself conflates criticism of the State of Israel and political project of Zionism with antisemitism, for example by discussing Jewish people's connection to the land of Israel as a guiding principle in implementation, and the need to combat efforts to "delegitimize" Israel abroad.

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

255.   Thus, the new law appears to include various forms of criticizing Israel and the political philosophy of Zionism in its understanding of antisemitic discrimination by instructing districts to follow the Biden National Strategy.

256.   Another reason this appears to be so is that the law includes as examples of antisemitic discrimination "distortions of Jewish … ancestry, history and identity," as well as use of "coded language," "expressions," and "antisemitic tropes and conspiracy theories." That language is extremely vague, while at the same time appears to be alluding to the position that Palestinians, rather than Ashkenazi (European) Jews, are indigenous to Palestine and Israel.

257.   A person of ordinary intelligence would not be certain what constitutes antisemitism under the new law since the concept appears unrestricted to traditional notions of nondiscrimination—that is, discrimination on the basis of race, religion, national origin, or ethnicity, especially because the term is not defined and because it instructs school districts to adhere to the Biden National Strategy, but falls short of expressly stating how they are to do so.

258.   Because AB 715 does not make clear what it forbids, while suggesting it encompasses in its prohibitions constitutionally protected speech, Teacher Plaintiffs cannot know what they may and may not teach and say in class and what instructional materials they may use.

259.    However, they will likely self-censor on topics related to Israel-Palestine, and refrain from teaching the lessons they have taught in the past, in order to avoid negative professional consequences.

260.   AB 715's Amendments to California's education law will, therefore, have a strong chilling effect.

261.   In fact, Ms. Adenwala has explained that she believes she is being punished more harshly because of the mere introduction of AB 715. She can only imagine what the future holds once AB 715 takes effect.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

262.    AB 715 also requires schools to take remedial actions if a teacher uses instructional materials in class that expose pupils to unlawful discrimination.

263.    California's Education Code does not explain what it means to subject a student to unlawful discrimination through instructional materials, since the concept of discrimination by use of written materials is not a commonly understood one.

264.    The law does not say whether this requirement applies to fiction such as *The Merchant of Venice* and *The Great Gatsby*, both of which launder in negative stereotypes through portrayal of fictional Jewish characters, or James Baldwin's literature, which contain negative stereotypes of Black people.

265.    Furthermore, AB 715's amendments require teachers to provide "factually accurate information."

266.    As Teacher Plaintiffs know from prior experience, some from being disciplined themselves for teaching factual information about Israel and Palestine, "factually accurate" information about Israel, Palestine, and Zionism, is considered antisemitic by some people.

267.    Teacher Plaintiffs will be left wondering whether the requirement applies to the opinions of various international human rights organizations that Israel has committed genocide, or that the creation of Israel resulted in the displacement of three-quarters of a million Palestinians, or fiction that contains stereotypical depictions of minority groups.

268.    The tension between these two requirements further contributes to Teacher Plaintiffs' inability to conform their speech in the classroom and during professional development trainings to the law's strictures.

269.    For these reasons, the enactment of AB 715 violates Teacher Plaintiffs' Fourteenth Amendment Due Process rights because it is unconstitutionally vague.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

## COUNT II: FIRST AMENDMENT OVERBREADTH AND VIEWPOINT DISCRIMINATION (TEACHER PLAINTIFFS)

270.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth therein.

271.    The AB 715 amendments state that they are designed to address a rise in antisemitic discrimination.

272.    AB 715 does not define antisemitism but requires use of the Biden National Strategy to guide its enforcement.

273.    The Biden National Strategy, in turn, apparently relies on the IHRA definition of antisemitism, which includes various forms of criticism of the State of Israel and the project of Zionism, to guide inquiry.

274.    Moreover, the Biden National Strategy itself repeatedly mentions support for Israel as a foundational principle in its plan to combat antisemitism, and states that Jewish students and teachers facing pushback for their views on Israel constitutes antisemitism.

275.    The Biden National Strategy does not mention Palestine or Palestinians, nor does it contain any discussion of Palestinian rights or ties to the land of historic Palestine.

276.    Thus, it appears that the primary impetus behind AB 715 is to incorporate criticism of Israel and Zionism into antidiscrimination law.

277.    This may be inferred because otherwise there would be no purpose to AB 715, because preexisting law already prohibits discriminating against students because of their Judaism since it forbids discrimination on the basis of race, religion, ethnicity, or national origin.

278.    Criticism of Israel and the political philosophy of Zionism is First Amendment protected speech and the ability to criticize governments, nations (including foreign ones), and political philosophies is at the heart of the First Amendment. *See Stand with Us Center for Legal Justice v. Mass.*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

*Institute of Technology*, No. 24-1800, slip op. at 32 (1st Cir. 2025) ("We therefore reject plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic[]"; upholding dismissal of Title VI lawsuit against the university).

279.    The ability to criticize governments, nations, and political philosophies is also crucial to providing students with a solid education and helping to foster critical thinking skills.

280.    Individual Teacher Plaintiffs, and many LA EJP members, have addressed subjects involving Israel and Palestine in their courses as part of educating their students.

281.    That has included addressing colonialism in the context of Israel-Palestine, the conditions in Gaza resulting from Israel's military assaults, Israel's occupation of the West Bank and blockade of Gaza, and various lessons and projects that have addressed experiences of Palestinians.

282.    They have also answered questions their pupils posed about Israel, Palestine, and Zionism. Ms. Hassan has answered questions students posed because of her experience as a Palestinian whose father fled during the Nakba and eventually arrived in Spain.

283.    In the past, Plaintiffs Prichett, Adenwala, and many members of LA EJP have had complaints lodged against them and been investigated for alleged antisemitism, for teaching about Israel and Palestine, and answering students' questions on the subjects.

284.    While many of these complaints were deemed meritless, enduring the investigative process and reputational damage has had a profound deterrent impact on these Plaintiffs and other teachers, who are aware of what they have been through and often end up staying silent rather than risk enduring the stress of investigations.

285.    Under AB 715's amendments appearing to conflate criticism of Israel and Zionism with antisemitism, the complaints against teachers are much less likely to be dismissed, and their speech may be deemed antisemitic discrimination and subject the districts to punishment, which in turn threatens their jobs and very livelihoods.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

286.     Based on their own past experiences and the experiences of other teachers, under AB 715, Plaintiffs will be much more reluctant to discuss subjects related to Israel-Palestine, to answer students' questions on the subject, and to teach the Palestinian perspective on the conflict for fear of losing their jobs and harming their careers and reputations.

287.     While the law is not entirely decisive on where teachers' rights begin and end, it *is* clear that wherever that line ends up being drawn, AB 715's amendments fall squarely outside of it, since they operate to impose, through state government, viewpoint-based restrictions on teachers by conflating antisemitism with criticism of Israel and the philosophy of political Zionism, and failing to even mention Palestinians.

288.     These restrictions impede Teacher Plaintiffs' ability to provide factually accurate instruction related to Israel-Palestine based on their experience, education, and values, and to permit discussion of the Palestinian point of view on the conflict.

289.     Accordingly, AB 715 appears to outlaw speech that is critical to students' development, without a compelling pedagogical or other state interest, since there is no legitimate interest in prohibiting criticism of a government, a foreign country or a particular political philosophy.

290.     For these reasons, the AB 715 amendments are overbroad, because they appear to forbid factually accurate information and the type of discussions that are crucial to students' intellectual development.

291.     Because they subject expression of one point of view to discipline while endowing another with protection under antidiscrimination law, they are viewpoint discriminatory.

292.     For both reasons, the AB 715 amendments violate Teacher Plaintiffs' First Amendment rights.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

COUNT III:  FIRST AMENDMENT OVERBREADTH AND VIEWPOINT-BASED DISCRIMINATION
(STUDENT PLAINTIFFS)

293.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth therein.

294.    As discussed above, AB 715 does not explicitly define antisemitism, but appears to surreptitiously include criticism of the State of Israel and political philosophy of Zionism, and advocacy for Palestinian human rights in its definition.

295.    Student Plaintiffs' parents believe that, in order to receive a well-rounded education, their children must be exposed to multiple perspectives on Israel and Palestine in school, including the points of view of Palestinians, anti-Zionist Jews, and even Zionist Jews who disagree with the Israeli government's policies.

296.    In their opinions, that includes information about the Nakba, the occupation of the West Bank and blockade of Gaza, and the claims of numerous scholars and human rights organizations that Israel has committed war crimes in Gaza and the West Bank and genocide in Gaza.

297.    They object to one-sided narratives in the classroom that favor Israel's claims and silence Palestinians'.

298.    They also believe their children should be able to discuss these ideas and historical and current events with other students and their teachers, without anyone fearing repercussions.

299.    However, the AB 715 Amendments will incentivize teachers to avoid discussing these subjects given the threat of professional consequences, as discussed above in Counts I and II.

300.    AB 715 therefore interferes with Student Plaintiffs' constitutionally enshrined rights to obtain information about this and other subjects and to receive an education free from political bias, and to be exposed to the perspectives of Palestinians.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

301.    It does so for no legitimate reason, since there is no state interest in perpetuating one-sided narratives and silencing debate.

302.    Moreover, AB 715 does not state whether it applies to fiction, for example whether students reading *The Great Gatsby* in class could be deemed antisemitic discrimination because the novel contains negative stereotypes about Jewish individuals and other minorities.

303.    In J.J.'s experience, reading *The Great Gatsby* and works of James Baldwin for class, though they contain offensive stereotypes, has been a valuable component of her education.

304.    Reading these books has helped her to learn about stereotypes and recognize the harm those stereotypes cause.  She also believes that a well-rounded education includes reading classic novels, even if those novels involve depictions of characters and events that would be offensive by contemporary standards.

305.    She reasonably fears that under AB 715, classis such as *The Great Gatsby* would no longer be taught, and she would be deprived of crucial educational experiences.

306.    Accordingly, AB 715 is overbroad and viewpoint discriminatory in violation of Plaintiffs Students' First Amendment rights to receive information in the context of their public-school education.  *See Stand With Us*, No. 24-1800, at *33 (rejecting students' claims that criticizing Israel's actions rather than other countries', and accusing Israel of genocide, necessarily equates to antisemitism; noting that "even prominent Israelis have lodged the [genocide] accusation.").

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A. A declaration that the AB 715 amendments to California's Education Code violate Teacher Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution because they are unconstitutionally vague;

B. A declaration that the AB 715 amendments to California's Education Code violate Teacher Plaintiffs' rights under the First Amendment to the United States Constitution because they are overbroad and viewpoint discriminatory;

C. A declaration that the AB 715 amendments to California's Education Code violate Student Plaintiffs' rights under the First Amendment to the United States Constitution because they are overbroad and viewpoint discriminatory;

D. An injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)) and each of them, from enforcing the AB 715 amendments;

E. Attorney's fees pursuant to 42 U.S.C. § 1988; and

F. Any other just and proper relief.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

November 2, 2025

Respectfully submitted,

/s/ *Thomas B. Harvey*

THOMAS B. HARVEY (CA Bar #287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

/s/ *Jenin Younes*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO._____

53

National Legal Director

*/s/ Deyar Jamil*

AMERICAN-ARAB ANTI-DISCRIMINATION
COMMITTEE
910 17th Street Northwest, Suite 1000
Washington, D.C. 20006
Telephone: (202) 244-2990
jyounes@adc.org

*/s/ Michael Bracamontes*

MICHAEL BRACAMONTES
BRACAMONTES & VLASAK
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 835-6777
mbracamontes@bvlawsf.com

*Attorneys for Plaintiffs*