THOMAS B. HARVEY (CA Bar #287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

JENIN YOUNES* (*pro hac vice*)
DEYAR JAMIL (*pro hac vice*)
AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE
910 17th Street Northwest, Suite 1000
Washington, DC 20006
Telephone: (202) 244-2990
jyounes@adc.org
*Designated Counsel for Service*

MICHAEL BRACAMONTES (CA Bar # 242655)
BRACAMONTES & VLASAK
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 835-6777
mbracamontes@bvlawsf.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| **ANDREA PRICHETT**, et al., | |
| *Plaintiffs,* | **Case No. 5:25-cv-09443** |
| v. | |
| **GAVIN NEWSOM**, et al., | **Notice of Motion and Memorandum in Support of Motion for Preliminary Injunction** |
| *Defendants.* | |

**NOTICE OF MOTION AND MOTION TO THE HONORABLE COURT AND TO ALL PARTIES:**

PLEASE TAKE NOTICE that on December 16, 2025, at 10:00 a.m., Plaintiffs hereby move for a preliminary injunction halting enforcement of California Assembly Bill 715's ("AB 715") amendments to California's Education Code on constitutional grounds. As explained in detail in the accompanying memorandum, AB 715 is facially unconstitutional under the Fourteenth Amendment Due Process Clause because it is unconstitutionally vague and under the First Amendment because it is overbroad and imposes unreasonable viewpoint-based restrictions on Teacher Plaintiffs' speech and Student Plaintiffs' rights to speak and receive information. The Ninth Circuit recognizes that the abrogation of Plaintiffs' First Amendment and related constitutional rights for any time period constitutes irreparable harm, so that a colorable First Amendment claim presumes that the balance of equities and public interest favor Plaintiffs. Accordingly, this Court should hold a hearing as soon as possible and enjoin Defendants from enforcing AB 715's amendments to California's Education Code during the pendency of this litigation.

DATED:  November 7, 2025

*/s/ Jenin Younes*
Jenin Younes

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 4

  I.   ASSEMBLY BILL 715 ....................................................................................................... 4

  II.  THE PLAINTIFFS ............................................................................................................ 6

     A.  *Teacher Plaintiffs* ................................................................................................... 6

     B.  *Student Plaintiffs* .................................................................................................... 8

  III.  AB 715'S CHILLING EFFECT ....................................................................................... 8

     A.  *Teacher Plaintiffs* ................................................................................................... 8

     B.  *Student Plaintiffs* .................................................................................................. 11

LEGAL STANDARD ............................................................................................................. 12

ARGUMENT ......................................................................................................................... 13

  I.   PLAINTIFFS NOT ONLY HAVE A COLORABLE FIRST AMENDMENT CLAIM, BUT A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ........................................ 13

     A.  *The AB 715 Amendments Contravene Void-for-Vagueness Doctrine, Violating Teacher Plaintiffs' First and Fourteenth Amendment Rights* .................................................. 13

     B.  *The AB 715 Amendments are Overbroad and Viewpoint-Discriminatory, Violating All Plaintiffs' First Amendment Rights* ...................................................................... 17

        1.  Viewpoint Discrimination ................................................................................ 17

        2.  Unconstitutional Overbreadth ......................................................................... 18

        3.  Teacher Plaintiffs ............................................................................................. 19

        4.  Student Plaintiffs ............................................................................................. 23

  II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN PLAINTIFFS' FAVOR .................................................................................................................. 25

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of University Professors v. Rubio,*
   2025 U.S. Dist. LEXIS 193069, No. 25-10685-WGY (D. Ma. Sept. 30, 2025) .............................. 22

*Am. Beverage Ass'n v. City and County of San Francisco,*
   916 F.3d 749 (9th Cir. 2019) ........................................................................................ 12

*Arce v. Douglas,*
   793 F.3d 968 (9th Cir. 2015) .................................................................... 19, 22, 23, 24

*Ashcroft v. ACLU,*
   535 U.S. 564 (2002) .................................................................................................... 17

*Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico,*
   457 U.S. 853 (1982) .............................................................................................. 17, 23

*Bond v. Floyd,*
   385 U.S. 116 (1966) .................................................................................................... 21

*Brown v. Entm't Merchs. Ass'n,*
   564 U.S. 786 (2011) .................................................................................................... 24

*C.F. v. Capistrano Unified Sch. Dist.,*
   654 F.3d 975 (9th Cir. 2011) ................................................................................ 20, 22

*Cal Teachers Ass'n v. State Bd. of Educ.,*
   271 F.3d 1141 (9th Cir. 2001) .............................................................................. 14, 20

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
   657 F.3d 936 (9th Cir. 2011) ...................................................................................... 19

*Doe v. University of Michigan,*
   721 F. Supp. 852 (E.D. Mich. 1989) ........................................................................... 17

*Downs v. Los Angeles Unified Sch. Dist.,*
   228 F.3d 1003 (9th Cir. 2000) .................................................................................... 19

*Elrod v. Burns,*
   427 U.S. 347 (1976) .............................................................................................. 12, 25

*Epperson v. Arkansas,*

   393 U.S. 97 (1968) .................................................................................... 19, 21, 22

*FCC v. Fox T.V. Stations Inc.,*

   567 U.S. 239 (2012) ................................................................................................ 13

*Gammoh v. City of La Habra,*

   395 F.3d 1114 (9th Cir. 2005) .............................................................................. 14

*Gooding v. Wilson,*

   405 U.S. 518 (1972) ................................................................................................ 19

*Grayned v. City of Rockford,*

   408 U.S. 104 (1972) ................................................................................................ 13

*Hazelwood Sch. Dist. V. Kuhlmeier,*

   484 U.S. 260 (1988) ........................................................................................ 20, 23

*Høeg v. Newsom,*

   652 F. Supp. 3d 1172 (E.D. Ca. Jan. 25, 2023) ...................................... 14, 15, 16

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*

   455 U.S. 489 (1982) ................................................................................................ 13

*Holder v. Humanitarian Law Project,*

   561 U.S. 1 (2010) .............................................................................................. 2, 15

*Kennedy v. Bremerton,*

   597 U.S. 507 (2022) ................................................................................................ 19

*Ketchens v. Reiner,*

   194 Cal. App. 3d 470 (Cal. Ct. App. 1987) ........................................................ 15

*Keyishian v. Bd. of Regents,*

   385 U.S. 589 (1967) .......................................................................................passim

*Kohls v. Bonta,*

   752 F.Supp.3d 1187 (E.D. Ca. 2024) .................................................................. 18

*Lamont v. Postmaster General,*

   381 U.S. 301 (1965) (Brennan, J., concurring) .................................................. 17

*Matal v. Tam,*

    582 U.S. 218 (2017) ................................................................................................... 17

*Mayer v. Monroe County Cmty. Sch. Corp.,*

    474 F.3d 477 (7th Cir. 2007) ..................................................................................... 19

*Melendres v. Arpaio,*

    695 F.3d 990 (9th Cir. 2012) ............................................................................. 13, 25

*Monteiro v. Tempe Union School District,*

    158 F.3d 1022 (9th Cir. 1989) ............................................................................. 3, 23

*Nken v. Holder*

    556 U.S. 418 (2009) ................................................................................................... 12

*Packingham v. North Carolina,*

    582 U.S. 98 (2017) ..................................................................................................... 18

*Parents v. Liberated Ethnic Stud.,*

    No. 2:22-cv-3243, 2024 US Dist. LEXIS 216929 (C.D. Ca. Nov. 30, 2024) ............................. 3, 23

*Plummer v. Columbus,*

    414 U.S. 2 (1973) ....................................................................................................... 19

*Pratt v. Indiana Sch. Dist. No. 831,*

    670 F.2d 771 (8th Cir. 1982) ..................................................................................... 20

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*

    515 U.S. 819 (1995) ..................................................................................................... 2

*Rosenberger v. Rector and Visitors of Univ. of Va.,*

    515 U.S. 819 (1995) ................................................................................................... 17

*Sheldon v. Dhillon,*

    No. C-08-03438, 2009 US Dist. LEXIS 110275 (N.D. Cal. Nov, 25, 2009) ............................. 2, 20

*Speech First, Inc. v. Cartwright,*

    32 F.4th 1110 (11th Cir. 2022) .................................................................................. 18

*StandWithUs Center for Legal Justice v. Mass. Institute of Technology,*

    No. 24-cv-1800, 2025 U.S. App. LEXIS 27390 (1st Cir. Oct. 21, 2025)...................................passim

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) .................................................................. 2, 15

*Tinker v. Des Moines Independent Community School Dist.,*
  393 U.S. 503 (1969) .......................................................................................... 19

*United States v. Hansen,*
  599 U.S. 762 (2023) .................................................................................... 18, 19

*United States v. Stevens,*
  559 U.S. 460 (2010) ...................................................................................... 18

*United States v. Williams,*
  553 U.S. 285 (2008) .................................................................................... 18, 19

*Viacom Int'l, Inc. v. FCC,*
  828 F.Supp. 741 (N.D. Ca. 1993) ................................................................ 25

*Virginia v. Hicks,*
  539 U.S. 113 (2003) ...................................................................................... 18

*Wardsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) .................................................................... 3, 13

**Statutes**

California Education Code § (b)(2) ................................................................ 5

California Education Code § 1(d) ................................................................ 14

California Education Code § 244 (a)(2) ......................................................... 5

California Education Code § 244(a)(1) ......................................................... 10

California Education Code § 244(a)(2) ......................................................... 10

California Education Code § 244(b)(1) ......................................................... 10

California Education Code § 244(b)(2) ......................................................... 10

California Education Code § 244(d) ............................................................. 10

California Education Code § 51500(b) ........................................................... 5

**Other Authorities**

*Audit of Antisemitic Incidents 2024*, Center on Extremism (April 22, 2025),

    https://www.adl.org/resources/report/audit-antisemitic-incidents-2024 ........................................ 5

Eyal Press, *The Problem with Defining Antisemitism*, THE NEW YORKER (Mar. 13, 2024) ................. 1

*FBI cuts ties with two advocacy groups that track US extremism after rightwing backlash*, THE GUARDIAN (Oct.

    3, 2025), available at https://tinyurl.com/59e7mvex ........................................ 5

Shane Burley, *Examining the ADL's Antisemitism Audit,* JEWISH CURRENTS (June 17, 2024),

    https://tinyurl.com/2denyay3 ........................................ 5

*The Life Cycle of a Bill*, STATE OF CALIFORNIA CAPITOL MUSEUM, https://tinyurl.com/2t2mthrj .. 4, 5

White House, *The U.S. National Strategy to Combat Antisemitism* (May 2023),

    https://tinyurl.com/3n4sc9ca ........................................ 5, 6

*Zionism*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/Zionism (last visited

    Nov. 6, 2025) ........................................ 1

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Last month, Governor Gavin Newsom signed Assembly Bill 715 ("AB 715") into law, amending California's Education Code. AB 715 purports to strengthen antidiscrimination protections for Jewish students specifically but does not define the term "antisemitism." Since California's Education Code already prohibits discrimination on the basis of race, religion, ethnicity, and national origin, the only plausible inference to be made is that the new law seeks to alter or expand the definition—but without statutory guidance on how it seeks to do so.

This supposition is further substantiated by AB 715's requirement that school districts follow former President Joseph Biden's National Strategy to Combat Antisemitism ("Biden National Strategy") to identify, respond to, prevent, and counter antisemitism. The Biden National Strategy also does not expressly define antisemitism but refers to the International Holocaust Remembrance Alliance's ("IHRA") definition as the most prominent, implying that it guides the strategy's implementation.[1] Both the IHRA definition of antisemitism and the Biden National Strategy conflate criticism of the State of Israel, as well as the political philosophy known as Zionism,[2] with antisemitism. *See StandWithUs Center for Legal Justice v. Mass. Institute of Technology*, No. 24-cv-1800, 2025 U.S. App. LEXIS 27390, at *28-29 (1st Cir. Oct. 21, 2025) ("Plaintiffs are entitled to their own interpretive lens equating anti-Zionism (as they define it) and antisemitism. But it is another matter altogether to insist that others be bound by plaintiffs' view. Plaintiffs' equation finds no consensus

---

[1] Notably, even Kenneth Stern, who crafted the IHRA definition of antisemitism, believes that it should not carry the force of law. *See, e.g.*, Eyal Press, *The Problem with Defining Antisemitism*, THE NEW YORKER (Mar. 13, 2024) (explaining that Stern himself testified at a congressional hearing that he "believed that enshrining [the IHRA definition] into law would have dangerous consequences" and a bill proposing to do that posed "a clear threat to academic freedom.").

[2] Merriam Webster defines "Zionism" as: "an international movement originally for the establishment of a Jewish national or religious community in the historical region of Palestine and later for the support of modern Israel." *See Zionism*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/Zionism (last visited Nov. 6, 2025).

support in dictionary definitions.  Nor does a review of the academic literature point to any consensus that criticism of Zionism is antisemitic.").

Plaintiffs are teachers ("Teacher Plaintiffs") and students ("Student Plaintiffs") in California public schools who teach and seek to learn about, respectively, subjects related to Palestine, Israel, and the Middle East. By failing to define antisemitism while requiring schools to follow the Biden National Strategy that relies on the controversial IHRA definition, the law leaves Teacher Plaintiffs with inadequate guidance as to what constitutes unlawful discrimination under the AB 715 amendments.  *See Tingley v. Ferguson*, 47 F.4th 1055, 1089 (9th Cir. 2022) ("The terms of a law cannot require 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.'") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010)).  At the same time, the new law exposes Teacher Plaintiffs to charges of unlawful discrimination and corresponding discipline if they convey ideas, information, and instructional materials to their students that may be considered critical of the State of Israel and the philosophy of Zionism—thus, creating a chilling effect and infringing on the First Amendment rights of both the teacher and student.  *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (explaining that government must "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *Sheldon v. Dhillon*, No. C-08-03438, 2009 US Dist. LEXIS 110275, at *12-13 (N.D. Cal. Nov, 25, 2009) ("The Ninth Circuit has previously recognized that teachers have First Amendment rights regarding their classroom speech, albeit without defining the precise contours of those rights.").

Student Plaintiffs' parents reasonably believe that their children will be prevented from learning about differing perspectives on Israel, Palestine, and the Middle East because their teachers will be deterred from allowing free discussion and use of instructional materials that anyone with the wherewithal to file a complaint perceives as critical of Israel or Zionism.  That undermines Student

Plaintiffs' rights to receive information, which the Supreme Court recognizes are encompassed in the First Amendment's free speech protections. *See Monteiro v. Tempe Union School District*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1989) ("The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting."). *See also Parents v. Liberated Ethnic Stud.*, No. 2:22-cv-3243, 2024 US Dist. LEXIS 216929, at *65 (C.D. Ca. Nov. 30, 2024) (noting that the Supreme Court has recognized "the importance of protecting the 'robust exchange of ideas'" in the context of a public-school education) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

It is rare for a state legislature to pass a law that fails entirely to define a term that is both key to its implementation and vigorously contested in the public square, and even more extraordinary to do so while simultaneously leaving the impression that certain viewpoints may be singled out for punishment under it. It is almost unheard of for the Governor to sign such a bill into law. Plaintiffs have not only put forth a "colorable" First Amendment claim, the standard for granting a preliminary injunction in the Ninth Circuit, but they have shown a substantial likelihood on the merits of all of their claims. *See Wardsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) ("Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.").

In the absence of a preliminary injunction, Plaintiffs will suffer irreparable harm because beginning January 1, 2026, and possibly earlier, they will be subject to discipline under the AB 715 amendments (Teacher Plaintiffs) and deprived of their constitutional rights to receive information (Student Plaintiffs). Furthermore, Plaintiffs cannot be certain whether speech prior to the statute's effective date may be used against them either as the basis for a complaint, or to enhance any sanctions for speech occurring after January 1, 2026. Thus, the AB 715 amendments already chill

Plaintiffs' speech and deprive Student Plaintiffs of their rights to receive information. Consequently, a preliminary injunction is warranted as soon as is technically feasible. For these reasons, as well as those set forth below, Plaintiffs ask the Court to declare the AB 715 amendments unconstitutional and immediately halt enforcement.

### STATEMENT OF FACTS[3]

### I. ASSEMBLY BILL 715

Governor Newsom signed AB 715, which amends California's Education Code governing Elementary and Secondary education, into law on October 7, 2025, after it passed both houses of the state legislature the month prior. Compl., ECF No. 1 ¶¶ 33-34. By default, unless specified otherwise, laws in California take effect on the first day of the new year, but AB 715 states that its strictures should be implemented as soon as possible and no later than the beginning of the next school year, suggesting that districts may already be making changes to comply with it. Compl., ECF No. 1 ¶ 35. *See The Life Cycle of a Bill*, STATE OF CALIFORNIA CAPITOL MUSEUM, https://tinyurl.com/2t2mthrj (last visited Nov. 4, 2025).

The stated purpose of AB 715 is to buttress anti-discrimination law in order to combat antisemitism in California public schools. *Id.* ¶ 36. As the preamble to the bill acknowledges, existing law already protects students from discrimination on the basis of nationality, race, ethnicity, religion, and other protected characteristics. *Id.* ¶ 37. However, the Legislature asserts that additional protections are needed due to a surge of antisemitic discrimination against Jewish and Israeli pupils

---

[3] A more detailed statement of facts is laid out in the Complaint. *See* Compl., ECF No. 1 ¶¶ 33-217. A succinct version of those facts most pertinent to the request for a preliminary injunction is offered here. For facts related to the background of the Middle East conflict, refer to the Complaint, ECF No.1 ¶¶ 187-217.

that includes the use of antisemitic tropes and conspiracy theories, slurs, symbols, expressions, use of coded language, and distortions of Jewish religion, ancestry, history and identity. *Id.* ¶ 38.[4]

The Legislature also claims that this discrimination has included the "use of inappropriate instructional materials and instruction," without providing examples or explaining what that means. *Id.* ¶ 39. On that basis, AB 715 adds to the prohibition against school districts adopting or approving for use textbooks, instructional materials, supplemental instructional materials, or a curriculum "if its use would subject a pupil to unlawful discrimination." *Id.* ¶ 42. Now, if a complaint to this effect is made, the Board must "investigate and remediate" the situation. *Id.* ¶ 43. *See* Ca. Educ. Code § 244 (a)(2), (b)(2). And while preexisting law had required educational materials used in schools to be "factually accurate," AB 715 now imposes this requirement on teachers' *instruction*. Compl., ECF No. 1 ¶ 48. *See* Ca. Educ. Code § 51500(b).

Despite its stated purpose, AB 715 *does not define the term "antisemitism."* Compl, ECF No. 1 ¶ 40. It instructs school districts and a newly appointed Antisemitism Prevention Coordinator to follow former President Joe Biden's 60-page "United States National Strategy to Counter Antisemitism" ("Biden National Strategy") in identifying, responding to, preventing, and countering antisemitism. *Id.* ¶ 41. *See id.* § 1(i) (referring to White House, *The U.S. National Strategy to Combat Antisemitism* (May 2023), https://tinyurl.com/3n4sc9ca (last visited Oct. 24, 2025)). The Biden National Strategy also does not define antisemitism, though it refers to the International Holocaust Remembrance Alliance's

---

[4] Because the data collection methods underlying the claims about skyrocketing antisemitism requiring emergency legislation also entail a conflation of antisemitism and criticism of Israel and Zionism, there is some circularity when it comes to grasping the nature and degree of the problem the Legislature asserts. *See FBI cuts ties with two advocacy groups that track US extremism after rightwing backlash*, THE GUARDIAN (Oct. 3, 2025), available at https://tinyurl.com/59e7mvex (last visited Oct. 15, 2025) (explaining that FBI stopped collaborating with ADL for these purposes in October of 2025); *Audit of Antisemitic Incidents 2024*, Center on Extremism (April 22, 2025), https://www.adl.org/resources/report/audit-antisemitic-incidents-2024 (last visited Oct. 15, 2025) (stating that the majority of antisemitic incidents reported were related to Israel or Zionism). *See also* Shane Burley, *Examining the ADL's Antisemitism Audit*, JEWISH CURRENTS (June 17, 2024), https://tinyurl.com/2denyay3 (last visited Oct. 21, 2025) (determining that ADL audits demonstrate that their methodology involves creating a false equivalence between political expression (including criticism of Israel or Zionism) with antisemitic sentiment and conduct).

("IHRA") definition as the most "prominent." Compl., ECF No. 1 ¶ 41(h). Both the Biden National Strategy and the IHRA definition incorporate various forms of criticizing Israel and the political philosophy of Zionism into their understanding of what constitutes antisemitism. *Id.* ¶¶ 41(b)-(e), (j).

## II.    THE PLAINTIFFS

### A.    Teacher Plaintiffs

Teacher Plaintiffs have all taught about Israel, Palestine, and related subjects. For example, Plaintiff Andrea Prichett, a middle-school U.S. history teacher in Berkeley who discusses colonialism in her classes, had to endure a months-long investigation after a complaint was filed against her because she stated, in response to a student's question, that there are Israeli settlements in Palestine, which is an indicator of colonialism (Decl. of Andrea Prichett ¶¶ 3-4, 21-22, 24-26, Exhibit A).

Jonah Olson, a middle-school Jewish but non-Zionist science teacher, allows his students to choose projects for the school science fair that are based on finding solutions to real-world problems they have seen. (Decl. of Jonah Olson ¶¶ 1-4, 6-9, Exhibit B). The past couple of years, students have chosen projects after seeing social media posts about Gaza—for example, one student worked on a project aimed at preserving food in war torn areas after seeing images online of moldy food delivered to hungry Palestinians there, and another worked on water distillation after coming across a social media post about lack of clean water in Gaza. *Id.* ¶¶ 6-9.

Dunia Hassan is a high-school Spanish teacher in Santa Clara, California whose father immigrated to Spain in adulthood, having survived the Nakba (expulsion of three-quarter million Palestinians to create a predominately Jewish State in what is now Israel) as a child. (Decl. of Dunia Hassan ¶¶ 1-5, Exhibit C). *See* Compl., ECF No. 1 ¶¶ 194-97.

Kauser Adenwala is a public high school teacher in California, where she teaches Honor Civics, Honors Economics, and Financial Literacy; in the past she taught history. (Declaration of

Kauser Adenwala ¶¶ 1, Exhibit D). Ms. Adenwala has endured prolonged investigations stemming from discussions related to Israel-Palestine. In one case, a student complained after she showed a slide-deck bearing an image of the wall Israel built in the West Bank to separate Palestinians from Jewish settlers; she was found to have violated a policy requiring that diverse perspectives be taught. *Id.* ¶¶ 6-10. In September of 2024, another complaint—which was not sustained—was filed against her after she showed a video that included a Holocaust survivor condemning Israel's conduct in Gaza.

Following the introduction of AB 715 at the beginning of 2025, there was increased anxiety about allegations of antisemitism among public educators, which put pressure on the district to mollify parents who were unhappy she had not been fired. *Id.* ¶¶ 13-14. The district provided antisemitism training as part of its appeasement, leaving teachers confused about the term's definition: for example, a question was posed about whether criticizing Israel would constitute discrimination, and the answer was that "it depends," leaving teachers unsure what could subject them to discipline and incentivizing them to avoid the topic entirely for fear of backlash. *Id.* ¶ 15. In April 2025, two staunchly pro-Israel groups, StandWithUS and Bay Area Jewish Coalition (both of which lobbied for passage of AB 715), filed a Title VI complaint against the school district for failing to adequately combat antisemitism, including the video Ms. Adenwala had shown as an example of "blood libel-type messaging." *Id.* ¶ 26-27. Although ultimately the investigation concluded that Ms. Adenwala had caused no harm to students, she was found to have violated multiple board policies because the video "promote[d] a discriminatory bias toward Jewish students." *Id.* ¶ 31. StandWithUS took credit for the outcome, posting on Facebook: "Advocacy Win! School District Reprimands Teacher Following StandWithUS Complaint." *Id.* ¶ 28.

LA EJP is a professionally and ethnically diverse group of around 100 teachers, academic counselors, school psychologists, and other individuals who hold out-of-classroom positions in

school districts across Los Angeles, with many Jewish members.  Decl. of Iris Mendoza ¶¶ 3-4, Exhibit E.  Many LA EJP members, especially history and ethnic studies teachers who engage in critical dialogue around genocide and colonialism around the world, have been targeted for their efforts to protect the academic freedom and free speech rights of educators and for teaching various curricula in English and Social Sciences that discuss Palestinian culture, Middle East history, and the factual events surrounding the 1948 creation of the state of Israel.  *Id.* ¶¶ 5-7.

### B.  *Student Plaintiffs*

J.J. is a 16-year-old Palestinian high school student in Granite Bay, California who has found that discussing Israel and Palestine with classmates—even those who are pro-Israel, has allowed them to reach common ground. (Decl. of J.J. ¶¶ 1-2, 7-8, Exhibit F).  J.J. takes a speech and debate class, in which she has chosen topics related to Israel-Palestine.  *Id.* ¶¶ 9,17.

Both Ms. Khoury-Umili, who is Palestinian-American and Ms. Finen, parents of schoolchildren in California, would like their children to be exposed to Palestinian and Arab culture (along with other cultures) and to learn about issues related to Israel-Palestine and the Middle East from diverse perspectives, without their children or their children's teachers self-censoring to avoid discipline.  (Declaration of Linda Khoury-Umili ¶¶ 2-24, Exhibit G; Decl. of Alice Finen ¶ 11-2, Exhibit H).

## III.    AB 715'S CHILLING EFFECT

### A.  *Teacher Plaintiffs*

AB 715 will severely curtail Teacher Plaintiffs' ability to teach their students. To begin, they do not know what they may and may not say under AB 715.

For example, Ms. Prichett is under the impression that, since AB 715 instructs schools and teachers to adhere to Biden's National Strategy, any statements critical of Israel's policies may now subject her to discipline as antisemitic discrimination.  Yet at the same time, Ms. Prichett finds the

law confusing because it does not explicitly define antisemitism, nor the prohibitions entailed by the new law. Ex. A ¶¶ 32-34. Ms. Prichett also does not know what to make of the requirement that she teach only "factually accurate" information. Ex. A ¶¶43-44. For example, Palestinians in the West Bank have almost no rights at all under Israeli occupation, and the international consensus is that Israel is occupying Palestine, but supplying students with that information could be deemed antisemitic—as she knows from personal experience. Ex. A ¶¶ 41-44, 49.

Likewise, based on her past experiences, Ms. Adenwala believes that the new law is an attempt to expand the tactics used against her to more teachers to entirely silence conversation about Israel, Palestine and Gaza. Ex. D ¶ 37. Ms. Adenwala believes showing her class a video of a Holocaust survivor condemning Israel's actions was only deemed to be discriminatory because of AB 715: initially she was vindicated, but months later the introduction of AB 715 increased pressure on the district to appease complaining parents, leading to her being censured. Ex. D ¶ 32.

Because they do not know exactly what AB 715 prohibits but believe it will subject them to discipline for discussions in the classroom that are critical of Israel and Zionism, Teacher Plaintiffs explain that students will be forbidden from completing projects they have assigned in the past. Ms. Hassan is hesitant to repeat the "My Name, My Identity" presentation that she normally assigns. This exercise asks students to recount their life stories. Palestinian students' life stories involve the harm caused to them and their families by the creation of Israel and ongoing occupation of Palestine, both of which deprived Palestinians like them and their relatives of the right to self-determination. Ex. C ¶¶ 24-25. Under AB 715, Palestinian students' participation in this activity could be considered antisemitic discrimination. Ms. Hassan also will not feel comfortable answering students' questions about Spanish-language news on topics related to Palestine, since her honest responses could expose her to discipline under AB 715. Ex. C ¶¶ 27, 29.

Similarly, Mr. Olson's ability to perform his job as a teacher will be negatively impacted by AB 715. Often, science projects such as those his students have done in the past–for instance the students who designed science experiments revolving around food preservation and water distillation–are prompted when students ask questions about current events, including Palestine and Gaza. But under AB 715, Mr. Olson will be afraid to allow discussion of these topics because it could be deemed antisemitic by pro-Israel individuals. Ex. C ¶¶ 10-11. He also would worry about answering his students' questions about his Judaism, since he often responds that it does not include support for Israel; under AB 715, he might be in violation of the law for answering this question in the manner to which he is accustomed. Ex. C ¶ 5.

LA EJP members are convinced that the law will prevent student inquiry about historical events that lead to critical classroom discussions about the Israeli government's actions, and chill honest classroom conversations about Palestinian and Arab history and cultures. Ex. E ¶ 10. The fact that *anyone* can file a complaint under AB 715, reporting educators to an "Antisemitism Prevention Coordinator" also means that, in the views of Teacher Plaintiffs, AB 715 provides individuals and organizations who seek to silence critical discussion of Israel with more tools to misuse the public school system for their political purposes. Ex. E ¶ 9. *See* Ca. Educ. Code § 244(d).

And AB 715 has implications outside of the classroom, since it applies to professional development materials and training, too. *See* Ca. Educ. Code § 244(a)(1), (2), (b)(1), (2). Ms. Prichett has expressed concern that the new law will discourage teachers from offering or participating in such trainings for similar reasons discussed in the context of classrooms: factual accuracy and "antisemitic discrimination" under AB 715 may be at odds with each other. Ex. A ¶ 48. Likewise, Ms. Adenwala found that a training (probably conducted due to the legislature's introduction of AB 715) left teachers confused because they were told only "it depends" whether they could be

disciplined for unlawful discrimination for providing students with information that cast the State of Israel in a negative light.  Ex. D ¶ 15.

### B.  Student Plaintiffs

J.J. believes that AB 715 will significantly impede the ability of both students and teachers to freely discuss Israel, Palestine, and related topics, because the law does not clearly state what antisemitism is.  Ex. F ¶¶ 22, 32.  Students will likely stop asking questions about her Palestinian background and identity, and she and others will be uncomfortable freely answering questions on the subject anyway, because they will fear legal action or other forms of retaliation. Ex. F ¶¶ 21-22.  She also believes that under AB 715, her teacher would refrain from showing a documentary she watched in AP world history about Israel's creation, since it included factual information about how the country was created on a land inhabited by other people, and that the United Kingdom ("UK") gave the land away without the consent of the Palestinians living there.  *Id.* ¶¶ 28-29. And she might well be prohibited from selecting a debate topic like the one she chose earlier this year, depriving her and her classmates of vital educational experiences.  Ex. F ¶ 20, 30-31.  And in J.J.'s opinion, AB 715 will have impacts beyond discussions about Israel and Palestine. It will allow for the censorship of lessons, books, films and events because some people find them offensive, meaning that even students who are not interested in politics will lose the opportunity to engage in valuable learning experiences.  She refers to her experience reading *The Great Gatsby*, which could be found to expose students to antisemitic discrimination under AB 715 because it has a Jewish character who is depicted in a stereotypical manner. Ex. F ¶¶ 27, 33.

Ms. Khoury-Umili is deeply concerned that AB 715 will have a significant, negative impact on her children's education.  Ex. G ¶¶ 26-27.  Ms. Khoury-Umili believes that a teacher would think twice about allowing a presentation like one she gave for her daughter's class to which she wore traditional Palestinian attire, brought traditional Palestinian food, and taught the children a traditional

Palestinian dance, since it could get her in trouble.  As Ms. Khoury knows from personal experience, Palestinians are frequently accused of being antisemitic or offensive simply for being, since their existence naturally calls into question the idea that Israel was established in a land without people. Ex. G ¶ 25.

Mr. Olson, Ms.  Khoury-Umili, and Ms. Finen, are extremely concerned about the ways in which AB 715 will negatively affect their children's abilities to learn factual information about Israel and Palestine, to express their own views, and to ask questions and engage in free-flowing discussions with their teachers and other students, when both are afraid they will be complained about, investigated, and possibly disciplined for discussions that could be perceived as antisemitic under the Biden National Strategy.  Ex. B ¶¶14-16; Ex. G ¶¶25-27; Ex. H ¶¶ 18-19, 21.

Mr. Olson is also worried that the new law will negatively impact his young son's sense of identity.  He believes that his son should be able to express Jewish beliefs without support for Israel. Ex. B ¶ 14.  Furthermore, he considers his anti-Zionist beliefs to stem from his interpretation of Judaism, and so the new law impedes his ability to express his own religious beliefs without government interference.  *See* Ex. B ¶¶ 3-5.

## LEGAL STANDARD

A preliminary injunction is appropriate if the Plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) the necessity of the injunction to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019).

The Supreme Court has repeatedly held that the "loss of First Amendment freedoms, even for minimal periods of time, [is an] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  And in the Ninth Circuit, once a "colorable First Amendment claim" has been set forth, the second

through fourth prongs of the *Nken* inquiry are presumed to have been met. *See Wardsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) ("under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."); *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (observing that the balance of equities and public interest favors those whose First Amendment rights are being chilled); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("it is always in the public interest to prevent the violation of a party's constitutional rights.").

## ARGUMENT

### I.  PLAINTIFFS NOT ONLY HAVE A COLORABLE FIRST AMENDMENT CLAIM, BUT A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. *The AB 715 Amendments Contravene Void-for-Vagueness Doctrine, Violating Teacher Plaintiffs' First and Fourteenth Amendment Rights*

Due process of law requires clear definitions of legal prohibitions, as vague laws may trap the innocent by failing to provide adequate warning and lead to arbitrary and discriminatory enforcement, resulting in the delegation of basic policy to police officers, judges, and juries. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). A law is unconstitutionally vague if it "does not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108-09.

Vague laws are of particular concern in the First Amendment context because they "operate to inhibit the exercise of" the freedoms safeguarded by it by chilling constitutionally protected speech. *Id. See FCC v. Fox T.V. Stations Inc.*, 567 U.S. 239, 253-54 (2012) ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."). *See also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (explaining

that when First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly); *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of specificity and clarity is required when First Amendment rights are at stake."). Where a statute "clearly implicates free speech rights," a facial vagueness challenge is appropriate, and a court may deem a law unconstitutionally vague. *Cal Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001).

While AB 715 was purportedly enacted to strengthen anti-discrimination protections for Jewish students, it *does not define antisemitism*. As indicated by the judicially recognized controversy around equating criticism of Israel and Zionism[5] with antisemitism, there is no established definition. *See StandWithUs Center for Legal Justice v. Mass. Institute of Technology*, No. 24-cv-1800, 2025 U.S. App. LEXIS 27390, at *27–28 (1st Cir. Oct. 21, 2025) (explaining that while plaintiffs are "entitled to their own interpretative lens equating anti-Zionism (as they define it) and antisemitism[,]" "it is another matter altogether to insist that others must be bound by [their] view. Plaintiffs' equation finds no consensus support in dictionary definitions."). *See generally Hoeg v. Newsom*, 652 F. Supp. 3d 1172, 1186 (E.D. Ca. Jan. 25, 2023) (preliminarily enjoining law that punished doctors for giving patients advice about Covid-19 that departed from the "contemporary scientific consensus"; *inter alia*, such a term "does not have an established technical meaning in the medical community" and plaintiffs' declarations "explain[] that 'scientific consensus' is a poorly defined concept.").

At the same time, the new law clearly is aimed at speech—substantially, if not entirely. It seeks to regulate teachers' classroom instruction and impose additional restrictions on written materials used in California schools. The law includes in the general examples of what it seeks to curb "distortions of Jewish … ancestry, history and identity," use of "coded language," "expressions," and "antisemitic tropes and conspiracy theories." *See* Ca. Educ. Code § 1(d). And it instructs school districts to follow the Biden National Strategy, which on multiple occasions mentions

types of speech—such as efforts to delegitimize the State of Israel and to honor Jewish people's ties to that land—as a focus of its efforts to combat antisemitism (rather than conduct).

The legislature could have defined antisemitism but chose not to. Instead, by commanding school districts to follow the Biden National Strategy, the AB 715 amendments heavily imply that criticizing Israel and Zionist ideology constitute antisemitism. *See Tingley v. Ferguson*, 47 F.4th 1055, 1089 (9th Cir. 2022) ("The terms of a law cannot require 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010)).

For these reasons, a person of ordinary intelligence would not be certain what constitutes antisemitic discrimination under the new law. Because AB 715 does not make clear what it forbids while suggesting that it encompasses constitutionally protected speech and factual information, Teacher Plaintiffs cannot know what they may and may not teach and say in class, or what instructional materials they may use. *See Hoeg*, 652 F. Supp. 3d at 1186 ("The use of a poorly-defined, subjective term is particularly objectionable here because it serves to define the prohibited conduct, rather than merely explain the context in which the prohibition applies"). However, they will self-censor on topics related to Israel-Palestine and refrain from teaching the lessons they have taught in the past in order to avoid negative professional consequences. AB 715's amendments to California's Education Code will, therefore, have a strong chilling effect, as Teacher Plaintiffs all attest. *See Ketchens v. Reiner*, 194 Cal. App. 3d 470, 477 (Cal. Ct. App. 1987) (enjoining law that penalized parents and others who "insults or abuses any teacher" in the presence of school personnel or pupil, without defining "insult" and "abuse," on grounds that it was unconstitutionally vague).

AB 715 also requires schools to pursue remedial measures, including discipline, if teachers use instructional materials in class that expose pupils to "unlawful discrimination." California's Education Code does not explain what this means. The concept of discrimination by use of written

instructional materials is not commonly understood, even by the very people who might be using these materials. The law does not say whether this requirement applies to canonical fiction, such as *The Merchant of Venice* and *The Great Gatsby*, both of which have been criticized for their negative portrayal of fictional Jewish characters. Thus, this is yet another reason the statute is unconstitutionally vague.

Furthermore, AB 715's amendments require teachers to provide only "factually accurate information." As Teacher Plaintiffs know from prior experiences fielding complaints and navigating investigations and disciplinary proceedings, "factually accurate" information about Israel, Palestine, and Zionism can be considered antisemitic. Teacher Plaintiffs will be left wondering whether the requirement applies to the opinions of various international human rights organizations that Israel has committed genocide in Gaza, or indisputable fact that the creation of Israel resulted in the displacement of three-quarters of a million Palestinians. *See StandWithUs*, 2025 U.S. App. LEXIS 27390, at *34 (rejecting plaintiffs' claim that accusing Israel of committing genocide is inherently antisemitic; "even prominent Israelis have lodged the same accusation") (citing Omer Bartov, *I'm a Genocide Scholar. I know It When I See It*, THE NEW YORK TIMES (July 15, 2025), https://tinyurl.com/44y83jky (last visited Nov. 6, 2025)).

The tension between these two requirements exacerbates Teacher Plaintiffs' inability to conform their speech in the classroom and during professional development trainings to the law's strictures. *See Høeg*, 652 F. Supp. 3d at 1189 (rejecting Defendants' argument that including "standard of care," which had an accepted meaning, along with "contemporary scientific consensus," which did not, provided adequate clarity; "far from clarifying the statutory prohibition, the inclusion of the term . . . only serves to further confuse . . . . It is impossible to parse the sentence and understand the relationship between the two clauses[.]"). For these reasons, the enactment of AB 715 violates Teacher Plaintiffs' First and Fourteenth Amendment Due Process rights because it is

unconstitutionally vague.  *See Doe v. University of Michigan*, 721 F. Supp. 852, 867 (E.D. Mich. 1989) (holding that university policy prohibiting "stigmatiz[ing]" or "victimiz[ing]" was unconstitutionally vague as it was "simply impossible to discern any limitation on its scope or any conceptual distinction between prohibited and unprohibited conduct.").

B.  *The AB 715 Amendments are Overbroad and Viewpoint-Discriminatory, Violating All Plaintiffs' First Amendment Rights*

1.  <u>Viewpoint Discrimination</u>

The First Amendment, incorporated against the states through the Fourteenth Amendment, prohibits the government from making laws that punish people for expressing certain viewpoints. *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

On these grounds, the government may not discriminate against speech based on the ideas or opinions it conveys; viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional." *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995).  The essence of viewpoint discrimination is when a law "[r]eflects the [g]overnment's disapproval of a subset of messages it finds offensive[.]" *Matal v. Tam*, 582 U.S. 218, 221 (2017).

The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follows ineluctably from the sender's First Amendment right to send them." *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982). *See also id.* ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring)).  As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where

they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

    2.  <u>Unconstitutional Overbreadth</u>

A law may be invalidated under the First Amendment overbreadth doctrine if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). *See Speech First. Inc. v. Cartwright*, 32 F.4th 1110, 1125 (11th Cir. 2022) (enjoining "staggeringly broad" university policy that targeted "verbal, physical, electronic, or other conduct" based on "race," "ethnicity," "religion [or] non-religion," "sex," and "political affiliation"). While litigants mounting a facial challenge to a statute must typically establish that no set of circumstances exists under which the statute would be valid, in the free speech context overbreadth context, courts have deemed statutes unconstitutionally vague despite potential lawful applications. *See United States v. Hansen*, 599 U.S. 762, 769 (2023). *See Kohls v. Bonta*, 752 F.Supp.3d 1187, 1194 (E.D. Ca. 2024) (granting preliminary injunction against law banning "deepfake" videos online on grounds that it was overbroad because while it might have some legitimate purposes, it also swept up protected speech).

This doctrine is based on a recognition that the First Amendment "provides breathing room for free expression." *Hansen*, 599 U.S. at 769-70. *See also Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (explaining that overbroad laws "deter or 'chill' constitutionally protected speech," silencing potential speakers and resulting in the loss of their contributions in the marketplace of ideas). To avoid potential chill and the commensurate harm to society, "the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 769-70 (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)).

"The first step in an overbreadth analysis is to construe the statute, as 'it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'" *Arce v. Douglas*, 793 F.3d 968, 984 (9th Cir. 2015) (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011)).  A statute that reaches speech should be found facially unconstitutional if its application is not limited to punishing unprotected speech but is "susceptible of application to protected expression." *Plummer v. Columbus*, 414 U.S. 2, 2-3 (1973) (*quoting Gooding v. Wilson*, 405 U.S. 518, 522 (1972)).  If a plaintiff demonstrates that the statute "'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (quoting *Williams*, 553 U.S. at 292).

    3.  <u>Teacher Plaintiffs</u>

"The First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton*, 597 U.S. 507 (2022) (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)).  *See also Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die.").

While courts accept some restrictions on the First Amendment rights of public-school teachers to choose curricula, *see, e.g., Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 478-80 (7th Cir. 2007), *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1014-17 (9th Cir. 2000) (describing its own decision as "narrow"), our courts do not tolerate a state government enacting laws designed to favor certain *viewpoints* (as opposed to establishing curricula broadly) and exclude others in public schools.  *See Epperson v. Arkansas*, 393 U.S. 97, 104-05 (1968) (holding that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom") (quoting *Keyishian*, 385 U.S.

at 603).   Courts are yet more skeptical of such restrictions when they interfere with important pedagogical interests.   *See Hazelwood Sch. Dist. V. Kuhlmeier*, 484 U.S. 260, 271, 273 (1988) (explaining that exercise of editorial control over a student newspaper must be "reasonably related to legitimate pedagogical concerns"); *Pratt v. Indiana Sch. Dist. No. 831*, 670 F.2d 771, 777 (8th Cir. 1982) (holding that school board "must establish a substantial and reasonable government interest exists for interfering with the students' right to receive information[]" and therefore could not remove a controversial film simply because a majority of its members objected to the film's ideological and religious content).

In fact, the Ninth Circuit has explicitly recognized that teachers' instructional speech is entitled to some degree of First Amendment protection, as educators must be "given leeway to challenge students to foster critical thinking skills and develop their analytical abilities.  … we must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective."  *C.F. v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 988 (9th Cir. 2011).  *See also Cal. Teacher's Ass'n.*, 271 F.3d at 1148 (assuming that, under *Hazelwood*, a teacher's instructional speech receives some First Amendment protection); *Sheldon v. Dhillon*, No. C-08-03438, 2009 US Dist. LEXIS 110275, at *12-13 (N.D. Ca. Nov. 25, 2009) ("The Ninth Circuit has previously recognized that teachers have First Amendment rights regarding their classroom speech, albeit without defining the precise contours of those rights.").

Though AB 715 does not define antisemitism, by requiring schools to follow the Biden National Strategy (which incorporates the IHRA definition), it heavily insinuates that criticism of the State of Israel and the political philosophy of Zionism are encompassed within its prohibitions.  Yet, such speech is unquestionably First Amendment protected: the ability to criticize governments, nations (including foreign ones), and political philosophies lies at the heart of the First Amendment. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing "a profound national commitment

to the principle that debate on public issues should be uninhibited, robust, and wide-open."). *See also Bond v. Floyd*, 385 U.S. 116, 132 (1966) ("there can be no question but that the First Amendment protects expressions in opposition to national foreign policy[.]"); *StandWithUs*, No. 24-cv-1800, 2025 U.S. App. LEXIS 27390, at *32 ("We therefore reject plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic).

Of course, the rights of teachers to voice their own opinions, political or otherwise, is restricted when it comes to classroom instruction. But importantly, the ability to criticize governments, nations, and political philosophies is also crucial to providing students with a solid education and helping to foster critical thinking skills. For these reasons, government may not restrict classroom instruction "based upon reasons that violate the First Amendment" as the State may not "impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees." *Epperson*, 393 U.S. at 107 (citing *Keyishian*, 385 U.S. at 605-06).

While the law is not entirely decisive on where teachers' rights begin and end and that such rights are inextricably intertwined with and limited by students' pedagoglical interests, it *is* clear that wherever that line ends up being drawn, AB 715's amendments fall squarely outside of it, since they operate to impose viewpoint-based restrictions on teachers by conflating antisemitism with criticism of Israel and the philosophy of political Zionism, and failing to even mention Palestinians. *See StandWithUs*, 2025 U.S. App. LEXIS 27390, at *29 ("[t]his absence of consensus [about antizionism v. antisemitism] reflects ongoing debate as to the relationship between anti-Zionism and antisemitism – debate that our constitutional scheme resolves through discourse, not judicial fiat."). These restrictions impede Teacher Plaintiffs' ability to provide factually accurate instruction related to Israel-Palestine based on their experiences and education, to permit discussion of the Palestinian point of view on the Israeli-Palestinian conflict, to provide honest answers to questions students pose on these matters, and to facilitate development of students' critical thinking skills. Accordingly, to

the extent AB 715 does not merely protect students from discrimination based upon protected characteristics but instead stretches concepts of antidiscrimination law far beyond this mandate to encompass opinions, facts, and views about a foreign government and a political philosophy, AB 715 exceeds reasonable restrictions that may be imposed upon teachers in the classroom. *See Capistrano*, 654 F.3d at 988 (holding that teachers' remarks about Christianity that a student perceived as offensive did not clearly cross a line and recognizing importance of "'robust exchange of ideas' in education, 'which discovers truth out of a multitude of tongues.'") (quoting *Keyishian*, 385 U.S. at 603).[6]

    For similar reasons, the AB 715 amendments are overbroad: they appear to forbid factually accurate, First-Amendment-protected speech and the type of discussions that are crucial to students' intellectual development. Granted, it is difficult to construe the statute, the first step in an overbreadth analysis, *Arce*, 793 F.3d at 984, because as discussed *supra*, the law is unconstitutionally vague. But to the extent it encompasses First Amendment protected speech, ironically by failing to define key terms, it creates a chilling effect by "cast[ing] a pall of orthodoxy of the classroom." *Epperson*, 393 U.S. at 104-05. While protecting students from discrimination based upon race, religion, ethnicity or national origin is undoubtedly a laudable goal, redefining discrimination to encompass information or opinions that reflect negatively on a foreign government, including the State of Israel, and a political philosophy about entitlement to land, is not. *See Am. Ass'n of University Professors v. Rubio*, 2025 U.S. Dist. LEXIS 193069, No. 25-10685-WGY, *139 n. 40 (D. Ma. Sept. 30, 2025) ("a policy of intentionally targeting pro-Palestine and anti-Israel speech in order to chill it is of course viewpoint discriminatory, and … would also fail strict scrutiny for want of being narrowly tailored to the invoked end of combatting antisemitism."). Because the flawed (non) definition of

---

[6] *Capistrano* addressed a different argument: namely, whether the teacher's remarks violated the First Amendment's Establishment Clause. Nevertheless, the court's discussion about the importance of allowing teachers leeway in order to foster critical thinking skills is instructive here.

antisemitism applies to all parts of AB 715, no part of the new law can be saved. For both reasons, the AB 715 amendments are overbroad and viewpoint discriminatory, violate Teacher Plaintiffs' First Amendment rights, and should be enjoined in their entirety.

### 4. Student Plaintiffs

Our courts recognize that *students* have First Amendment rights both to express and receive different viewpoints, derived from the right to receive information as a corollary of the right to speak. *See Arce*, 793 F.3d at 982-83 (observing that the First Amendment requires balancing students' rights with the state's authority in educational matters). "The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting." *Monteiro v. Tempe Union School District*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1989) (citing *Pico*, 457 U.S. at 912-13 (plurality op.) ("[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom."). *See also Parents v. Liberated Ethnic Stud.*, No. 2:22-cv-3243, 2024 US Dist. LEXIS 216929, at *65 (C.D. Ca. Nov. 30, 2024) (noting that the Supreme Court has recognized "the importance of protecting the 'robust exchange of ideas'" in the context of a public-school education) (quoting *Keyishian*, 385 U.S. at 603).

The Ninth Circuit interprets Supreme Court precedent to require that any "state limitations on school curricula that restrict a student's access to materials otherwise available may be upheld only where they are reasonably related to legitimate pedagogical concerns–especially . . . where the local school board has already determined that the material at issue adds value to its local school curriculum." *See Arce*, 793 F.3d at 983 (applying *Hazelwood*, 484 U.S. at 273).

Student Plaintiffs' parents believe that, in order to receive a well-rounded education, their children must be exposed to multiple perspectives on Israel and Palestine in school, including the points of view of Palestinians, anti-Zionist Jews, and Zionist Jews who disagree with the Israeli

government's policies.  That includes information about the Nakba (the dispossession of Palestinians caused by the establishment of the State of Israel), the occupation of the West Bank and blockade of Gaza, and the claims of numerous scholars and human rights organizations that Israel has committed war crimes in Gaza and the West Bank and genocide in Gaza.  They object to one-sided narratives in the classroom that favor Israel's claims and silence Palestinians.  They also believe their children should be able to discuss these ideas and historical and current events with other students and their teachers, without anyone fearing repercussions.  However, the AB 715 amendments will chill teachers from discussing these subjects given the threat of professional consequences, as discussed above.

AB 715 therefore interferes with Student Plaintiffs' constitutionally enshrined rights to obtain information about this and other subjects and to receive an education free from political bias, and to be exposed to the perspectives of Palestinians.  It does so for no legitimate reason, since there is no legitimate state interest in perpetuating one-sided narratives and silencing debate.  *Arce*, 793 F.3d at 983 (holding that "the state may not remove materials otherwise available in a local classroom unless its actions are reasonably related to legitimate pedagogical concerns.").

Moreover, AB 715 does not state whether it applies to fiction. For example, the amendments seem to forbid students from reading books like *The Great Gatsby* in class because doing so could "expose them to unlawful discrimination" since the novel contains negative stereotypes about Jewish individuals and other minorities. In J.J.'s experience, reading *The Great Gatsby* has been a valuable component of her education. Being exposed to this literature has helped her to learn about stereotypes and recognize the harm those stereotypes cause.  She also believes that a well-rounded education includes reading classic novels, even if those novels include depictions of characters and events that would be offensive by contemporary standards.  She reasonably fears that under AB 715, classics such as *The Great Gatsby* would no longer be taught, and she would be deprived of crucial educational experiences. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) ("The Free Speech

Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try.").

Accordingly, AB 715 is overbroad and viewpoint discriminatory in violation of Plaintiffs Students' First Amendment rights to receive information in the context of their public-school education.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH HEAVILY IN PLAINTIFFS' FAVOR

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. In fact, the Ninth Circuit presumes that the other three prongs of the preliminary injunction inquiry are met once a "colorable First Amendment claim" has been put forth, for the existence of such a claim presumptively establishes irreparable harm and tips the balance of equities in Plaintiffs' favor. *See Melendres*, 695 F.3d at 1002 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Viacom Int'l, Inc. v. FCC*, 828 F.Supp. 741, 744 (N.D. Ca. 1993) ("Under the law of this circuit, a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim.").

For the reasons discussed above, Plaintiffs have established not only a colorable First Amendment claim, but a substantial likelihood of success on the merits of all claims.

## CONCLUSION

For the reasons set out above, the Court should immediately enjoin the Government from enforcing AB 715. A proposed order is attached as an exhibit to this motion.

Respectfully submitted,

/s/ *Thomas B. Harvey*

THOMAS B. HARVEY (CA Bar #287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

/s/ *Jenin Younes*

National Legal Director

/s/ *Deyar Jamil*

AMERICAN-ARAB
ANTI-DISCRIMINATION COMMITTEE
910 17th Street Northwest, Suite 1000
Washington, D.C. 20006
Telephone: (202) 244-2990
jyounes@adc.org

/s/ *Michael Bracamontes*

MICHAEL BRACAMONTES
BRACAMONTES & VLASAK
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 835-6777
mbracamontes@bvlawsf.com

*Attorneys for Plaintiffs*