WILLKIE FARR & GALLAGHER LLP
Douglas C. Emhoff (SBN 151049)
  DEmhoff@willkie.com
Alex M. Weingarten (SBN 204410)
  AWeingarten@willkie.com
Matthew M. Gurvitz (SBN 272895)
  MGurvitz@willkie.com
2029 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone: (310) 855-3000

Attorneys for *Amicus Curiae*
Jewish Public Affairs Committee of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ANDREA PRICHETT, et al., | Case No. 5:25-cv-09443-NW-NMC |
| Plaintiffs, | Hon. Noël Wise |
| v. | **BRIEF OF *AMICUS CURIAE* JEWISH PUBLIC AFFAIRS COMMITTEE OF CALIFORNIA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

Date:        December 17, 2025
Time:        9:00 A.M.
Courtroom:   3

Action Filed:   November 2, 2025

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

**Page**

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT ................................................................................................................................. 3

I.    AB 715 IS NOT UNCONSTITUTIONALLY VAGUE, AND NEITHER RESTRICTS
      PROTECTED FREE SPEECH NOR INFRINGES ON PLAINTIFFS' FIRST
      AMENDMENT RIGHTS ................................................................................................... 3

      A.    Teachers Have Limited First Amendment Rights When Providing Classroom
            Instruction ........................................................................................................... 4

      B.    AB 715 Is Not Unconstitutionally Vague Because It Applies Clear and Familiar
            Nondiscrimination Standards ................................................................................ 5

            1.    AB 715 Was Enacted to Target Antisemitism ............................................ 6

            2.    AB 715 Operates Within, And Strengthens, Existing Nondiscrimination
                  Frameworks ................................................................................................. 7

            3.    AB 715 Closes Gaps in Existing Law By Extending Protections And
                  Creating Robust Enforcement Infrastructure .............................................. 9

II.   PLAINTIFFS LACK STANDING TO BRING THIS ACTION AND HAVE FAILED
      TO, AND CANNOT, DEMONSTRATE IRREPARABLE HARM ............................... 11

III.  CALIFORNIA HAS A LEGITIMATE INTEREST IN PREVENTING ANTISEMITISM
      AND ALL FORMS OF UNLAWFUL DISCRIMINATION IN PUBLIC SCHOOLS
      THAT FAR OUTWEIGHS PLAINTIFFS' UNSUBSTANTIATED CONCERNS ........ 13

      A.    Antisemitism Is a Growing Problem in California's K-12 Education System ..... 14

      B.    Discriminatory School Climates Have A Disproportionate Impact on Students'
            Educational Opportunity ..................................................................................... 17

      C.    Enjoining AB 715 Will Harm Jewish Students And Educators ........................... 17

IV.   CONCLUSION ................................................................................................................ 18

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*All. for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) .......................................................................13

5

6

*Ass'n for Accessible Medicines v. Becerra*
    822 F. App'x 532 (9th Cir. 2020) .................................................................13

7

*California Teachers Ass'n v. Davis*
    64 F. Supp. 2d 945 (C.D. Cal. 1999) ..............................................................4

8

9

*Clapper v. Amnesty Int'l USA*
    568 U.S. 398 (2013).........................................................................................13

10

*Dariano v. Morgan Hill Unified Sch. Dist.*
    745 F.3d 354 (9th Cir. 2014) ...........................................................................5

11

12

*Downs v. Los Angeles Unified Sch. Dist.*
    228 F.3d 1003 (9th Cir. 2000) .................................................................4, 15

13

14

*Esquivel v. San Francisco Unified Sch. Dist.*
    630 F. Supp. 2d 1055 (N.D. Cal. 2008) ..........................................................5

15

*Garcetti v. Ceballos*
    547 U.S. 410 (2006) .........................................................................................4

16

17

*Grayned v. City of Rockford*
    408 U.S. 104 (1972) .........................................................................................5

18

19

*Johnson v. Poway Unified Sch. Dist.*
    658 F.3d 954 (9th Cir. 2011) ...........................................................................5

20

*Pickering v. Board of Education*
    391 U.S. 563 (1968)..........................................................................................4

21

22

*Thomas v. Anchorage Equal Rts. Comm'n*
    220 F.3d 1134 (9th Cir. 2000) ...............................................................11, 13

23

24

*United Public Workers v. Mitchell*
    330 U.S. 75 (1947).....................................................................................11, 13

25

*Williams v. Vidmar*
    367 F. Supp. 2d 1265 (N.D. Cal. 2005) ..........................................................4

26

27

28

1

**Statutes and Other Authorities**

2

Cal. Assemb. B. 9, 2011 Cal. Stat. ch. 649 ...................................................8

3

Cal. Assemb. B. 715, 2025 Cal. Stat. ch. 428 ...................................... *passim*

4

Cal. Assemb. B. 2845, 2016 Cal. Stat. ch. 621 ...........................................8

5

Cal. Code Regs. § 4600...............................................................................12

6

Cal. Civ. Code § 51 *et seq.*..........................................................................7

7

Cal. Educ. Code § 201 ................................................................................17

8

Cal. Educ. Code § 220 ................................................................2, 8, 9, 10

9

Cal. Educ. Code § 244 ...................................................................... *passim*

10

Cal. Educ. Code § 260 ..................................................................................6

11

Cal. Educ. Code § 51500 ..............................................................................9

12

Cal. Educ. Code § 60000 ..............................................................................5

13

Cal. Educ. Code § 60040 ..............................................................................8

14

Cal. Gov't Code § 11135 *et seq.*..................................................................7

15

Cal. Gov't Code § 12900 *et seq.*..................................................................7

16

Cal. Penal Code §§ 422.55–422.75 ..............................................................8

17

Cal. Senate B. 48, 2011 Cal. Stat. ch. 81 .....................................................8

18

19

20

21

22

23

24

25

26

27

28

## IDENTITY AND INTEREST OF AMICUS CURIAE

Founded in 1972, the Jewish Public Affairs Committee of California ("JPAC")[1] is the largest single-state coalition of Jewish organizations in the United States.  It is composed of forty-one leading Jewish community organizations in California, including Jewish Federations, Jewish Community Relations Councils, Jewish Family Service agencies, and other organizations serving Jewish communities across the state.  Collectively, JPAC's member organizations serve and represent the interests of California's 1.2 million Jewish population.

JPAC's mission is to amplify Jewish voices through strategic statewide advocacy and coalition building to better the lives of Jews and all Californians.  For over fifty years, JPAC has advocated on behalf of the Jewish community for public policies that protect Jewish communities, support vulnerable populations, and combat discrimination and antisemitism, including in California's schools and college campuses.  JPAC has a strong interest in ensuring that Jewish students have equal access to education, and that Jewish students and educators do not face harassment and threats because of their identity.

In furtherance of its mission, JPAC works to pass legislation to counter antisemitism and hate, and protect vulnerable populations.  Most importantly, JPAC led the advocacy efforts to pass California Assembly Bill 715 ("AB 715"), the law at the heart of this case.  Many of JPAC's member organizations provide direct services to Jewish students and families statewide and have witnessed firsthand how antisemitic harassment and discrimination have increased in frequency and severity over the years.

This case involves a constitutional challenge to AB 715, which was signed into law by Governor Gavin Newsom on October 7, 2025 and enacted to address a documented and significant rise in acts of antisemitism in California's schools.  Plaintiffs now seek the extraordinary relief of a preliminary injunction to halt enforcement of that law before it has even taken effect.  JPAC's longstanding work within the Jewish community and efforts combating antisemitism equips it to explain how antisemitism manifests in educational contexts, why the preexisting statutory

---

[1] A complete list of organizations who join JPAC in support of this *amicus curiae* brief is attached as an addendum and filed concurrently with this brief.

framework proved insufficient, and how AB 715 provides necessary clarity and support to school districts struggling to address rising antisemitic harassment.

### INTRODUCTION AND SUMMARY OF ARGUMENT[2]

This case turns on a foundational principle of California law: public schools must safeguard the right of every student to an education free from discrimination based on ethnicity, religion, or nationality. Cal. Educ. Code § 220. Yet for Jewish students, that promise has fallen short in the face of escalating antisemitic discrimination, harassment, and bullying across the state and in California's K-12 schools. In 2024 alone, there has been 860 antisemitic incidents reported in K-12 schools—a figure that does not include incidents occurring on college or university campuses.[3] Confronted with these disturbing developments, the California Legislature enacted, and Governor Newsom signed into law AB 715, a landmark legislation meant to reaffirm California's commitment against discrimination in schools. AB 715 passed both chambers of the Legislature with overwhelming bipartisan support with the Assembly voting 71-0 and the Senate voting 35-0.[4]

AB 715 is consistent with longstanding, constitutionally permissible approaches that allow schools to prevent and respond to harassment without infringing upon First Amendment rights. Plaintiffs' constitutional challenge misconstrues the statute's plain language and the Legislature's intent. AB 715 was not intended to restrict protected speech and cannot be construed to do so. Instead, it targets discriminatory conduct that denies Jewish students equal educational opportunities.

The balance of equities and public interest likewise weigh decisively against an injunction. Enjoining AB 715 would significantly impair efforts to address antisemitic

---

[2] Publicly available information and articles are attached as exhibits to the declaration of David Bocarsly. In the alternate, JPAC respectfully requests that the Court take judicial notice of this publicly available information.
[3] *Audit of Antisemitic Incidents 2024*, ADL (April 22, 2025), https://www.adl.org/resources/report/audit-antisemitic-incidents-2024. In 2024, there were a total of 1,694 antisemitic incidents in U.S. college/university campuses. *Id.*
[4] California Legislative, Bill Votes, *AB-715 Educational equity: discrimination: antisemitism prevention*, California Legislative Information (last visited November 11, 2025), https://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=202520260AB715.

harassment and hostile environments that impede students' ability to learn.  Data on the rise of antisemitism and reports of antisemitic harassment in California's schools demonstrate that Jewish students face real and immediate harm when schools lack adequate tools to identify, respond to, or prevent antisemitic conduct.  An injunction would exacerbate these challenges. Plaintiffs' motion should therefore be denied.

## ARGUMENT

I.     **AB 715 IS NOT UNCONSTITUTIONALLY VAGUE, AND NEITHER RESTRICTS PROTECTED FREE SPEECH NOR INFRINGES ON PLAINTIFFS' FIRST AMENDMENT RIGHTS**

Plaintiffs erroneously argue that AB 715 is facially unconstitutional because it putatively prohibits First Amendment-protected speech, including classroom instruction and discussion of the Israeli–Palestinian conflict.  *See* ECF No. 15, Pls. Mot. Prelim. Injunction ("Mot.") 14:7– 15:9.  They further assert, as a result, that teachers "cannot know what they may and may not teach." *Id.* 15:14–15.  Plaintiffs' theory is two-fold:  (i) AB 715 is vague because it purportedly fails to clarify what is prohibited under the law, and (ii) it is overbroad and imposes viewpoint-based restrictions on speech by "redefining discrimination to encompass information or opinions that reflect negatively on a foreign government, including the State of Israel, and a political philosophy about entitlement to land." Mot. 14:7–15:24, 17:8–18:22, 22:18–20.  The statute does neither.

Plaintiffs' cannot show a likelihood of prevailing on the merits for, *inter alia*, two reasons: (1) the United States Supreme Court has conclusively held that teachers ***do not*** have a First Amendment right to determine the curriculum taught in schools, a fatal flaw to Plaintiffs' challenge; and (2) AB 715 is not unconstitutionally vague as it applies well-established non-discrimination principles consistent with myriad other California laws.

1    **A.      Teachers Have Limited First Amendment Rights When Providing**

2    **Classroom Instruction**

3        As a preliminary matter, Plaintiffs' argument that AB 715 unconstitutionally restricts

4   classroom speech is fundamentally flawed because teachers' rights to free speech in the

5   classroom is not unlimited.  The Court confronted teachers' free speech rights by creating a

6   balancing test for protected speech, highlighting that the "problem in any case is to arrive at a

7   balance between the interest of the teacher, as a citizen, in commenting upon matters of public

8   concern and the interest of the State, as an employer, in promoting the efficiency of the public

9   services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568

10  (1968).  In balancing the individual and societal interests served when employees speak as private

11  citizens, and the needs of government employers to promote an effective and efficient workplace,

12  the Court in *Pickering* underscored the importance of acknowledging the countervailing state

13  interests as an employer.  *Id.*  As such, a public-school teacher's instructional speech "is not

14  subject to the constraints of constitutional safeguards." *Downs v. Los Angeles Unified Sch. Dist.*,

15  228 F.3d 1003, 1011, 1013 (9th Cir. 2000); *see also Garcetti v. Ceballos*, 547 U.S. 410 (2006)

16  (public employees' statements pursuant to their official duties are not speaking as citizens for

17  First Amendment purposes).  Plaintiffs cannot argue in good faith that their interests in

18  commenting on the Israel–Hamas war outweighs California's interest in eradicating the pervasive

19  antisemitism and discrimination that surged as a result of the war.

20       Consistent with that rule, "teachers do not have a First Amendment right to determine

21  what curriculum will be taught in the classroom." *Williams v. Vidmar*, 367 F. Supp. 2d 1265,

22  1271 (N.D. Cal. 2005) (citation modified) (elementary school teacher did not have

23  constitutional right to express his point of view as part of classroom instruction, a nonpublic

24  forum).  "This is especially true if the teacher's curriculum of choice is in contravention of

25  specific school policies or dictates." *California Teachers Ass'n v. Davis*, 64 F. Supp. 2d 945,

26  953 (C.D. Cal. 1999).

27

28

1    Under this framework, Plaintiffs cannot reasonably argue that AB 715 prohibits or

2  restricts protected speech by setting nondiscrimination standards for classroom instruction and

3  instructional materials.  The authority to adopt and set curriculum in California's public schools

4  rests with the school districts (Cal. Educ. Code § 60000(c)) and courts recognize that the

5  government—not individual teachers—retain authority to determine school curriculum.  *See*

6  *Esquivel v. San Francisco Unified Sch. Dist.*, 630 F. Supp. 2d 1055, 1060 (N.D. Cal. 2008)

7  ("[T]he First Amendment does not limit the government's ability to speak, such as when deciding

8  what to teach in public schools").  The State, through school districts, has always exercised

9  authority over public school curricula, and AB 715 is consistent with that established authority.

10    Moreover, courts have routinely upheld schools' authority to regulate certain expressions

11  and speech without violating the First Amendment.  *See Dariano v. Morgan Hill Unified Sch.*

12  *Dist.*, 745 F.3d 354, 359–60 (9th Cir. 2014) (School action requiring students to change clothing

13  bearing American flag on Cinco de Mayo did not violate students' First Amendment rights);

14  *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967–69 (9th Cir. 2011) (school district's

15  action requiring a teacher to remove banners emphasizing religious belief from classroom did not

16  violate the teacher's right to free speech).  Accordingly, amendments to the Education Code

17  pursuant to AB 715 reflect the State's legitimate authority to set curriculum and standards for

18  classroom instruction.

19    The foundational premise of Plaintiffs' motion completely ignores clear precedent

20  establishing that teachers do not possess unlimited First Amendment rights to dictate curriculum

21  in the classroom.

22  **B.    AB 715 Is Not Unconstitutionally Vague Because It Applies Clear and**

23  **Familiar Nondiscrimination Standards**

24    Plaintiffs' argument that AB 715 is vague because it purportedly fails to clarify what is

25  prohibited under the law is similarly without merit.  A statute is unconstitutionally vague where

26  it fails to provide "a person of ordinary intelligence a reasonable opportunity to know what is

27  prohibited" or invites "arbitrary and discriminatory enforcement."  *Grayned v. City of Rockford*,

28

5

408 U.S. 104, 108–09 (1972).  AB 715 does neither.  AB 715 is not unconstitutionally vague because both its substance and scope are firmly defined.  AB 715 operates within California's long-standing nondiscrimination framework, which courts have applied consistently across education and other civil rights contexts.  Further, far from introducing uncertainty, AB 715 expands those established protections in clear and administrable ways.

### 1. AB 715 Was Enacted to Target Antisemitism

As stated in the chaptered bill, the Legislature's intention in enacting AB 715 was to "reduc[e] antisemitism in schools and ensur[e] that no pupil faces an antisemitic school environment."  *See* Cal. Assemb. B. 715, 2025 Cal. Stat. ch. 428, § 1(h) ("AB 715").  According to the Legislature, AB 715 was necessary to address the rise in antisemitic harassment and hostility toward Jewish students which had become "severe and pervasive across California public schools" and because existing protections were inadequate or inconsistently applied.  AB 715 § 1(c)–(e).  The determination of whether classroom materials or instruction are unlawfully discriminatory is vested with the appropriate school boards for uniform application across all schools, rather than leaving individual teachers with discretion to deviate from set standards that could lead to disastrous results for Jewish students.  *See* Cal. Educ. Code § 260 (school boards hold primary responsibility for ensuring programs and activities are free from discrimination and for monitoring compliance with nondiscrimination rules); § 244 (vesting school boards with authority to adopt and approve instructional materials free from discriminatory content).

AB 715 requires that classroom instruction and instruction materials be "factually accurate," be consistent with adopted curricula, be free of partisanship, and that instructional materials do not "subject a pupil to unlawful discrimination," and leaves that determination to the appropriate school boards rather than individual teachers. AB 715 §§ 2, 7, 8 (amending Cal. Educ. Code §§ 244(a)(1), 51500(b), 51501(b)). These requirements cannot be construed as censoring or imposing view-point-based restrictions on classroom speech, as alleged by Plaintiffs.  Rather, they ensure that classroom instruction and materials do not perpetuate antisemitic discrimination under the guise of academic instruction.

Plaintiffs' allegations illustrate the harm the Legislature sought to mitigate. Plaintiffs include teachers whose courses do not include Middle East history or geopolitics, yet who seek to inject discussions of the Israel–Palestinian conflict and criticisms of Israel into their classrooms. Plaintiff Jonah Olson, a middle-school science teacher, claims AB 715 will limit "discuss[ions] [on] . . . the current genocide in Gaza [and] the political influence of pro-Israel organizations" and "strip [his] right to express support for Palestinian people and Palestine." *See* ECF 15-3, Decl. of Jonah Olson in Support of Pls. Mot. Prelim. Injunction, ¶¶ 11–13. Plaintiff Dunia Hassan, a high-school Spanish teacher, alleges AB 715 would limit her ability to "honestly answer questions about Palestine and Israel in [her] class" or engage in discussions as to "how the creation of Israel has harmed Palestinians and deprived them of their rights to self-determination." *See* ECF 15-4, Decl. of Dunia Hassan in Support of Pls. Mot. Prelim. Injunction, ¶¶ 25, 29. Similarly, Plaintiff Andrea Pritchett, who teaches eighth grade U.S. history, questions whether under AB 715 she may teach that "Palestinian citizens of Israel do not have equal rights," "Palestinians living . . . under Israeli occupation have almost no rights at all," and "Israel is occupying Palestine." *See* ECF 15-2, Decl. of Andrea Pritchett in Support of Pls. Mot. for Prelim. Injunction, ¶¶ 40–45.

Neither the complaint nor the motion identifies any cognizable First Amendment right of these teachers to diverge from adopted curricula. Teachers have no First Amendment rights to use class time to pursue personal advocacy or ad hoc global politics discussions. *See supra* § 1.A. AB 715 prevents such divergence from curriculum-based instruction, particularly where such divergence perpetuates harmful antisemitic narratives and creates a hostile learning environment for Jewish students.

## 2. AB 715 Operates Within, And Strengthens, Existing Nondiscrimination Frameworks

California maintains a long-standing, comprehensive framework prohibiting discrimination in public life, including in schools, business establishments, employment, housing, and state-funded programs. *See, e.g.,* Unruh Civil Rights Act (Cal. Civ. Code § 51 et

7

seq.); Fair Employment and Housing Act (Cal. Gov't Code § 12900 et seq.); Cal. Gov't Code § 11135 et seq. (prohibiting discrimination in state-funded or state-administered programs and activities).  California's nondiscrimination laws prohibit discrimination based on religion, race, ethnicity, nationality, or ancestry.  California's hate-crime statutes reinforce these protections through enhanced penalties for identity-based violence or intimidation.  *See* Cal. Penal Code §§ 422.55–422.75 (enhanced penalties for crimes motivated by a victim's religion, race, ethnicity, nationality, or other protected identity), § 422.6 (criminalizing interference with constitutional rights through threats or intimidation motivated by bias).  The Education Code is consistent with framework, prohibiting discrimination in educational programs and activities and requiring instructional materials to be accurate, inclusive, and nondiscriminatory.  *See* Cal. Educ. Code §§ 220, 60040.

AB 715 fits squarely within this existing statutory scheme.  It does not expand the meaning of discrimination or require schools to adopt a novel evaluative test.  AB 715 merely clarifies that antisemitic discrimination is prohibited and directs school districts, rather than individual teachers, to identify and address antisemitism in schools using the enforcement mechanism, as provided the statute.  California courts are well-versed in evaluating discrimination claims across education, housing, employment, and public accommodation and they do so by examining whether conduct unlawfully burdens or targets protected groups. Nothing in AB 715 alters that standard or asks courts to apply unfamiliar criteria.

AB 715 is also not unique.  When particular protected groups face heightened harassment or discrimination, the Legislature has adopted measures to strengthen protections for such groups. For example, Seth's Law, [5] enacted in 2011, strengthened complaint and enforcement procedures to combat bullying of LGBTQ+ students.  The FAIR Education Act of 2011[6] incorporated contributions of LGBTQ+ individuals and persons with disabilities into K-12 instruction to ensure that the curriculum was inclusive rather than discriminatory.  The Safe Place to Learn Act

---

[5] Seth's Law, Cal. Assemb. B. 9, 2011 Cal. Stat. ch. 649.
[6] FAIR Education Act, Cal. Senate B. 48, 2011 Cal. Stat. ch. 81 (codified as amended at Cal. Educ. Code §§ 51204.5, 51500, 51501, 60040, and 60044).

BRIEF OF *AMICUS CURIAE* JEWISH PUBLIC AFFAIRS COMMITTEE OF CALIFORNIA
Case No. 5:25-cv-09443-NW-NMC

of 2016[7] responded to increased harassment of Muslim, Sikh, and Asian American students. Each of these laws reinforced existing protections against discrimination in the Education Code through improved implementation and enforcement mechanisms, which is precisely what AB 715 does.

### 3. AB 715 Closes Gaps in Existing Law By Extending Protections And Creating Robust Enforcement Infrastructure

Likewise, AB 715 is far from vague because it simply expands and strengthens the longstanding protections against discrimination through clear and enforceable mechanisms. The Education Code already prohibits instruction that "promote[s] a discriminatory bias" based on race or ethnicity, gender, religion, disability, nationality, sexual orientation, or any other characteristic included in the Penal Code's definition of hate crimes. *See* Cal. Educ. Code § 51500; *see also id.* § 220. AB 715 reaffirms these existing protections and strengthens them by requiring that instruction be "factually accurate," aligned with adopted curricula, and consistent with accepted standards of professional responsibility—rather than advocacy, personal opinion, bias, or partisanship. *See* AB 715 § 7 (amending Cal. Educ. Code § 51500(a)(2)–(3)).

AB 715 also reiterates the existing prohibition on discriminatory instructional content in the Education Code and extends those protections to the broader ecosystem that produces and supports instructional materials, mandates swift removal of offending content, and backs the standards with concrete enforcement and vendor accountability. *See* AB 715 §§ 2, 9, 10 (amending Cal. Educ. Code §§ 244, 60151, 60152). This is imperative because, as recently as last year, the San Francisco Unified School District maintained a resource library containing educational material that attempted to legitimize the massacre of civilians on October 7— material that traced back to Hamas, the internationally recognized terrorist organization that was responsible for the October 7 terror attack.[8]

---

[7] Safe Place to Learn Act, Cal. Assem. B. 2845, 2016 Cal. Stat. ch. 621 (codified as amended at Cal. Educ. Code § 234).
[8] Digital Democracy, CalMatters, "Assembly Standing Committee on Education Hearings," May 14, 2025, https://calmatters.digitaldemocracy.org/hearings/259095?t=459&f=1af1777a4fef3a5cd657fa1c407281c0.

9

1    With AB 715, discriminatory materials provided (i.e., materials that would subject a pupil

2    to unlawful discrimination) by third parties would be prohibited.  It expressly brings professional

3    development materials and services within the nondiscrimination framework, preventing indirect

4    reintroduction of discriminatory content through teacher training or vendor services.   *See* AB

5    715 § 2 (amending Cal. Educ. Code § 244). In other words, if any professional development

6    materials and services promote or support the use of discriminatory instructional content, it would

7    be expressly prohibited.

8    Furthermore, if a district knows or has reason to know that materials were used or an

9    action occurred that subjected a student to unlawful discrimination under section 220 of the

10   Education Code, it must investigate and remediate the conduct.  *See* AB 715 § 2 (amending Cal.

11   Educ. Code § 244 (a)(2)). Once the investigation is conducted and it is determined that the

12   instructional materials provided by a third party violate section 244 of the Education Code, not

13   only is the third party vendor required to reimburse all funds received from a local education

14   agency ("LEA"), it must also disclose the violation to every LEA it served and in any future

15   proposal to LEAs.  *See id.* § 10 (amending Cal. Educ. Code  § 60152).  This deters any future use

16   of discriminatory materials statewide.  AB 715 seeks to further prevent antisemitic discrimination

17   in our schools—creating a safe environment for Jewish children to enjoy an equal educational

18   opportunity.

19   AB 715 also builds a concrete governance, oversight, and enforcement framework

20   through the Office of Civil Rights and the creation of an Antisemitism Prevention Coordinator

21   so that schools not only know what to do, but are also held accountable if they fail to do so.  *See*

22   *id.* § 5 (amending Cal. Educ. Code  § 33800).  California has seen a sustained surge of antisemitic

23   hostility.  Separately, statewide data shows that anti-Jewish incidents comprise the large majority

24   of reported religion-based hate crimes while Jews are a small fraction of the population.[9]  AB

25

26   [9] *See* Bocarsly Decl., ¶ 12, Ex. A, California Department of Justice. Hate Crime in California 2024. Last visited
      November 26, 2025. https://data-openjustice.doj.ca.gov/sites/default/files/2025-

27   06/Hate%20Crime%20In%20CA%202024.pdf.  The Hate Crime in California report found that anti-Jewish bias
      events accounted for 76 percent of all reported religious hate crimes, while Jewish people make up only

28   approximately 3 percent of the state's population.

715 doesn't just denounce antisemitism—it builds an operational system that make schools accountable for results.  By creating an independent Office of Civil Rights ("OCR") within the Government Operations Agency, led by a Governor-appointed, Senate confirmed Director, and including an Antisemitism Prevention Coordinator ("APC"), AB 715 creates a clear chain of authority with set duties and the ability to take enforceable action with consequences.  *See* AB 715 § 5 (amending Cal. Educ. Code §§ 33800–33802, § 33803.1).

AB 715 equips parents and communities with information to hold systems to account. *See* AB 715 § 7 (amending Cal. Educ. Code § 51500(c)).  Under the statute, local education agencies "shall ensure that parents and guardians have access" to classroom instructional and related educational materials, including textbooks, curriculum, supplemental instructional materials, and other materials used for instruction at a reasonable time.  *Id.*  Oftentimes, when parents raised their concerns about antisemitic incidents or indoctrination in school board meetings, they were met with disparaging and mocking responses.[10]  Parents were left with no recourse but to keep their children home from school or transfer them to a different district.[11] With AB 715, parents are able to fully participate in their children's education and ensure teachers are providing factually accurate information in the classroom.

There is nothing vague about preventing discrimination.

## II.    PLAINTIFFS LACK STANDING TO BRING THIS ACTION AND HAVE FAILED TO, AND CANNOT, DEMONSTRATE IRREPARABLE HARM

No Plaintiff has been investigated, disciplined, or threatened with investigation under AB 715, nor has any school district determined the Plaintiff Teachers' instruction or instructional materials to be factually inaccurate, inconsistent with adopted curricula, partisan, or discriminatory in violation of the statute.  *See* AB 715 §§ 2, 7, 8 (amending Cal. Educ. Code §§ 244(a)(1), 51500(b), 51501(b)).  Plaintiffs instead ask this Court (rather than the express mechanism provided under AB 715) to declare preemptively that the statute, as applied, would

---

[10] *See* Bocarsly Decl., ¶ 17, Ex. D, at 4.
[11] Monica Velez, *Report suggests Jewish families are choosing to leave Oakland Unified*, EdSource, (Jan. 17, 2024), https://edsource.org/updates/report-suggests-jewish-families-are-choosing-to-leave-oakland-unified.

BRIEF OF *AMICUS CURIAE* JEWISH PUBLIC AFFAIRS COMMITTEE OF CALIFORNIA
Case No. 5:25-cv-09443-NW-NMC

prohibit hypothetical classroom instruction, discussions, or educational materials.    Plaintiffs

therefore seek an advisory opinion, which federal courts are not authorized to issue under Article

III.  *See United Public Workers v. Mitchell*, 330 U.S. 75, 89 (1947) ("[F]ederal courts established

pursuant to Article III of the Constitution do not render advisory opinions."); *Thomas v.

Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Our role is neither to issue

advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or

controversies.").

AB 715 establishes a detailed process for the approval of instructional materials and

review of instructional materials alleged to unlawfully discriminate against a student.    As

amended, the California Education Code prohibits the adoption or approval of any "textbooks,

instructional materials, supplemental instructional materials, curriculum, [or] professional

development materials" if their use would "subject a pupil to unlawful discrimination."  AB 715

§ 2 (amending Cal. Educ. Code § 244(a)(1)).  It further provides that if a school district or local

education board has reason to know that materials were used in a classroom or an action occurred

that resulted in unlawful discrimination, it shall investigate and remediate the action.    *Id*

(amending Cal. Educ. Code § 244(a)(2)).  Complaints may be brought under the existing Uniform

Complaint Procedures, pursuant to California Code of Regulations section 4600, or directly to

the Superintendent, who is authorized to order corrective action**.**  *Id*.  A complainant filing

directly with the Superintendent must present "evidence that supports the basis for the direct

filing and why immediate action is necessary," and the Superintendent may directly intervene or

wait for an investigation by the school district, county office of education, or charter school.  *Id*.

(amending Cal. Educ. Code § 244(c)).  A party to a written complaint of prohibited discrimination

may appeal the action taken by the governing board of a school district to the department of

education.  *Id.* § 3 (amending Cal. Educ. Code § 262.3(a)).

AB 715 and existing law prescribe exactly how concerns about classroom instruction or

educational materials are to be raised, reviewed, and resolved:  through the school board and

administrative processes the Legislature has designated**.**  Plaintiffs' disagreement with the

Legislature's chosen mechanism for review of alleged violations of the statute does not create a ripe case or controversy. No school board or district has rejected the Plaintiff Teachers' proposed curriculum, nor has a school board or district found that their instruction or instructional materials result in unlawful discrimination under AB 715. Plaintiffs nevertheless request that this Court determine preemptively that unspecified instructional materials and classroom instruction are not prohibited under the law. This is precisely the sort of abstract, pre-enforcement determination Article III forbids. *See United Public Workers,* 330 U.S. at 90; *Thomas*, 220 F.3d at 1138.

For the same reason, Plaintiffs cannot establish irreparable harm to justify a preliminary injunction. Harm that is contingent on future administrative decisions and speculative interpretations of a law that has not yet been enforced does not give rise to a threat of imminent injury to support pre-enforcement relief. *See Ass'n for Accessible Medicines v. Becerra*, 822 F. App'x 532, 534 (9th Cir. 2020) (vacating district court's grant of preliminary injunction where plaintiffs alleged only "possible future injury" and did not establish a "substantial risk of harm"); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401-02 (2013) ("[R]espondents cannot manufacture standing . . . based on hypothetical future harm that is not certainly impending."). Plaintiffs have identified no adverse action taken under AB 715, nor any pending investigation, complaint, or threatened sanction. Any alleged injury depends entirely on how local educational agencies might apply the statute in response to complaints raised against future classroom instruction—events that have not occurred and may never occur.

III.    **CALIFORNIA HAS A LEGITIMATE INTEREST IN PREVENTING ANTISEMITISM AND ALL FORMS OF UNLAWFUL DISCRIMINATION IN PUBLIC SCHOOLS THAT FAR OUTWEIGHS PLAINTIFFS' UNSUBSTANTIATED CONCERNS**

As long-standing law makes clear, a court assessing a preliminary injunction must weigh the parties' respective harms as well as the public interest—both of which weigh decisively against granting relief. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("The public interest analysis for the issuance of a preliminary injunction requires us to

consider whether there exists some critical public interest that would be injured by the grant of preliminary relief.").  When considering competing public interests, courts will not grant a preliminary injunction unless "public interests outweigh other public interests that cut in favor of *not* issuing the injunction." *Id*.  In other words, a court will only grant a preliminary injunction if the public interest supporting the injunction is stronger than the public interest against it.  Here, the public interest in addressing antisemitism in California's K-12 education system and preventing discriminatory school climates far outweighs Plaintiffs' unsubstantiated and hypothetical concerns.  In fact, an injunction against AB 715 would expose Jewish students— and the educators tasked with protecting them—to significant and immediate harm.

**A.  Antisemitism Is a Growing Problem in California's K-12 Education System**

Reports of antisemitic incidents have increased dramatically in many educational settings over the past several years.[12]  Since 1979, the Anti-Defamation League ("ADL") has tracked antisemitic incidents across the United States, including in schools.  Since 2020, incidents in California K-12 schools have spiked by an alarming 434%.[13]  Notably, there was a staggering increase between 2022 and 2023, following the October 7, 2023 terrorist attacks in Israel.[14]  For example, in 2023, there was 1,162 reported antisemitic incidents in K-12 schools (mostly public schools).  This represented a 135% increase from 495 K-12 school based incidents in 2022.[15]  Of the 1,162 K-12 school incidents, 672 were cases of harassment, 464 were cases of vandalism, and 26 were cases of assault.[16]  K-12 schools offer only a snapshot of the broader reality reflecting the troubling rise of antisemitism occurring throughout the United States.  In 2024, there were

---

[12] *Audit of Antisemitic Incidents 2022*, ADL (March 23, 2023), https://www.adl.org/resources/report/audit-antisemitic-incidents-2022.

[13] *Antisemitism in Independent K-12 Schools Post-October* 7, ADL (May 21, 2025), https://www.adl.org/resources/report/antisemitism-independent-k-12-schools-post-october-7; *see also* Bocarsly Decl., ¶ 15, Ex. B.

[14] *Audit of Antisemitic Incidents 2023*, ADL (April 16, 2024), https://www.adl.org/resources/report/audit-antisemitic-incidents-2023; *see also* Bocarsly Decl., ¶ 15, Ex. B.

[15] *Audit of Antisemitic Incidents 2023*, ADL (April 16, 2024), https://www.adl.org/resources/report/audit-antisemitic-incidents-2023.

[16] *Id*.  These statistics are only comparing the incidents between 2022 and 2023 to show the effects of the October 7, 2023 terrorist attacks in Israel.  The 2024 ADL audit data shows that there has been a decrease in antisemitic incidents in K-12 – a total of 860 incidents, which is a 23% decrease since 2023.  *See infra* note 17.

14

9,354 reported antisemitic incidents—representing a 5% increase from the 8,873 incidents recorded in 2023.[17]

Since the later part of 2023, Jewish organizations have placed increased focus on tracking antisemitic incidents. For example, in November 2023, the Bay Area Jewish Coalition ("BAJC") formed in Santa Clara County and began collecting reports about antisemitic incidents specifically in K-12 schools.[18] Since November 2023, BAJC has received over 400 reports of antisemitic incidents in K-12 schools in Santa Clara County alone.[19] On average, BAJC receive reports of 1.3 antisemitic incidents per school day.[20] Of the reported incidents, about 14% were Elementary Schools, 27% in Middle Schools, and 59% in High Schools.[21]

These antisemitic incidents, unfortunately, are not isolated to one county or city—the data indicates a pervasive pattern of occurrences all throughout California. Jewish and Israeli public school students have been victimized, harassed, and assaulted at school. Some of the more egregious antisemitic incidents in California that occurred within the past few years include:

- Los Angeles: In February 2024, a 15-year-old Jewish high school student attending El Camino Real High School in Woodland Hills was physically assaulted during class by a classmate who had previously yelled antisemitic slurs at her.[22]

- Huntington Beach: A 12-year-old middle school Jewish student at Mesa View Middle School in Huntington Beach Unified was physically and verbally attacked by another student multiple times in a single day. The attacker told the Jewish student, "Everyone I have a problem with is Jewish."[23]

- Berkeley: On March 20, 2024, a Jewish first grader at a Berkeley Unified Elementary School heard older children on the playground say, "Jews are stupid." That evening,

---

[17] *Audit of Antisemitic Incidents 2024*, ADL (April 22, 2205), https://www.adl.org/resources/report/audit-antisemitic-incidents-2024.
[18] *See* Bocarsly Decl., ¶ 16, Ex. C.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Sid Garcia, *EL Camino Real HS Students Stage Walkout Over Alleged Antisemitic Attach At School*, ABC7 News (February 27, 2024), https://abc7.com/post/el-camino-real-high-school-alleged-antisemitic-attack-danielle-eshed/14473655/.
[23] *See* Bocarsly Decl., ¶ 17, Ex. D, at 5.

the six-year-old was visibly distressed and told his mother that he wishes he weren't Jewish because kids don't like Jews.[24]  In the same district, students have reported calls in the hallways to "Kill the Jews" and to "eliminate Israel."  Jewish students report being asked what "their number is," a reference to the inhumane treatment of Jews in Nazi Concentration Camps.[25]

- <u>Ventura County</u>:  More than 30 large swastikas were painted on the gym wall of a Ventura middle school gym.  In the same district, schoolchildren have been relentlessly bullied for being Jewish.  In one case, a Jewish student was told by one of her peers that "Hitler should have finished the job."[26]

Unfortunately, many of the teachers and administrators entrusted with protecting students have failed to do so—oftentimes perpetrating harm towards innocent Jewish students.  School districts across California permit many teachers to indoctrinate children through biased and hateful content in their curricula.  As just one illustrative incident—one that sent ripples across the Oakland community—in December 2023, during a "Teach-In," Oakland teachers provided a coloring book for kindergartens stating, "A group of bullies called Zionists wanted our land, so they stole it by force and hurt many people."[27]  Other materials included a lesson asking students to draw "Zionist leaders of Israel" "receiv[ing] money" "to conduct" a "two-tiered (unfair) system where Palestinians are mistreated and attacked."[28]  After this anti-Israel "teach-in" and other incidents, at least 30 Jewish families transferred out of the Oakland Unified School district over fears of antisemitism.[29]  While the "teach-in" was eventually disavowed by Oakland Unified School District Superintendent, its very occurrence underscores systemic failures that allowed educators to engage in the activity in the first place.  The issue is not simply that the conduct happened, but how such conduct was permitted to proceed unchecked.  Incidents like this

---

[24] *Id.*, at 4.
[25] *Id.*
[26] *Id.*
[27] *See* Bocarsly Decl., ¶ 17, Ex. D, at 2.
[28] *Id.*
[29] Lauren Toms, *Jewish Parents Transfer Children Out of Oakland Unified Over Antisemitism Concerns*, CBS News (January 12, 2024), https://www.cbsnews.com/sanfrancisco/news/jewish-parents-transfer-children-out-of-oakland-unified-over-antisemitism-concerns/.

BRIEF OF *AMICUS CURIAE* JEWISH PUBLIC AFFAIRS COMMITTEE OF CALIFORNIA
Case No. 5:25-cv-09443-NW-NMC

demonstrate the lack of adequate safeguards and uniform curricula that leaves students, particularly Jewish students, vulnerable to real and lasting harm.

### B. Discriminatory School Climates Have A Disproportionate Impact on Students' Educational Opportunity

A discriminatory school climate denies students equal educational opportunity because it undermines the very conditions necessary for learning—safety, belonging, and access to unbiased instruction. California's statutory framework makes clear that the State itself recognizes how a "hostile environment on school grounds [ ] impairs the access of pupils to equal education opportunity." Cal. Educ. Code § 201(f). As demonstrated above through a few examples of antisemitic incidents, Jewish students are being deprived of the right to an equal education.[30] Jewish children in K-12 schools all over California are experiencing various forms of antisemitism, including verbal harassment, exclusion for their Jewish identity, and biased instruction.[31]

When students are subjected to hostility, bias, and exclusion, their ability to participate meaningfully in educational programs is impaired in concrete ways: they disengage from class, experience emotional distress that diminishes their academic focus, and have lower academic performance.[32] The diminished engagement and lower academic performance can have detrimental effects on students, placing them at a measurable and lasting educational disadvantage. With antisemitism surging nationwide, including in California's K-12 schools, too many Jewish students are in jeopardy of being denied an equal educational opportunity.

### C. Enjoining AB 715 Will Harm Jewish Students And Educators

AB 715's provisions create comprehensive enforcement systems that protect students and support educators. AB 715 advances California's long-standing commitment to providing

---

[30] *See* Cal. Educ. Code § 201(c) ("harassment on school grounds directed at an individual on the basis of personal characteristics or status creates a hostile environment and jeopardizes equal educational opportunity as guaranteed by the California Constitution and the United States Constitution").

[31] *See supra* III.A.

[32] Linda Darling-Hammond, et al., *Educating the Whole Child: Improving School Climate to Support Student Success*, Learning Policy Institute (September 2018), https://learningpolicyinstitute.org/sites/default/files/product-files/Educating_Whole_Child_BRIEF.pdf.

17

students with a safe, nondiscriminatory educational environment by prohibiting materials that subject students to unlawful discrimination. As a result, the statute safeguards students' ability to learn free from bias, hostility, or exclusion—conditions that are foundational to equal educational opportunity.

At the same time, AB 715 meaningfully supports educators. The law provides a consistent statewide framework that ensures teachers receive professional development resources untainted by discriminatory content. Moreover, the creation of the Office of Civil Rights and the Antisemitism Prevention Coordinator ensures that educators have access to expert guidance, responsive support, and opportunities for consultation when questions arise. *See* AB 715 § 5 (amending Cal. Educ. Code § 33803.1). AB 715 equips educators with the tools and training to maintain lawful, inclusive learning environments. *Id.*

## IV.    CONCLUSION

For the foregoing reasons, JPAC respectfully requests that the Court deny Plaintiffs' motion for preliminary injunction.

Dated: December 1, 2025                          Respectfully submitted,

                                                 WILLKIE FARR & GALLAGHER LLP

                                                 By: */s/ Alex M. Weingarten*
                                                        Alex M. Weingarten

                                                 Attorneys for *Amicus Curiae*
                                                 Jewish Public Affairs Committee of California

BRIEF OF *AMICUS CURIAE* JEWISH PUBLIC AFFAIRS COMMITTEE OF CALIFORNIA
Case No. 5:25-cv-09443-NW-NMC