1   JENIN YOUNES* (*pro hac vice*)
2   DEYAR JAMIL (*pro hac vice*)
    AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE
3   910 17th Street Northwest, Suite 1000
    Washington, DC 20006
4   Telephone: (202) 244-2990
5   jyounes@adc.org
    *Designated Counsel for Service
6
7   THOMAS B. HARVEY (CA Bar #287198)
    LAW OFFICES OF THOMAS B. HARVEY
8   365 E. Avenida De Los Arboles, #226
    Thousand Oaks, CA 91360
9   Telephone: (805) 768-4440
    tbhlegal@proton.me
10
11  MICHAEL BRACAMONTES (CA Bar # 242655)
    BRACAMONTES & VLASAK
12  220 Montgomery Street, Suite 2100
    San Francisco, CA 94104
13  Telephone: (415) 835-6777
    mbracamontes@bvlawsf.com
14

15  *Attorneys for Plaintiffs*

16

17              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
18                    SAN JOSE DIVISION

19

20  **ANDREA PRICHETT, et al.,**                    Case No. 5:25-cv-09443-NW

21                                *Plaintiffs*,     **REPLY IN SUPPORT OF MOTION FOR
                                                    PRELIMINARY INJUNCTION**
22          **v.**
                                                    **THIRTY MINUTES ORAL ARGUMENT
23                                                  REQUESTED**

24  **GAVIN NEWSOM, et al.,**
                                                    Date:         December 17, 2025
25                                *Defendants*.     Time:         9:00 A.M.
                                                    Courtroom:    3
26                                                  Judge:        The Honorable Nöel Weiss
                                                    Trial Date:   Not Set
27                                                  Action Filed: 11/02/2025

28

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

   I.   PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS .................................................. 2

     A.  *AB 715's Chilling Effect Constitutes an Injury-In-Fact* .......................................... 2

       1. Plaintiffs Have a Concrete Plan Because Their Speech is Chilled. ..................... 3

       2. Plaintiffs Have Established a Credible Threat of Enforcement ........................... 5

     B.  *Plaintiffs' Injuries are Traceable to AB 715 and Redressable Through the Requested Relief.* ..................... 6

       1. Traceability Exists Because AB 715 Predictably Alters the Complaint and Enforcement Landscape, Harming Plaintiffs ..................... 6

       2. Redressability Exists Because an Injunction Would Meaningfully Reduce Plaintiffs' Risk of Punishment and Chill ..................... 7

  II.  PLAINTIFFS' CLAIMS ARE RIPE FOR ADJUDICATION ..................................................... 9

  III.  SOVEREIGN IMMUNITY DOES NOT APPLY TO THE STATE OFFICIALS IN THIS ACTION ........... 11

  IV.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ........................ 11

     A.  *AB 715 Is Unconstitutionally Vague.* .................................................................. 11

     B.  *Teachers' Instructional Speech is Entitled to First Amendment Protection, even if the Precise Contours Are Not Yet Clearly Defined by the Supreme Court.* ..................... 13

CONCLUSION ...................................................................................................................... 15

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Ass'n of Irritated Residents v. U.S. Env't Prot. Agency,*

4

    10 F.4th 937 (9th Cir. 2021) ........................................................................9

5

*Babbitt v. United Farm Workers Nat'l Union,*

6

    442 U.S. 289 (1979) ..........................................................................2, 5

7

*Bufkin v. Collins,*

8

    604 U.S. 369 (2025) ..........................................................................1, 4

9

*C.F. v. Capistrano Unified Sch. Dist.,*

10

    654 F.3d 975 (9th Cir. 2011) ......................................................................14

11

*Cal. Pro-Life Council v. Getman,*

12

    328 F.3d 1088 (9th Cir. 2003) ......................................................................2

13

*Cal. Trucking Ass'n v. Bonta,*

14

    996 F.3d 644 (9th Cir. 2021) ......................................................................5

15

*California v. Texas,*

16

    593 U.S. 659 (2021) ..........................................................................8

17

*Confederated Tribes & Bands of Yakama Indian Nation v. Locke,*

18

    176 F.3d 467 (9th Cir. 1999) ......................................................................11

19

*Ctr. For Special Needs Trust Admin., Inc. v. Olson,*

20

    676 F.3d 688 (8th Cir. 2012) ......................................................................4

21

*Dep't of Commerce v. New York,*

22

    588 U.S. 752 (2019) ..........................................................................6, 8

23

*Duncan v Walker,*

24

    533 U.S. 167 (2001) ..........................................................................4

25

*Epperson v. Arkansas,*

26

    393 U.S. 97 (1968) ..........................................................................15

27

*Flaxman v. Ferguson,*

28

    151 F.4th 1178 (2025) ....................................................................9, 10

*Grayned v. City of Rockford,*

408 U.S. 104 (1972) ...................................................................................12

*Haaland v. Bracken,*

599 U.S. 255 (2014) ....................................................................................8

*Johnson v. Poway Unified Sch. Dist.,*

658 F.3d 954 (9th Cir. 2011) ...............................................................13, 15

*Keyishian v. Bd. of Regents,*

385 U.S. 589 (1967) ...................................................................2, 7, 14, 15

*Kingdomware Techs., Inc. v. United States,*

579 U.S. 162 (2016) ....................................................................................4

*Larson* v. *Valente,*

456 U.S. 228 (1982) ....................................................................................8

*Libertarian Party of L.A. County v. Bowen,*

709 F.3d 867 (9th Cir. 2013) ......................................................................2

*Lopez v. Candaele,*

630 F.3d 775 (9th Cir. 2010) ......................................................................2

*Los Angeles Cty. Bar Ass'n v. Eu,*

979 F.2d 697 (9th Cir. 1992) ....................................................................11

*Massachusetts v. EPA,*

549 U.S. 497 (2007) ...............................................................................7, 8

*Matal v. Tam,*

582 U.S. 218 (2017) ..................................................................................13

*Maya v. Centex Corp.,*

658 F.3d 1060 (9th Cir. 2011) ....................................................................7

*Medina v. Planned Parenthood S. Atl.,*

606 U.S. 357 (2025) ....................................................................................4

*Murthy v. Missouri,*

603 U.S. 43 (2024) ......................................................................................7

*Peace Ranch, LLC v. Bonta,*
  93 F.4th 482 (9th Cir. 2024)............................................................................2, 3

*Pickering v. Bd. Of Educ.,*
  391 U.S. 563 (1968)...................................................................................15

*Planned Parenthood Great Northwest v. Labrador,*
  122 F.4th 825 (9th Cir. 2024).........................................................................2, 3

*Protectmarriage.com-Yes on 8 v. Bowen,*
  752 F.3d 827 (9th Cir. 2014)..............................................................................5

*Reno v. ACLU,*
  521 U.S. 844 (1997)...................................................................................13

*Sec'y of State of Md. v. Joseph H. Munson Co.,*
  467 U.S. 947 (1984).....................................................................................3

*Shelton v. Tucker,*
  364 U.S. 479 (1960)...................................................................................14

*Shurtleff v. City of Boston,*
  596 U.S 243 (2022)...................................................................................13

*Students for Justice in Palestine v. Abbott,*
  756 F.Supp.3d 410 (W.D. Texas 2024) ................................................................12

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014).............................................................................2, 6, 8, 9

*Sweezy v. New Hampshire,*
  354 U.S. 234 (1957)...................................................................................14

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022).....................................................................2, 5, 9

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001)......................................................................................4

*Virginia v. American Booksellers Ass'n,*
  484 U.S. 383 (1988)......................................................................................5

*Wilder v. Va. Hosp. Ass'n,*

  496 U.S. 498 (1990) ..................................................................................................4

**Statutes**

California Educ. Code § 60151(a)(2) ...........................................................................10

California Educ. Code § 60151(b) ...............................................................................10

California Education Code § 244 (a)-(e) ......................................................................10

California Education Code § 51500 .............................................................................10

California Education Code § 60151(a)(1) .....................................................................10

California Education Code § 60161(a)(4) ......................................................................9

California Education Code §§ 262.3(a)-(d) ..................................................................10

**Other**

AB 715 § 1(i) ........................................................................................................... 3, 10

AB 715 §1 (l) ................................................................................................................3

AB 715 §1(j) .................................................................................................................3

Assem. Bill 715, 2025-2026 Reg. Sess., ch. 428, 2025 Cal. Stat.................................10

**INTRODUCTION**

Plaintiffs, teachers and students in California public schools, brought this challenge on Due Process void for vagueness and First Amendment viewpoint discrimination and overbreadth grounds to recently passed AB 715, which amends California's Education Code, purportedly to fortify protections against antisemitic discrimination. As Plaintiffs demonstrated in their opening brief, the real purpose and effect of the AB 715 amendments is to suppress speech critical of Israel and Zionism, as well as speech that recognizes Palestinian rights and humanity, by neglecting to define antisemitism while requiring districts to rely on the Biden Administration's National Strategy to Counter Antisemitism ("Biden National Strategy"). That document conflates criticism of Israel and Zionism with antisemitism and ignores the existence, rights, and humanity of Palestinians. (*See* Pl. Op. Br. at 15-25).

Defendants' arguments that Plaintiffs lack standing, the case is not ripe, and the law is not unconstitutional are predicated upon a misrepresentation of what AB 715 does. Contrary to Defendants' claims, the new law in its entirety is informed by the Biden National Strategy. Defendants claim that the new law does not require districts to use that document, because it is mainly referred to only in AB 715's precatory provision, not substantive amendments. However, the legislature clearly imposed a mandate by stating districts "shall" use Biden National Strategy. Courts do not allow legislatures to label requirements as precatory and deny their enforcement power. *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command.").

According to Defendants, all AB 715 does is provide for the creation of an Office of Civil Rights and Antisemitism Prevention Coordinator. This blatantly disregards not only the new (non) definition of antisemitism, but ignores the multitude of requirements directly regulating districts, schools, and teachers' speech. AB 715 unquestionably provides for punishment of noncompliant teachers, chilling their speech and endowing them with standing. Nor is the impact of AB 715 far off in the future; its chilling effect is occurring right now, as Plaintiff teachers attested in their declarations and further established by a recent administrator training that showed districts are already making changes to accommodate the new law. Finally, Plaintiffs prevail on the merits of their claims, because AB 715's failure to define antisemitism while sowing confusion renders it unconstitutionally vague and at the

1

same time overbroad and viewpoint discriminatory. Contrary to Defendants' claims, Plaintiff Teachers have First Amendment rights, as the Supreme Court has clearly held. *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 593-94 (1967).

<u>**ARGUMENT**</u>

I.    **P**LAINTIFFS **H**AVE **S**TANDING TO **B**RING **T**HEIR **C**LAIMS.[1]

   A.  ***AB 715's Chilling Effect Constitutes an Injury-In-Fact.***

   "'Pre-enforcement injury is a special subset of injury-in-fact' where 'the injury is the anticipated enforcement of the challenged statute in the future.'" *See Planned Parenthood Great Northwest v. Labrador*, 122 F.4th 825, 835-56 (9th Cir. 2024) (quoting *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024)). In the pre-enforcement context, a plaintiff demonstrates an injury-in-fact for Article III standing purposes by showing: (1) an intention to engage in a course of conduct arguably affected with a constitutional interest but (2) proscribed by a statute and (3) that there exists a credible threat of prosecution thereunder. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). In assessing the existence of such an injury, Courts in the Ninth Circuit ask whether: (1) the plaintiff has a concrete plan to violate the law; (2) enforcement authorities have communicated a specific warning or threat to initiate proceedings; and (3) there is a history of past enforcement.[2] *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022). The "unique standing considerations" in pre-enforcement First Amendment cases "tilt dramatically toward a finding of standing." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010). "'[T]he Supreme Cout has dispensed with rigid standing requirements for First Amendment protected speech claims and has instead endorsed a 'hold your tongue and challenge now' approach.'" *Tingley*, 47 F.4th at 1067 (quoting *Cal. Pro-Life Council v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003)). Plaintiffs do not have to "await the consummation of a threatened injury to obtain preventive relief," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), because a chilling of the exercise

---

[1] Should the Court have outstanding questions about Plaintiffs' injuries, or any other aspect of their standing or claims, they can be made available to testify at the Court's request.

[2] Defendants do not address prong three, sensibly, since a history of enforcement carries little or no weight when the challenged law is relatively new. *See Tingley*, 47 F.4th at 1069.

of First Amendment rights is a constitutionally sufficient injury. *Libertarian Party of L.A. County v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).

In *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984), the Supreme Court held:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

1. Plaintiffs Have a Concrete Plan Because Their Speech is Chilled.

As Plaintiffs attest in their declarations, they all have engaged in classroom speech about Israel, Palestine, and the Middle East that is arguably proscribed by the AB 715 Amendments, and they will be reluctant to engage in similar speech in the future for fear of retribution. (*See* Plaintiff's Opening Brief ("Pl. Br."), ECF 15 at 6-11). That fulfills the "concrete plan" requirement, because they have shown that they are refraining from engaging in speech they otherwise would engage due to the enactment of AB 715. *See Labrador*, 122 F.4th at 837 ("'[A] plaintiff need not plan to break the law' to show an 'intention to engage in a course of conduct' … . Rather, we 'must ask whether the plaintiff would have engaged in the proscribed conduct, were it not proscribed.'") (quoting *Peace Ranch*, 93 F.4th at 488)).

According to Defendants, Teacher Plaintiffs' alleged injury stems from an "unsupported" and "unreasonable" interpretation of AB 715, because it does not bar them from engaging in their desired speech and AB 715 does not change the definition of antisemitic discrimination (Defendant's Opposition, ("Def. Opp."), at 5-7). These arguments are predicated upon a mischaracterization of AB 715's requirements. The Biden National Strategy is broadly applicable, and contrary to Defendants' claims, extends far beyond the appointment of an "Antisemitism Prevention Coordinator" ("APC"). The National Strategy is mentioned four times in Section 1 of the bill alone, including in the form of a mandate: it "*shall* be a basis to inform schools on how to "*identify*, respond to, prevent, and counter antisemitism." *See* AB 715 § 1(i) (emphases added). *See also* AB 715 §1(j), (l). In other words, the Biden

National Strategy undergirds the entirety of AB 715's amendments to California's Education Code, much of which operates independently from the Office of Civil Rights ("OCR") and the APC. And AB 715 creates obligations for schools, districts, and administrators, as well as penalties for noncompliance that do not have to be enforced by OCR or the APC. *See infra*, Part II (Ripeness).

Defendants claim that the above-cited references are irrelevant because they are only in the precatory statements preceding AB 715's substantive amendments. (*See* Def. Br. at 13). This is incorrect, because Section 1 explicitly states that the Biden National Strategy "*shall* be a basis to inform schools on how to *identify*, respond to, prevent, and counter antisemitism." (emphases added). *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command."); *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-872 (2016) (holding that Congress's use of term "shall" "connotes a requirement"). Regardless of the label affixed to the pertinent provision, it carries legal force; courts do not allow governments to hide behind the "precatory" label when they are clearly endowing the section in question with the force of law. *See Ctr. For Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688, 700 (8th Cir. 2012) ("The use of the word "shall" in [the pertinent section] is mandatory, not precatory."). *See also Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 512 (1990) (explaining that the amendment in question "is cast in mandatory rather than precatory terms: the state plan *"must"* "provide for payment[.]"), *overruled in part on other grounds*, *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 377 (2025).

Furthermore, it is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that … no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v Walker,* 533 U.S. 167, 174 (2001)). If, as Defendants claim, AB 715 does nothing more than establish the OCR and provide for appointment of the APC, then its inclusion of other provisions is inexplicable and superfluous.

The supplemental evidence Plaintiffs submitted about an administrator training held in Oakland on December 4, 2025, confirms their position. (*See* Decl. of Elizabeth Jackson, ECF 40-1; Slide Deck, ECF 40-3).[3] The School District's lawyers posed several specific statements or opinions on a slide

---

[3] Ms. Jackson is available to testify at the preliminary injunction hearing scheduled for December 17, 2025, should the Court so request.

deck and asked whether they constitute antisemitic discrimination under AB 715. *See* Slide Deck, ECF 40-3. Those included "Stating that the Israeli's [*sic*] are committing genocide; "Stating that Zionism is 'settler colonization[']; Stating that there should be a two-state solution; Displaying student 'pro-Palestinian' work; and Inviting AROC [Arab Resource and Organizing Center] to present to staff[.]" (ECF 40-1, b). The lawyers were unable to say whether these statements, "presented as 'open questions'" constituted antisemitic discrimination under AB 715, leading the administrator attendees "to conclude that these examples could be prohibited[.]" (ECF 40-1 ¶¶ 10-16). This proves that the types of speech in which Plaintiffs have engaged and would engage but for the enactment of AB 715 subjects them to punishment, and that the new law changes the legal definition of antisemitism, transforming statements recognizing Palestinian rights and humanity into unlawful discrimination.

2.  Plaintiffs Have Established a Credible Threat of Enforcement.

Plaintiffs have also satisfied the second prong of the injury-in-fact inquiry. "[I]n the context of pre-enforcement challenges to laws on First Amendments grounds, a plaintiff 'need only demonstrate that a threat of potential enforcement will cause him to self-censor.'" *Tingley*, 47 F.4th at 1068 (quoting *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014)). An "alleg[ation] that the law has chilled [plaintiff's] speech and that he has self-censored himself out of fear of enforcement" suffices. *Tingley*, 47 F.4th at 1068. Plaintiffs have made such a showing, as discussed above. *See Babbitt*, 442 U.S. at 301-02 (plaintiffs had standing to challenge a statute prohibiting encouragement of certain boycotts as they had engaged in similar campaigns in the past).

Moreover, "the state's refusal to disavow enforcement … is strong evidence that the state intends to enforce the law and that [plaintiffs] face a credible threat." *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021). Defendants have neither displayed nor asserted an intent to refrain from enforcing AB 715's amendments, warranting a presumption that they intend to do so beginning January 1, 2026. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) ("We are not troubled by the pre-enforcement nature of this suit … plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."). Accordingly, they have demonstrated an injury-in-fact.

**B. Plaintiffs' Injuries are Traceable to AB 715 and Redressable Through the Requested Relief.**

    1.  <u>Traceability Exists Because AB 715 Predictably Alters the Complaint and Enforcement Landscape, Harming Plaintiffs</u>

Defendants claim that Plaintiffs lack standing because anyone can file a complaint under AB 715, so their harm is not traceable to Defendants. (*See* Def. Opp. at 7). That is a nonsensical interpretation of standing doctrine and would deprive people of the ability to challenge laws when third-party complaints trigger state enforcement. The Supreme Court resoundingly rejected that reasoning in *Driehaus*, 573 U.S. at 150, in which the plaintiff challenged an Ohio law that was only enforced if someone filed a complaint with the Elections Commission. In fact, the Court held the third-party complaint system *exacerbated* the threat of enforcement, rather than undermined standing. *See id.* at 150 ("The credibility of that threat is bolstered by the fact that a complaint may be filed with the State Commission by 'any person[.]'").

Contrary to Defendants' arguments, traceability does not require that the government be the sole actor causing harm to plaintiffs. It requires only that the injury be "fairly traceable" to the challenged government action. *See Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (holding that plaintiffs had standing where their theory "relies … on the predictable effect of Government action on the decisions of third parties.").

Defendants' arguments both misrepresent the governing jurisprudence and its application here, and downplay the significance of AB 715's impacts. Not only does AB 715 codify into law a flawed (non) definition of antisemitism, but it materially changes the landscape for California educators. It creates a statewide complaint system that invites anonymous reporting, does away with the requirement that harm to a protected group be shown (thereby opening the door to a far greater number of complaints) and mandates investigation and "corrective action" whenever the state deems a district's response inadequate. (*See infra,* Part III (Ripeness); Slide Deck, ECF 40-3, c-k). These new mechanisms substantially increase the likelihood that teachers' speech about Israel and Palestine will trigger state-level scrutiny and discipline. Pre-existing complaints lacked these statewide consequences. Plaintiffs' injuries, therefore, include the credible threat of investigation, discipline, reputational

damage and corresponding self-censorship, all of which flow directly from AB 715's structural changes. This is exactly the kind of predictable causal chain that satisfies Article III. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("Defendants would have us require plaintiffs to demonstrate that defendants' actions are the 'proximate cause' of plaintiffs' injuries. Plaintiffs do not bear so heavy a burden."). *See also Keyishian v. Bd. of Regents*, 385 U.S. 589, 593-94 (1967) (addressing merits of teachers' claims that state statute requiring school boards to administer loyalty oath to teachers and provide procedures for disqualification or removal of those who refused was unconstitutional, even though discipline occurred through a third parties).

Defendants' reliance on *Murthy v. Missouri*, 603 U.S. 43 (2024) is misplaced. *Murthy* did not involve a pre-enforcement challenge to a law, but rather to informal government attempts to influence social media platforms' content moderation decisions. The Court rejected standing there because plaintiffs could not show that their past censorship on social media platforms resulted from government interference as opposed to the companies' preexisting policies. *Id.* at 60. The Court also held that claims about whether platforms would take future actions in response to government communications were speculative, especially since the speech Plaintiffs had been censored for, mainly about Covid-19 and the 2020 election, were—by 2024—no longer the subject of government censorship efforts. *Id.* at 68-69. Here, AB 715 imposes binding legal duties and creates a specific enforcement pathway from anonymous complaint to mandatory state investigation to required corrective action. The causal chain is concrete and non-speculative.

### 2. Redressability Exists Because an Injunction Would Meaningfully Reduce Plaintiffs' Risk of Punishment and Chill

As for Defendants' redressability claims (*see* Def. Opp. at 9-10): redressability does not require eliminating all sources of harm. It is enough that the risk "would be reduced to some extent if petitioners received the relief they seek." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (rejecting EPA's claim that plaintiffs lacked standing to challenge its failure to regulate greenhouse gas emissions from motor vehicles because third parties bore responsibility for creating the emissions). That standard is easily met here.

The possibility of continued third-party complaints is of no consequence. Defendants argue that because private citizens may still complain under other laws, this Court cannot provide relief to

Plaintiffs. If accepted, this position would bar virtually all pre-enforcement First Amendment challenges, since private actors can always criticize or complain. What chills Plaintiffs is not the possibility that a parent or advocacy group might complain, but that AB 715 requires the state to transform those complaints into formal investigations, findings of "antisemitism," and career-ending corrective actions.

Enjoining that government machinery directly alleviates the injury as it removes the mechanisms that intensify and formalize the harm. *Massachusetts v. EPA*, 549 U.S. at 526. An injunction would halt Defendants' authority to discipline Plaintiffs for speech that was not antisemitic discrimination under California's Education Code prior to passage of AB 715; eliminate the statewide complaint channel, preventing direct third-party submissions to the Superintendent; eradicate the possibility of complaints being substantiated without a showing of harm to a protected group; and forestall the creation of the OCR and APC. It would also strip the Superintendent of authority to impose antisemitism-specific corrective action plans and compliance mandates. Removing this state-created enforcement apparatus "materially reduces" the risk of discipline and chill, which is what Article III requires. *Larson* v. *Valente*, 456 U.S. 228, 244, n. 15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury").

Defendants also misguidedly rely on *Haaland v. Bracken*, 599 U.S. 255 (2014) and *California v. Texas*, 593 U.S. 659 (2021). (*See* Def. Opp. at 8-9). In *Haaland*, the injuries flowed from state court judgments and actors not before the federal court, so relief against federal officials offered no redress. 599 U.S. at 292-93. In *California*, the mandate was unenforceable; striking it down could not change behavior. *California*, 593 U.S. at 672-73. Here, by contrast, plaintiffs' injuries arise from state officials who are defendants in this case, and AB 715 is fully enforceable and carries real consequences.

At this preliminary stage, Plaintiffs need only plausibly allege a concrete First Amendment injury fairly traceable to AB 715 and a substantial likelihood that enjoining AB 715 will reduce that risk. Under *Department of Commerce*, *Massachusetts v. EPA*, and *Driehaus*, Plaintiffs' showing is more than sufficient.

II.   **PLAINTIFFS' CLAIMS ARE RIPE FOR ADJUDICATION.**

Plaintiffs' claims are ripe for review, because the AB 715 amendments are to take effect January 1, 2026, or possibly earlier, as the statutory language states that some of its changes should be implemented as soon as possible. *See* Cal. Educ. Code § 60161(a)(4).[4]

Prudential ripeness turns on two considerations: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding consideration. *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021). The fitness prong is met when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Flaxman*, 151 F.4th at 1188. As for hardship, the Ninth Circuit asks whether the law has a direct and immediate effect on the complaining parties; carries the status of law; and requires immediate compliance with its terms." *Flaxman*, 151 F.4th at 1188 (citation omitted).

AB 715 is final and binding on districts, schools, administrators, and teachers, who must comply with its terms. It carries the "status of law." *Tingley*, 47 F.4th at 1070. And the issues Plaintiffs raise are purely legal, on First and Fourteenth Amendment grounds. *See Driehaus*, 573 U.S. at 167. Withholding judicial review would impose a substantial hardship on all Plaintiffs. Either they hold their tongues, or risk investigations, reputational damage, professional harm, and the loss of careers. *See Flaxman*, 151 F.4th at 1189 ("withholding judicial review would impose a substantial hardship on the professors, who have been investigated and punished for their allegedly protected speech[.]"). Students do not even know whether they could be punished under AB 715's amendments, creating further confusion and exacerbating the chilling effect.

Defendants' claim that Plaintiffs' case is prudentially unripe rests on the faulty premise that the only real changes AB 715 effectuates are the creation of the OCR and the appointment of the APC, which have not occurred yet. (Def. Opp. at 10-11). This inaccurately characterizes the AB 715 amendments, which impose requirements directly on school boards, districts, and teachers to comply, as well as a framework to address allegations of noncompliance and provide for remedial action that does not necessitate or in some cases even mention the OCR and APC. (*See* Decl. of Elizabeth

---

[4]Defendants argue only prudential ripeness; Article III ripeness involves essentially the same inquiry as standing in the pre-enforcement context, so Plaintiffs won't reiterate those arguments here. *See Flaxman v. Ferguson*, 151 F.4th 1178, 1185 (2025) (citing *Driehaus*, 573 U.S. at 157 n. 5).

Jackson, ECF 40-1; Slide Deck, ECF C; Guidance, ECF D). *See also* AB 715 § 1(i) (ordering schools to follow Biden National Strategy); Ca. Educ. Code § 244 (a)-(e) (requiring school boards not to adopt written instructional or professional development materials that are violative of California's Education Code, as amended by AB 715); Ca. Educ. Code § 51500 (requiring teachers to give "factually accurate" instruction and refrain from sponsoring activities that promote "discriminatory bias"). Nowhere in the text of AB 715's amendments or elsewhere did the Legislature state that enforcement of these provisions must await the formation of the OCR and appointment of the APC.

AB 715's amendments also provide mechanisms for complaints about prohibited discrimination and violative instructional materials to be made directly to the Superintendent and local educational agencies, requiring departments to take corrective action. *See* Ca. Educ. Code §§ 262.3(a)-(d) 60151(a)(1). Remedial measures are not limited to engaging with OCR or APC. *See* Ca. Educ. Code § 60151(a)(2). Local educational agencies can levy financial penalties on noncompliant Superintendents without involving the OCR or APC. *See* Ca. Educ. Code § 60151(b).  Furthermore, as at least one of the Plaintiffs has attested, the chilling effect is already palpable, because districts and administrators are making efforts to conform to the new law. (*See* Decl. of Kauser Adenwala, ECF 15-5 ¶¶ 13-14, 38-41).

Guidance on the website of Oakland school district lawyers and their slide deck presentation affirm that AB 715 takes effect on January 1, and directly imposes compliance requirements on teachers, administrators, and districts. *See* Guidance, ECF 40-4 (AB 715 imposes new requirements for educational agencies to initiate investigations and take remedial actions); Slide Deck, ECF-3 at f, i (school boards must immediately investigate and remediate known use of discriminatory materials which then "shall immediately and permanently be omitted from all-course materials"). Alterations are already being made to accommodate the new concept of antisemitism, and teachers will be punished if they do not follow them. (*See* Decl. of Elizabeth Jackson, ECF 40-1).

Finally, AB 715 contains no assurances that speech made before January 1, 2026, will not serve as the basis for investigations, punishment and complaints, or to enhance sanctions for later offenses. Assem. Bill 715, 2025-2026 Reg. Sess., ch. 428, 2025 Cal. Stat. Altogether, these factors weigh heavily in favor of a finding of prudential ripeness.  *See Flaxman*, 151 F.4th at 1189.

**III.    SOVEREIGN IMMUNITY DOES NOT APPLY TO THE STATE OFFICIALS IN THIS ACTION.**

Defendants' immunity argument is not based on a fair reading of the applicable authorities. (*See* Def. Opp. 11-12). "[T]he Eleventh Amendment does not bar actions seeking only prospective declaratory or injunctive relief against state officers in their official capacities." *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992). In *Los Angeles Bar Ass'n*, the bar association sued Governor Pete Wilson and Secretary of State March Eu over a state statute that prescribed the number of superior court judges. Defendants in that case put forth the same Eleventh Amendment sovereign immunity arguments made here; specifically, raising the issue of whether the state officials had a connection to the enforcement of the allegedly unconstitutional act. There, the court's analysis was straightforward: "Eu and Wilson have a specific connection to the challenged statute. Wilson has a duty to appoint judges to any newly-created judicial positions, and Eu has a duty to certify subsequent elections for those positions." *Id.* at 704.

Defendants' citation to *Confederated Tribes & Bands of Yakama Indian Nation v. Locke*, 176 F.3d 467, 469-70 (9th Cir. 1999) is inapposite. The tribe was challenging the state lottery operating on their land and named the governor as a defendant. *Id.* However, the state lotto agency operated the lotto and the governor did not have any connection to its operations or determining where the tickets would be sold. *Id.* Thus, sovereign immunity applied in that case.

Here, Governor Newsom is appointing the APC to spearhead some aspects of enforcement of the new law and the Attorney General is tasked with defending and enforcing compliance with it. Like Governor Wilson appointing judges and Secretary of State March Eu's duty to certify subsequent elections for judges, the Defendants in this case have a sufficient connection to the challenged law. Accordingly, sovereign immunity does not apply.

**IV.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

**A.  AB 715 Is Unconstitutionally Vague.**

As a threshold matter, Defendants' argument that AB 715 is subject to an ordinary vagueness analysis instead of the heightened assessment typically required in First Amendment free speech cases is off base. (*See* Def. Opp. at 12-13). As Plaintiffs argued in their opening brief and *infra*, Part V, Supreme Court jurisprudence clearly establishes that teachers' speech is entitled to a significant degree

of First Amendment protection. (*See* Pl. Br. at 17-22.  In any event, laws that implicate *any* kind of speech are assessed under the heightened vagueness standard, even if aimed at speech that receives little or no protection, due to concerns about chilling protected speech.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (analyzing validity of anti-picketing ordinance; observing that because it involved speech, though it sought to curb disruptive speech which receives diminished protection, a heightened vagueness analysis was warranted).

Contrary to Defendants' claims (*see* Def. Opp. 14-15), AB 715 (likely intentionally) leaves those subject to its strictures with the distinct impression that what is forbidden goes well beyond accepted notions of discrimination in other contexts. AB 715 is not limited to punishing disparate treatment based on race, religion, ethnicity and national origin. Instead, it provides for punishment under antidiscrimination law for expression of ideas and information about another group of people's claims to a region, rights, humanity, and celebrations of their identity and heritage. *See Students for Justice in Palestine v. Abbott*, 756 F.Supp.3d 410, 425 (W.D. Texas 2024) (explaining that an executive order using IHRA definition of antisemitism for purposes of enforcing civil rights law constituted viewpoint discrimination and chilled protected speech).

As explained in the context of standing, the arguments put forth in Plaintiffs' opening brief about the law's vagueness are further substantiated by the Oakland administrator training. (*See* Decl. of Liz Jackson, ECF 40-1; Slide Deck, ECF 40-3; Guidance, ECF 40-4.). The school district's *own lawyers* could not answer whether speech of the sort Plaintiffs seek to engage—in their quest to provide factually accurate information to students and include diverse perspectives in the classroom—could be actionable under AB 715. (*See* Decl. of Elizabeth Jackson, ECF 40-1 ¶¶ 10-18). The training "focused exclusively on restricting speech related to Palestinian human rights and/or …speech that celebrates Arab-American heritage." (*Id.* ¶ 16). Such speech is not normally considered discriminatory against another group of people, so that adds to the chaos and confusion that AB 715 sows. (*Id.* ¶ 15) ("The administrators expressed concern that the training and answers provided … were so vague that they were unable to determine what words, statements or actions would be considered violations of AB 715. They believe that the only way to avoid running afoul of AB 715 is to avoid any criticism of Israel or reference to Palestinian history, identity, or struggles.").

In sum, AB 715's failure to define antisemitism while creating turmoil by instructing schools to use the Biden National Strategy to determine what constitutes antisemitism pervades the entire bill and renders it unconstitutionally vague. (*See* Pl. Br. at 13-17). *See Reno v. ACLU*, 521 U.S. 844, 885 (1997) (upholding district court's injunction of federal law prohibiting transmission of "indecent" and "patently offensive" internet communications to minors as unconstitutionally vague, given failure to define these key terms).

**B. Teachers' Instructional Speech is Entitled to First Amendment Protection, even if the Precise Contours Are Not Yet Clearly Defined by the Supreme Court.**

Plaintiffs argued in their opening brief that the question of where teachers' First Amendment free speech rights in the context of classroom instruction begin and end remains unsettled, but that such speech is entitled to at least some First Amendment protection and the Constitution certainly forbids the government from imposing viewpoint-based restrictions that lack a legitimate pedagogical basis. (*See* Pl. Br. at 19-21). Defendants, relying primarily on *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011), claim that teachers' classroom instruction is government speech entitled to *no* First Amendment protection whatsoever. (*See* Def. Br. at 19-20).

Subsequent (and prior) Supreme Court jurisprudence establishes that *Johnson* was wrongly decided, largely because it misconstrued the government speech doctrine, which applies *when government officials speak or seek to convey a message. See Shurtleff v. City of Boston*, 596 U.S 243, 252 (2022) (explaining that, when assessing whether government speech doctrine applies, the question is whether the government intends to speak for itself rather than to regulate private speech); *Matal v. Tam*, 582 U.S. 218, 235 (2017) ("while the government-speech doctrine is important … it is a doctrine that is susceptible to dangerous misuse" and inappropriately broad interpretations allow government to "silence or muffle the expression of disfavored viewpoints.").

Contrary to Defendants' arguments, the government speech doctrine does *not* mean government has *carte blanche* to exercise complete control over the speech of professionals it employs to perform tasks that require them to exercise judgment and discretion in the workplace, even where it has some regulatory authority. That is especially so when those professionals are trained, licensed, and hired with the specific purpose of inculcating critical thinking skills in young people. *See Sweezy v. New*

*Hampshire*, 354 U.S. 234, 250 (1957) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.").

All pertinent Supreme Court precedent cited in Plaintiffs' opening brief—none of which Defendants address in a meaningful way—affirms that public school teachers' classroom speech, while subject to some reasonable limitations, is not government speech that thereby may be stripped of any First Amendment protections. That is in no small part because to do so would also interfere with students' First Amendment rights to learn. *See, e.g.*, *Keyishian*, 385 U.S. at 603 ("Our nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us … .That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."). No Supreme Court opinion has *ever* concluded that teachers' speech is government speech devoid of constitutional protection.

Defendants' reasoning would reduce public school teachers to parrots of government-approved talking points, which conflicts with the notion (reflected in Supreme Court precedent) that educators' duties involve developing critical thinking skills in children. Defendants' approach leads to the inescapable conclusion that government may as well save their constituents' tax dollars and replace teachers with artificial intelligence programmed to parrot the views of California government officials. Perhaps *Matal* conveyed to the Ninth Circuit that *Johnson*'s analysis was misguided, because it has not since issued a decision so far afield from Supreme Court jurisprudence in this arena.

In fact, the Ninth Circuit decided *C.F. v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 988 (9th Cir. 2011) the same year as *Johnson*, in which it observed that teachers "must be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. … a court must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." Defendants claim that *Capistrano* is irrelevant because it ultimately addressed an Establishment Clause issue. (*See* Def. Br. at 20). While the Ninth Circuit did not explicitly couch its remarks about teachers' free speech rights in First Amendment free

speech terms, *Capistrano* cited Supreme Court precedent such as *Keyishian* which pontificated on the importance of public-school teachers' First Amendment free speech rights, demonstrating that was the basis for determining that teachers do, indeed, possess such rights.

Assuming *arguendo* that prior and subsequent Supreme Court jurisprudence did not render *Johnson* obsolete, the case was different because it involved a teacher hanging religious banners in his classroom—not classroom instruction. The *Johnson* court employed the Supreme Court's test from *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968) to conclude that the state's interest in prohibiting a teacher from disseminating certain religious beliefs in the classroom outweighed his right as a government employee to express those views. *See Johnson*, 658 F.3d at 961.[5]

Here, by contrast, the issue is Plaintiffs' instructional speech in the classroom. Because AB 715 *hampers* Plaintiffs' ability to perform their duties, which include providing students with factually accurate instruction, sharing real world experiences (within the bounds of propriety), teaching them to think critically by sharing different viewpoints, and consummating *students'* First Amendment rights to receive information, their classroom instruction deserves a *greater* degree of First Amendment protection than that of a teacher expressing a personal political or religious opinion unrelated to their professional obligations. *See Epperson v. Arkansas*, 393 U.S. 97, 104-05 (1968) (holding that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom").

## **CONCLUSION**

For the reasons set out above as well as in Plaintiff's opening brief, the Court should immediately enjoin the Government from enforcing AB 715.


Respectfully submitted,


/s/ *Jenin Younes*
National Legal Director

/s/ *Deyar Jamil*

---

[5] Defendants assume *Pickering* applies here, but the Supreme Court's precedent paints a more complicated picture when it comes to teachers' in-class instruction; *Pickering* addressed a teacher's out-of-work statements. *See Pickering*, 391 U.S. at 566-57. *Cf., e.g., Keyishian*, 385 U.S. at 602-03.

AMERICAN-ARAB
ANTI-DISCRIMINATION COMMITTEE
910 17th Street Northwest, Suite 1000
Washington, D.C. 20006
Telephone: (202) 244-2990
jyounes@adc.org


/s/ *Thomas B. Harvey*

THOMAS B. HARVEY (CA Bar #287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me



/s/ *Michael Bracamontes*

MICHAEL BRACAMONTES
BRACAMONTES & VLASAK
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 835-6777
mbracamontes@bvlawsf.com

*Attorneys for Plaintiffs*