Yaman Salahi (SBN 288752)
yaman@salahilaw.com
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: 415.236.2352

Tanina Rostain (*pro hac vice* forthcoming)
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001
tr238@georgetown.edu

*Attorneys for Amici Curiae*

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

|  |  |
|---|---|
| **ANDREA PRICHETT,** *et al.*, | Case No. 5:25-cv-09443-NW |
| *Plaintiffs*, | **[PROPOSED] BRIEF OF AMICI CURIAE 50 JEWISH SCHOLARS OF JEWISH STUDIES, HOLOCAUST STUDIES, MIDDLE EAST STUDIES, AND ANTISEMITISM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **v.** | |
| **GOVERNOR GAVIN NEWSOM, et al.**, | |
| *Defendants*. | **Date:** December 17, 2025<br>**Time:** 9:00 a.m.<br>**Judge:** The Honorable Noël Wise<br>**Courtroom:** 3 |
|  | **Trial Date:** Not Set<br>**Action Filed:** November 2, 2025 |

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  INTEREST OF AMICI ...................................................................................... 5

III. DISCUSSION ..................................................................................................... 6

  A.  Assembly Bill 715's Incorporation of the Biden National Strategy Chills Public School Teachers' and Students' Speech .......................................................... 6

    1.  By Referring to the Biden National Strategy, AB 715 Sanctions IHRA's Use to Police Speech Critical of Israel and Zionism .............................................. 6

    2.  IHRA, the Jerusalem Declaration, and the Nexus Statement ........................... 7

  B.  Zionism and Support for Israel Have Always Been Contested Among Jews ....................... 11

  C.  Jewish Views of Zionism, Israel, and Palestine Continue to be Debated and Evolve .......... 14

IV.  CONCLUSION ................................................................................................. 18

  APPENDIX A: LIST OF AMICI CURIAE ................................................................. 19

# TABLE OF AUTHORITIES

**CASES**

*Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685,
    2025 WL 2777659 (D. Mass. Sept. 30, 2025) ................................................................ 6

*Cantwell v. State of Connecticut*,
    310 U.S. 296 (1940) ..................................................................................................... 2

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ..................................................................................................... 1

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
    393 U.S. 440 (1969) ..................................................................................................... 4

Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.,
    158 F.4th 1 (1st Cir. 2025) ........................................................................................... 6

*Students for Justice in Palestine, at Univ. of Houston v. Abbott*,
    756 F. Supp. 3d 410 (W.D. Tex. 2024) ....................................................................... 6

*Yakoby v. The Trustees of the Univ. of Pennsylvania*,
    No. 23-cv-4789, 2025 WL 1558522 (E.D. Pa. June 2, 2025) ...................................... 6

**OTHER AUTHORITIES**

Alterman, E., *We Are Not One: A History of America's Fight Over Israel* (2022) ............................... 12

Beinart, P., *Being Jewish After the Destruction of Gaza: A Reckoning* (2025) ............................... 14

Boyarin, D., *The No-State Solution: A Jewish Manifesto* (2023) ............................................. 15

Butler, J., *Parting Ways: Jewishness and the Critique of Zionism* (2012) ............................... 15

Feld, M., *The Threshold of Dissent: A History of American Jewish Critics of Zionism* (2024) ............. 17

Goldin, S., et al., *Jewish Migration in Modern Times: The Case of Eastern Europe* (2020) ................ 11

Graubart, J., *Jewish Self-Determination Beyond Zionism: Lessons from Hannah Arendt and other
    Pariahs* (2023) ......................................................................................................... 15

Green, A., *Can Judaism Be Saved?: Its Future after Gaza* (2025) ........................................... 14

Hazony, Y., *The Jewish State: The Struggle for Israel's Soul* (2001) ...................................... 14

Kaplan, A., *Our American Israel: The Story of an Entangled Alliance* (2018) ............................. 12

Kaufman, M., *An Ambiguous Partnership: Non-Zionists and Zionists in America, 1939-1948* (1991) 13

Kroll-Zeldin, O., *Unsettled: American Jews and the Movement for Justice in Palestine* (2024) .......... 16

Levin, G., *Our Palestine Question: Israel and American Jewish Dissent 1948-1978* (2023) .............. 13

LeVine, M., et al., eds., *One Land, Two States: Israel and Palestine as Parallel States* (2014) .......... 15

Magid, S., *Jewish Anti-Zionism as Political Theology: The Major Writings of Rabbi Yael Teitelbaum* (2026) ................................................................................................................ 14

Magid, S., *The Necessity of Exile: Essays from a Distance* (2023) ................................. 14

Mann, I. & Yona, L., *Defending Jews from the Definition of Antisemitism*, 71 UCLA L. Rev. 1150 (2024) .......................................................................................................................... 17

Mazower, M., *On Antisemitism: A Word in History* (2025) ........................................... 12

Omer, A., *Days of Awe: Reimagining Jewishness in Solidarity with Palestinians* (2019) .................... 15

Penslar, D., *Zionism: An Emotional State (Key Words in Jewish Studies)* (2023) .................. 14

Salahi, Y. & Bargzie, N., *Talking Israel and Palestine on Campus: How the U.S. Department of Education can Uphold the Civil Rights Act and the First Amendment*, 12 Hastings Race & Poverty L.J. 155 (2015) ........................................................................................................ 6

Sasson, T., *The New American Zionism* (2015) .............................................................. 14

Stern, K., *The Conflict Over the Conflict* (2020) ............................................................. 8

Urofsky, M., *American Zionism from Herzl to the Holocaust* (1975) ............................... 12

Verbeeten, D., *The Politics of Nonassimilation: The American Jewish Left in the Twentieth Century* (2017) ............................................................................................................................ 13

Waxman, D., *Trouble in the Tribe: The American Jewish Conflict over Israel* (2016) ......... 16

Wertheimer, J., *The New American Judaism: How Jews Practice Their Religion Today* (2020) .......... 14

Wolfe, A., *At Home in Exile: Why Diaspora Is Good for the Jews* (2014) .......................... 15

I.    **INTRODUCTION**

This case raises important questions about the education that California schoolchildren deserve. On the one hand, antidiscrimination law mandates that no student be denied access to an equal education because of their race, religion, color, or national origin, among other characteristics. On the other hand, notions of free expression and academic freedom have long sought to protect "that free play of the spirit which all teachers ought especially to cultivate and practice," including by recognizing that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 601, 603 (1967). These equally important values have the potential to come into conflict, but they need not when pursued in a manner that heeds the First Amendment's protections. Unfortunately, Assembly Bill 715 does not pass this test.

Nobody disputes that Jewish school children, like their non-Jewish peers, deserve robust protection from discriminatory treatment and harassment in all forms—least of all the undersigned amici, who are Jewish scholars and educators in Jewish Studies, Holocaust Studies, Middle East Studies, and Antisemitism Studies. Jewish school children already enjoy these protections under California's Education Code and federal law, which prohibit discrimination on the basis of race, religion, ethnicity, and national origin.

But AB 715 goes further by seeking to shield Jewish children from discussions about Zionism and Israel. In both intent and effect, it operates on the premise that Jewish students are so harmed when speech in a classroom or on a campus addresses the state of Israel, its policies, its history, or its dominant ideologies, including Zionism, in a critical fashion that they are denied an equal education. Already, the law is having a chilling effect throughout the state's school system. Knowing that any comment on these topics will inevitably prompt a complaint likely followed by a civil rights investigation by school, district, and potentially even state authorities, only a rare teacher or school administrator would venture to introduce their students to a range of perspectives on these pressing topics. Schools will instead be incentivized to avoid such discussions altogether, thereby depriving

1  students on the verge of becoming adults or attending college from the educational opportunities they

2  both need and deserve.

3      The First Amendment is designed to protect from those harms.  Although AB 715 does not

4  explicitly prohibit or censor such speech, it fails to codify a sufficiently clear definition of antisemitism

5  and muddies the waters by incorporating references to definitions that are vague and overbroad, and

6  already being misapplied to curb protected expression regarding Israel and Zionism.[1]  AB 715 places

7  excessive discretion in the hands of school administrators and state officials to navigate this terrain and

8  decide what speech they believe crosses the line, violating longstanding First Amendment principles.

9  *See*, *e.g.*, *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940) (holding that "a state may not

10  unduly suppress free communication of views, religious or other, under the guise of conserving

11  desirable conditions," and vacating conviction "under a statute sweeping in a great variety of conduct

12  under a general and indefinite characterization, and leaving to the executive and judicial branches too

13  wide a discretion in its application" on deciding religious questions).

14      In addition to stretching antidiscrimination law well beyond its traditional boundaries of

15  redressing discriminatory treatment and harassment into spheres where breathing room is needed for

16  robust expression about matters of public concern, AB 715's premise of Jewish unanimity about Israel

17  and Zionism is simply wrong as a matter of empirical fact, both currently and historically.  For

18  millennia, Jewish communities around the world have promoted traditions of robust discussion and

19  intellectual disagreement.  Indeed, critical engagement with texts and traditions is a hallmark of Jewish

20

21  [1]  *See*, *e.g.*, ECF No. 40-1, ECF No. 40-3 at 2-3 (raising specter that various actions—exclusively those related to Palestinian identity, Zionism, or Israel's actions—require remedial action under AB 715);
22  ECF No. 15-2 ¶ 22 (describing a civil rights investigation based on accusation of "teaching a one-sided narrative on Israel and Palestine that is biased against Israel"); ECF No. 15-4 ¶¶ 12-16 (describing how
23  speaker's presentation about "his personal journey as a Palestinian refugee without discussing the current atrocities in Gaza" faced significant administrative pushback due to purported "concerns for . . .
24  children's safety"); ECF No. 15-5 ¶¶ 9, 21 (teacher describing investigation for slide deck "include[ing] images of the real-life graffiti covered apartheid wall built by Israel in the West Bank" and for sharing
25  "a short video showing an 87-year-old Holocaust survivor by the name of Marione Ingram protesting Israel's actions in Gaza"); ECF No. 15-6 ¶ 16 (teacher faced complaints after students in club he
26  supervised "organized and presented a teach-in to inform their fellow students about the history of Israeli occupation in Palestine" and "attend[ing] protests against the genocide in Gaza").
27

study and practice.  Consistent with that long history, ever since the emergence of political Zionism in the late 19th century, Jewish people in the United States, as elsewhere, have discussed and disagreed about their relationship to Zionism as a set of religious, ethical, and political beliefs.  Even after the creation of the state of Israel in 1948, Jewish Americans have continued to discuss and debate Zionism and Israel, with levels of support ebbing and rising, often in connection with unfolding events in the United States and in the Middle East.[2]

Amici thus write to make two overarching points.  First, the definition of antisemitism that AB 715 seeks to import, the "Working Definition" adopted by the International Holocaust Remembrance Alliance (IHRA), is not appropriate to guide government investigations or enforce antidiscrimination law.  It does not reflect a consensus view.  Moreover, it has been criticized for bringing a vast swath of constitutionally-protected expression about Israel and Zionism within its purview.  Amici highlight these critiques, many of which emerge from an author of the IHRA definition and other Jewish scholars.  By implicitly incorporating the IHRA definition as a tool for detecting anti-Jewish bias, AB 715 is already creating confusion about the fundamental difference between speech reflecting or promoting antisemitic bias and speech that is critical of Zionism and actions of the Israeli government, leading teachers and students to avoid discussions of historical and current events related to Palestinian history and culture, Israel, Zionism, and antisemitism—real issues that not only merit careful study, but also impact the lives of many Californians.

Second, disagreements about Zionism and Israel have a long tradition in Jewish religious and political debates.  The breadth of views held by Jewish thinkers, leaders, and lay people across time and space belies any suggestion that Jewish students need legal protection from spirited critiques of Israel or

---

[2]  *See*, *e.g.*, Caroline Morganti, *Recent Polls of US Jews Reflect Polarized Community*, Jewish Currents (June 29, 2023), https://jewishcurrents.org/recent-polls-of-us-jews-reflect-polarized-community (analyzing different approaches for polling Jewish-American perspectives on Israel and its policies); Naftali Bendavid, et al., *Many American Jews sharply critical of Israel on Gaza, Post poll finds*, The Washington Post (Oct. 6, 2025), https://www.washingtonpost.com/politics/2025/10/06/jewish-americans-israel-poll-gaza/ ("Many American Jews sharply disapprove of Israel's conduct of the war in Gaza, with 61 percent saying Israel has committed war crimes and about 4 in 10 saying the country is guilty of genocide against the Palestinians, according to a Washington Post poll.").

Zionism.  Indeed, these are the very debates Jewish Americans are already having in the wake of the death and destruction caused by the attacks on October 7, 2023 and Israel's military response in Gaza. Some, however, wish to curb the freedom of Jews and others to engage with those questions, including by promoting a very narrow vision of what it means to be Jewish—one that equates Jewish identity with support for the state of Israel, its founding principles, its government, and its treatment of the Palestinian people.  The Constitution does not allow the law to be wielded by the state to silence this debate.

By creating the prospect that the expression of views critical of Zionism and Israel will be treated as antisemitic discrimination, AB 715 creates several harms with unconstitutional dimensions. By reinforcing the notion that all Jewish Americans have the same perspective, it fails to recognize the individuality of Jews with different views, violating the principle that each person, regardless of what they believe, is entitled to equal treatment under the law.  Ascribing the views of some members of a group to all creates the further danger of stereotyping and animus against all members of the group.  An additional harm results from the religious context of this dispute.  As amici argue, protection of religious differences and dissent among Jews on the questions of Zionism and support for Israel reflects a bedrock constitutional principle: Government should, at all costs, avoid taking sides in internal religious disputes (just as it should avoid favoring any religion over another).  *See, e.g.*, *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (explaining that "First Amendment values are plainly jeopardized when . . . litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice," which would present the "hazard[] . . . of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern").

Casting this issue as one of protecting Jewish children from "discriminatory" harm, as supporters of AB 715 do, collapses the difference between avoiding discrimination and impermissibly limiting speech and dissent.  Protecting children from discrimination is not about shielding them from different views, even ones that may make them uncomfortable; it's about preventing them from being subjected to harassing and discriminatory conduct based on their religion or ethnic origin, among other protected characteristics.  Were the two equivalent, Palestinian schoolchildren could rightfully

complain that pro-Israel or pro-Zionist speech harms them unlawfully.  Indeed, any political dispute in the world could easily be recast as a war of identity, such as those between China and Taiwan, Russia and Ukraine, India and Pakistan, and so on.  The First Amendment requires that the law protect and facilitate the freedom of all people on all sides to participate in this debate and others; it does not allow law to be used to shut down the views of one side by characterizing the expression of those views as civil rights harms.

## II.    **INTEREST OF AMICI**

The undersigned amici, Jewish scholars and educators of Jewish Studies, Middle East Studies, Holocaust Studies, and Antisemitism Studies, hold a variety of views about Judaism, Zionism, and the state of Israel, and share a commitment to the freedom of all people to learn about and debate these issues.  These topics, like all others, are open to inquiry, debate, and disagreement.

Amici are deeply alarmed at increasing governmental adoption of IHRA-based approaches to combating antisemitism.  It is a threat to their own capacity to research and teach about Jewish history and culture, the history of Zionism, the creation of the state of Israel, the conflict between Israel and Palestine, and many other subjects in Jewish studies.  Even more fundamentally, it is a threat to their own freedom, as Jews, to set the terms of their relationships to Zionism, Israel, and the Palestinian people.

Amici are committed to the protection of robust debate related to Israel and Zionism.  As scholars in Jewish studies, they offer their expertise to explain the dangers of applying the IHRA approach in the antidiscrimination context.  As amici further explain, there is no single, established Jewish view of Zionism or Israel.  Since the beginnings of the Zionist movement, anti-, counter- and non-Zionist beliefs have always competed with Zionist beliefs within Jewish communities.  Debate and sharp disagreements about the role of Israel in Jewish belief are a long-standing tradition in Jewish communities.  Indeed, the existence of these debates demonstrates that there is no conflict between civil

rights and free speech in this context.[3]  Jews have long debated Zionism and Israel and are neither antisemitic, nor any less Jewish, for doing so.

## III.    DISCUSSION

### A.    Assembly Bill 715's Incorporation of the Biden National Strategy Chills Public School Teachers' and Students' Speech

#### 1.    By Referring to the Biden National Strategy, AB 715 Sanctions IHRA's Use to Police Speech Critical of Israel and Zionism

Since 2018, the International Holocaust Remembrance Alliance (IHRA) "Working Definition of Antisemitism" has been adopted or endorsed by thirty-seven states.[4]  The first Trump Administration relied on it in its Executive Order to Combat Antisemitism, and the current Trump Administration has reaffirmed its use.[5]  Despite IHRA's proliferation, courts have expressed serious concern about its constitutionality.[6]

---

[3]  *See*, *e.g.*, Yaman Salahi & Nasrina Bargzie, *Talking Israel and Palestine on Campus: How the U.S. Department of Education can Uphold the Civil Rights Act and the First Amendment*, 12 Hastings Race & Poverty L.J. 155, 176-79 (2015)  (explaining fallacy of using hostile environment law to police political debate).

[4]  The IHRA Working Definition in the Post-October 7 World: Trends and Case Studies: 2024 Mid-Year IHRA Report, COMBAT ANTISEMITISM MOVEMENT, 5 (2024), https://combatantisemitism.org/wp-content/uploads/2024/09/2024-Mid-Year-IHRA-Report-09-26-2024.pdf.

[5]  Executive Order 13899, Combating Anti-Semitism (Dec. 11, 2019); Executive Order 14188, Additional Measures to Combat Anti-Semitism (Jan. 29, 2025).

[6]  *See*, *e.g.*, *Students for Justice in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 417, 421 (W.D. Tex. 2024) (denying defendants' motion to dismiss on ground that incorporation of IHRA Working Definition in university guidelines has arguable connection to plaintiffs' protected speech); *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685, 2025 WL 2777659 *48-50 (D. Mass. Sept. 30, 2025) (holding that the IHRA EOs "in fact incorporated a definition of antisemitism that encompassed protected political speech," intended to cover "staunch public protest related to Israel's treatment of Palestinians," resulting in an enforcement policy which was "intentionally viewpoint-discriminatory, and thus violate[d] the First Amendment"); *cf. Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025) (affirming dismissal of antidiscrimination claim where most of alleged conduct was protected speech, and where gathering in groups, disrupting tranquility, and impeding travel did not render protesters' speech antisemitic much less unprotected); *Yakoby v. The Trustees of the Univ. of Pennsylvania*, No. 23-cv-4789, 2025 WL 1558522, at *7 (E.D. Pa. June 2, 2025) (holding no plausible violation of Title VI based on alleged antisemitism was stated where the plaintiffs' allegations "[a]t worst . . . accuse Penn of tolerating and permitting the expression of viewpoints which differ from their own").

This may explain why AB 715 does not refer to the IHRA Working Definition explicitly. Instead, it refers for guidance to the seemingly innocuous United States National Strategy to Counter Antisemitism adopted by the Biden Administration.[7]  The National Strategy's First Pillar addresses how to increase understanding and awareness of antisemitism among Americans, and provides a generally accepted definition of antisemitism as a stereotypical and negative perception of Jews.[8]  Were this the whole story, amici would have no reason for concern, but neither, one suspects, would AB 715 have had a reason to refer to the National Strategy in the first place.

The "tell" to spot AB 715's sleight of hand comes a few sentences later.  As the National Strategy notes, there are several "additional definitions" of antisemitism to help "increase awareness" of antisemitism, including the IHRA Working Definition, the Nexus Statement, and others.  The National Strategy, however, identifies the IHRA Working Definition as "the most prominent."  The First Amendment harm is no less real just because AB 715 does not explicitly codify the IHRA Working Definition, but instead holds it up as a model definition for those who will implement the law. This gesture ensures that, within California's enforcement of AB 715, the IHRA definition casts a prominent shadow over any discussion of the Palestine-Israel conflict or Zionism in schools.  It is this very real fear that any mention of Zionism or the Israel-Palestine conflict can be characterized as discriminatory that is already leading teachers and students to worry about what they can or cannot say, as Plaintiffs' submissions demonstrate.[9]

### 2.    IHRA, the Jerusalem Declaration, and the Nexus Statement

Adopted in 2016, the IHRA Working Definition was created by a non-governmental organization to track antisemitic incidents around the world by providing guidelines for statements that,

---

[7]  WHITE HOUSE, THE U.S. NAT'L STRATEGY TO COUNTER ANTISEMITISM (May 2023), https://bidenwhitehouse.archives.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf.

[8]  *Id.* at 12.

[9]  *See supra* note 1.

while not explicitly antisemitic, might reveal antisemitic bias.[10]  Thus, when incidents involving attacks on Jewish people or institutions are coupled with statements against Zionism or Israel, those incidents could be properly classified as antisemitic.[11]  In this regard, the IHRA Working Definition states:

> Antisemitism is a certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities.

It then adds:

> Manifestations *might include* the targeting of the state of Israel, conceived as a Jewish collectivity. However, criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic. Antisemitism frequently charges Jews with conspiring to harm humanity, and it is often used to blame Jews for "why things go wrong." It is expressed in speech, writing, visual forms and action, and employs sinister stereotypes and negative character traits. (italics added).

It then provides several examples of speech, six of which are statements involving Israel, that *might* be evidence that an attack on a Jewish person was intended as antisemitic in the sense that the attacker had picked the victim because they were Jewish.  While the IHRA Working Definition was focused on identifying *manifestations* of antisemitism, it was never intended as an authoritative definition of antisemitism, nor to be incorporated in regulation targeting hateful speech or discrimination. Nevertheless, the IHRA approach is being misused to suppress speech critical of Israel and its actions by misclassifying it as antisemitic.[12]

In response to this misuse of IHRA's "Working Definition," the Jerusalem Declaration and the Nexus Document have been promulgated by scholars, including some of the amici here, to clarify the

---

[10] *Working definition of antisemitism*, INTERNATIONAL HOLOCAUST REMEMBRANCE ALLIANCE, https://holocaustremembrance.com/resources/working-definition-antisemitism (last visited Dec. 7, 2025).

[11] *See* Kenneth S. Stern, *A Bad Deal: By Adopting the IHRA Definition of Antisemitism, Universities are Sacrificing Academic Freedom*, Knight First Amendment Institute at Columba University (Sept. 5, 2025), https://knightcolumbia.org/content/a-bad-deal-why-using-the-ihra-definition-of-antisemitism-on-campus-is-incompatible-with-academic-freedom-and-students-right-to-open-inquiry ("I was a lead drafter of the text of an antisemitism definition in 2004 that IHRA embraced and adopted over a decade later. It was never intended to be used as a de facto hate speech code . . . . Many pro-Israel Jewish groups eventually weaponized the definition to suppress student speech and to go after faculty for what they said, materials included in their courses, and speakers they invited to campus.").

[12] *See id.*; *see also* Kenneth S. Stern, *The Conflict Over the Conflict* (2020).

distinction between antisemitic speech (*i.e.*, speech that shows bias against Jewish people for being Jewish) from speech criticizing Zionism and Israel that is not per se antisemitic.[13]  For example, the Jerusalem Declaration takes pains to distinguish statements that *on their face* are antisemitic from those that are not.  Statements that are "on the face of it" antisemitic include: "[a]pplying the symbols, images and negative stereotypes of classical antisemitism . . . to the State of Israel" and "[h]olding Jews collectively responsible for Israel's conduct."  Statements that are not "on the face of it" antisemitic include "supporting the Palestinian demand for justice and the full grant of their political, national, civil and human rights," "criticizing or opposing Zionism as a form of nationalism," and evidence-based criticism of Israel, which includes "its institutions" and "founding principles," and "policies and practices, domestic and abroad, such as the conduct of Israel in the West Bank and Gaza."

The Nexus Document follows the same approach.  It identifies antisemitism as "anti-Jewish beliefs, attitudes, actions or systemic conditions[, including] negative beliefs and feelings about Jews, hostile behavior directed against Jews (because they are Jews), and conditions that discriminate against Jews and significantly impede their ability to participate as equals in political, religious, cultural, economic, or social life."  It then provides examples to distinguish speech that is antisemitic from speech that is not.  It notes, for example, that it is antisemitic to promote myths, stereotypes or attitudes about Zionism and/or Israel that derive from and/or reinforce antisemitic accusations and tropes, such as "[c]haracterizing Israel as being part of a sinister world conspiracy of Jewish control of the media, economy, government or other financial, cultural or societal institutions," "[h]olding individuals or institutions, because they are Jewish, a priori culpable of real or imagined wrongdoing committed by Israel," and "[c]onsidering Jews to be a priori incapable of setting aside their loyalty to the Jewish people and/or Israel."  In contrast, it observes that "[a]s a general rule, criticism of Zionism and Israel, opposition to Israel's policies, or nonviolent political action directed at the State of Israel and/or its policies should not, as such, be deemed antisemitic."

---

[13] JERUSALEM DECLARATION OF ANTISEMITISM, https://jerusalemdeclaration.org/ (last visited Dec. 7, 2025); *The Nexus Document*, NEXUS, https://nexusproject.us/nexus-resources/the-nexus-document/ (last visited Dec. 7, 2025).

1    Both the Jerusalem Declaration and the Nexus Document reveal the fatuousness of claiming that

2    it is antisemitic to apply "double standards" to the state of Israel, by "requiring of [Israel] a behavior not

3    expected or demanded of any other democratic nation," as suggested by the IHRA Working Definition.

4    Setting aside that what constitutes a "double standard" in politics is inherently subject to dispute, the

5    majority of critiques of Israel are grounded in universal human rights standards and international laws

6    that apply to all.[14]  The double standard is in exempting Israel from those standards.  Moreover, there

7    are myriad reasons why Americans or others would focus critique on Israel, given that Israel receives

8    more military aid from the United States than any other country, so the United States' own foreign

9    policy is directly implicated in a way that it is not for human rights violators that the United States does

10    not fund or arm.  Applied to Palestinians or Palestinian-Americans especially, the critique makes little

11    sense, given that Palestinians face an occupation by Israel, not another country.

12    Although the Jerusalem Declaration and the Nexus Document, by seeking to avoid false

13    conflation of anti-Zionism and anti-Semitism, improve on the defects of the IHRA definition, neither

14    was intended as an enforceable definition to be incorporated into antidiscrimination law.  To the

15    contrary, each document recognizes the risk that its examples may be misused—just as the IHRA

16    Working Definition is being misused—to chill protected speech and criticism of Zionism and the state

17    of Israel.  Both the Nexus Document and the Jerusalem Declaration offer principles and explanations to

18    guide context-sensitive investigations of the presence or absence of animus against Jewish people as

19    Jews, while steering clear of silencing speech critical of Zionism or the state of Israel.

20    By attempting to recast anti-Zionism and speech critical of Israel as antisemitic conduct that

21    harms Jewish children, supporters of AB 715 chill discussion that might cast a critical light on the

22    Israel-Palestine conflict.  The reframing of criticisms of Israel as "antisemitic" belies the long history of

23    debate and dissent about Zionism and Israel among American Jews—a history that this

24    mischaracterization elides completely.

25    _____

26    [14]  *See*, *e.g.*, B'tselem, *Our Genocide* 10-13 (July 2025),
https://www.btselem.org/sites/default/files/publications/202507_our_genocide_eng.pdf (Israeli human

27    rights organization report concluding that Israel is committing genocide against the Palestinian people
with reference to 1948 Convention on the Prevention and Punishment of the Crime of Genocide).

1

**B.    Zionism and Support for Israel Have Always Been Contested Among Jews**

2      Zionism, expressed in various political and religious ways, is the belief that Jewish people are

3   not simply adherents of a religion or members of an ethnic group or groups, but rather that they form a

4   nation.  It further holds that Jewish self-determination requires a Jewish homeland or state in the

5   geographic region referred to in the bible as Israel (the Northern Kingdom) and Judah (the Southern

6   Kingdom).  Zionism is not universally accepted either among religious or secular Jews.

7      The contemporary Zionist movement emerged in the late 19th century against a backdrop of

8   growing national movements among European minority groups and intensifying antisemitism,

9   particularly in Germany, France, and the Russian Empire.  While a small number of Jews had moved to

10  Palestine prior to the Zionist movement and in the decades prior to World War I, the vast majority of

11  Jews at that time, in Palestine and elsewhere, were not Zionists.  However, the Zionist movement grew

12  its support as the situation for European Jews sharply worsened in the two decades prior to World War

13  II and the Holocaust.  Most Jews fleeing European persecution chose migration to countries that

14  promised religious freedom and economic opportunity rather than settling in Palestine, with more than

15  two million European Jews immigrating to the United States between 1880 and 1924, ultimately

16  transforming American Jewry into the world's largest Jewish community for most of the twentieth

17  century.  This preference for migration to democratic, religiously tolerant societies reflected in part a

18  widespread Jewish belief that emancipation and equal citizenship, rather than national separation,

19  offered the best approach to ensuring their physical safety, participating as full citizens in democratic

20  processes and civil society, and protecting their communities' beliefs and practices.[15]

21      Consistent with this view, leaders of the American Jewish Reform movement in 1885 opposed

22  political Zionism as antithetical to the religious and political interests of American Jews.  As *The*

23  *Pittsburgh Platform* of American Reform Judaism asserted, "the Jews are not a nation, but a religious

24  community," a view which was only formally overturned in 1942, when the Reform movement gave its

25  support to Palestine as the site for Jewish refuge in response to the worsening conditions faced by

26
_____

27  [15]  Semion Goldin, Mia Spiro, and Scott Ury, *Jewish Migration in Modern Times: The Case of Eastern Europe* (2020).

European Jews during the Holocaust.[16]  The American Jewish Committee (AJC), which was founded in the early 20th century to protect the civil liberties of Jewish and other people, was emphatically anti-Zionist, viewing Zionism as a deep threat to the wellbeing of Jewish Americans.  As one of AJC's leaders insisted in 1945, "from every point of view of safety for Jews in America there has got to be an open, vocal Jewish dissent from nationalism and political Zionism."[17]  After the state of Israel was founded in 1948, the AJC became reconciled to its existence, although its leaders continued to argue with David Ben-Gurion, the first Israeli Prime Minister, over his claim that Israel represented the interests of Jews worldwide and his insistence on unconditional support for the state's policies from American Jewish organizations.  By the middle of the 20th century, however, the AJC was fully committed to Zionism, as the meaning of Zionism itself had changed both for American Jewish and Israeli leaders.  It was no longer closely tied to the claim that all Jews should move to Israel to fulfill their national destiny, but to the idea that Israel's existence should be supported because it served as a haven for Jewish refugees fleeing the Holocaust and other sites of persecution.[18]

While the AJC's position towards Israel changed, other Jewish organizations and leaders remained critical of Zionism and Israel's claim to represent all Jews.  Founded in 1942, the American Council for Judaism, like the AJC in its first period, grounded its opposition in the Jewish Reform movement, arguing that Zionism fundamentally distorted Judaism's universalist message and threatened to transform Jews into a political rather than religious community—a position it maintains to this day.[19]  Other Jewish organizations opposed Zionism, as did labor radicals associated with the Bund, and the Socialist and Communist Parties.  A wide range of Jewish intellectuals from Hannah Arendt to Albert Einstein disagreed about the appropriateness of Zionism and argued that a state that was defined

---

[16]  Mark Mazower, *The origins of today's conflict between American Jews over Israel*, The Guardian (Sept. 25, 2025), https://www.theguardian.com/news/2025/sep/25/origins-todays-conflict-between-american-jews-over-israel.

[17]  *Id.*

[18]  *See generally* Mark Mazower, *On Antisemitism: A Word in History* (2025); Amy Kaplan, *Our American Israel: The Story of an Entangled Alliance* (2018); Melvin I. Urofsky, *American Zionism from Herzl to the Holocaust* (1975).

[19]  Eric Alterman, *We Are Not One: A History of America's Fight Over Israel* (2022).

1    around Jewish identity, of necessity, involved the displacement of the Palestinian Arab population.  The

2    creation of hundreds of thousands of Palestinian refugees during the 1948 war troubled many Jews who

3    understood their tradition through a universalist lens as demanding justice for the vulnerable and

4    dispossessed.  While these concerns were sometimes muted in public discourse, they persisted in

5    Jewish intellectual circles.[20]

6    As this evidence demonstrates, Zionism was far from universally accepted by Jews even after

7    the Holocaust.  Support for Israel and its policies among Jewish Americans reached a highwater mark

8    with the 1967 war, driven by Israel's success in countering what was perceived by many as an

9    existential threat.  Israel's role as a haven for Soviet Jews who were unable to find refuge in the United

10   States or Europe further underlined the argument that a Jewish state served an essential purpose for

11   world Jewry.

12   The consensus around support for Israel began to fray in the early 1980s with Israel's invasion

13   of Lebanon and the first Intifada.  After the failure of the Oslo Peace accords, many Jews, while

14   remaining Zionist, became concerned that Israel's government had strayed from their understanding of

15   the state's foundational democratic principles.  Others began to question whether Zionism was

16   compatible with Jewish ethical traditions of justice and equality.[21]

17   From early on, certain religiously orthodox communities rejected Zionism for very different,

18   theological reasons.  For these communities, Zionism was a form of heresy, a human attempt to force

19   the messianic redemption that, according to traditional Jewish eschatology, could only be brought about

20   by divine intervention.  According to these communities, the Talmud forbids mass Jewish immigration

21   to Palestine with the goal of establishing a Jewish state before the coming of the Messiah.  To this day,

22   these communities (many of whom are affiliated with different sects of the Hasidic movement and live

23

24

---

[20] Menahem Kaufman, *An Ambiguous Partnership: Non-Zionists and Zionists in America, 1939-1948* (1991); Geoffrey Levin, *Our Palestine Question: Israel and American Jewish Dissent 1948-1978* (2023).

[21] *See* Kaplan, *supra*; Alterman, *supra*; David Verbeeten, *The Politics of Nonassimilation: The American Jewish Left in the Twentieth Century* (2017).

inside and outside the state of Israel) continue to oppose Zionism as a violation of their religious beliefs and practices.[22]

### C.    Jewish Views of Zionism, Israel, and Palestine Continue to be Debated and Evolve

Recent decades, in particular, have seen an explosion of generative debate among Jewish scholars and thinkers about the relationship of Jews living outside Israel and the state of Israel. Some scholars have sought to reaffirm Zionism as a principal aspect of Jewish collective identity. Drawing on biblical and philosophical sources, Yoram Hazony, a leading Modern Orthodox thinker, offers a full-throated defense of ethnonationalism in general and of Zionism in particular.[23]  Others, identified as liberal Zionists, while not rejecting criticism of Israel outright, identify a collective emotional "substrate" connecting Jews around the world to Israel.[24]  Others analogize the connection of Jews to Israel to the relationship of other diasporas to their homeland.[25]  Describing the rise of dark undercurrents that have overtaken Judaism since Israel's occupation in the wake of the Six-Day War, Rabbi Arthur Green ponders whether Judaism can be saved from itself and argues from traditional religious sources for a Zionism of peace and a rejection of nationalist exclusivism.[26]

Other Jewish writers have rejected Zionism as flawed from the outset, arguing that its ethno-nationalist ambitions contradict core Jewish values of equality.  Drawing on traditional Jewish texts, Shaul Magid and Peter Beinart, amici here, propose a one-state solution, in which two people, Jews and Palestinians, enjoy the right of return and full citizenship.[27]  Drawing on the writings of Martin Buber

---

[22]  *See* Jack Wertheimer, *The New American Judaism: How Jews Practice Their Religion Today* (2020); Shaul Magid, *Jewish Anti-Zionism as Political Theology: The Major Writings of Rabbi Yael Teitelbaum* (2026).

[23]  Yoram Hazony, *The Jewish State: The Struggle for Israel's Soul* (2001).

[24]  Derek J. Penslar, *Zionism: An Emotional State (Key Words in Jewish Studies)* (2023); Yossi Klein Halevi, *The Blogs: A Jewish Centrist Manifesto*, The Times of Israel (June 16, 2016), http://blogs.timesofisrael.com/the-state-of-the-jewish-world-2016/.

[25]  Theodore Sasson, *The New American Zionism* (2015).

[26]  Arthur Green, *Can Judaism Be Saved?: Its Future after Gaza* (2025).

[27]  Shaul Magid, *The Necessity of Exile: Essays from a Distance* (2023); Peter Beinart, *Being Jewish After the Destruction of Gaza: A Reckoning* (2025).

and Hannah Arendt, Jonathan Graubart advances a non-statist vision of Jewish self-determination rooted in what he calls "humanist Zionism," to envision Jewish flourishing through binational political arrangements rather than exclusive Jewish sovereignty.[28]  Atalia Omer, another amicus, reframes the current moment as a foundational re-examination of Jewishness through the lens of collective repentance and self-criticism.[29]

        A number of other Jewish thinkers have reimagined Jewish beliefs and practices decoupled from a commitment to Zionism or a tie to the biblical land of Israel.  Drawing on Jewish philosophers, including Emmanuel Levinas, Hannah Arendt, Walter Benjamin, and Primo Levi, Judith Butler, an amicus here, develops a diasporic Jewish ethics around the values of equality, justice, and co-habitation.[30]  Alan Wolfe seeks to recover and celebrate an understanding of Jewish flourishing rooted in the Jewish diasporic heritage.[31]  Going further, Daniel Boyarin, another amicus, argues that the contemporary binary understanding of Jews as either a religious community or an ethnic nation-state is historically flawed and seeks to uncover a robust sense of nationalism that does not involve sovereignty.[32]  Yet other Jewish scholars see their future as directly tied to reconciliation and building a common home with Palestinians throughout Israel/Palestine beyond territorially-grounded notions of nationalism and the nation-state.[33]

        This debate among scholars is mirrored by contentious disputes within the larger Jewish community.  There is no consensus among Jews about the Israeli-Palestinian conflict; nor is there consensus among Jews that Jewish identity necessarily involves an identification with Israel.  Changes in young people's position on Israel, Palestine, the Gaza war, particularly among young Jewish

---

[28]  Jonathan Graubart, *Jewish Self-Determination Beyond Zionism: Lessons from Hannah Arendt and other Pariahs* (2023).

[29]  Atalia Omer, *Days of Awe: Reimagining Jewishness in Solidarity with Palestinians* (2019).

[30]  Judith Butler, *Parting Ways: Jewishness and the Critique of Zionism* (2012).

[31]  Alan Wolfe, *At Home in Exile: Why Diaspora Is Good for the Jews* (2014).

[32]  Daniel Boyarin, *The No-State Solution: A Jewish Manifesto* (2023).

[33]  Mark LeVine and Mathias Mossberg, eds., *One Land, Two States: Israel and Palestine as Parallel States* (2014).  *See also* Israeli Palestinian Confederation, https://ipconfederation.org/.

1  Americans, underlines the fact that imputing a single perspective about Israel to Jewish young people is

2  itself an antisemitic act.[34]

3      Recent history and polling show sharp divisions among Jews.[35]  A large majority of Jewish

4  Americans polled believe that Israel has committed war crimes in Gaza after October 2023 and almost

5  40% agree with the claim that Israel has committed genocide against Palestinians.[36]  In a poll taken in

6  2021, before the current war, 25% of American Jews agreed that Israel was an apartheid state.[37]  Social

7  science research indicates a generation gap between younger and older Jews as well as among

8  Americans in general.[38]  Among younger Jews aged 18-35, a majority agree that Israel is committing

9  genocide in Gaza and almost 30% of younger Jews agree that it is not antisemitic to argue that Israel

10  does not have a right to exist as a Jewish state.[39]

11      The strong dissenting views of younger Jewish Americans have driven the creation and growth

12  of organizations that tie activism in support of Palestinian rights and against Israel's occupation and

13  Zionism to Jewish ethical and religious values.  Founded in the late 1990s, Jewish Voice for Peace, a

14  group which rejects Zionism and to which many amici belong, saw significant growth after October 7,

---

15  [34]  Oren Kroll-Zeldin, *Unsettled: American Jews and the Movement for Justice in Palestine* (2024).

16  [35]  *See, e.g.*, Dov Waxman, *Trouble in the Tribe: The American Jewish Conflict over Israel* (2016);
17  Andrew Silow-Carroll, *Jew vs. Jew rhetoric breaks hearts in a bitter internal debate about the Gaza war*, Jewish Telegraphic Agency (Aug. 17, 2025), https://www.jta.org/2025/08/17/ideas/jew-vs-jew-
18  rhetoric-breaks-hearts-in-a-bitter-internal-debate-about-the-gaza-war.

19  [36]  *See* Bendavid, *supra* note 2.

20  [37]  *See* Ron Kampeas, *Survey: A quarter of US Jews agree that Israel 'is an apartheid state'*, Jewish
Telegraphic Agency (July 13, 2021), https://www.jta.org/2021/07/13/politics/sizeable-minorities-of-us-
21  jewish-voters-believe-israel-is-guilty-of-genocide-apartheid; Ben Gale, *Poll: 25 percent of American
Jewish voters believe 'Israel is an apartheid state*, JNS.Org (July 14, 2021), https://www.jns.org/poll-
22  25-percent-of-american-jewish-voters-believe-israel-is-an-apartheid-state/.

23  [38]  *See, e.g.*, Jordan Muchnick & Elaine Kamarck, *The generation gap in opinions towards Israel*,
Brookings (Nov. 9, 2023), https://www.brookings.edu/articles/the-generation-gap-in-opinions-toward-
24  israel/; Kenneth Stein, *U.S. Generational Divide Solidifies on Views Toward Israel, Hamas*, Center for
Israel Education (Sept. 1, 2025), https://israeled.org/u-s-generational-divide-solidifies-on-views-
25  toward-israel-hamas/.

26  [39]  *See Sept. 2-9, 2025, Washington Post Jewish Americans Poll,* The Washington Post (October 6,
2025), https://www.washingtonpost.com/tablet/2025/10/06/sept-2-9-2025-washington-post-jewish-
27  americans-poll/.

2023.[40]  IfNotNow, an activist group that engages in organized protests incorporating Jewish rituals was created in 2014 to appeal to liberal Zionists as well as non-Zionists and became explicitly anti-Zionist with the Gaza War.[41]  While some may characterize these organizations as fringe of the Jewish community, they have millions of social media followers and represent the views of a significant number of Jewish millennials.  These organizations, and others, identify themselves as *Jewish* organizations and devote significant efforts to articulating the connections between their actions and their Judaism.

From the beginning, the relationship of Jews to Zionism and the state of Israel has been fraught. There is not now, nor has there ever been, a single collective Jewish identity formed around Zionism. On the contrary, Israel and Zionism have always been the subject of sharp disagreement and dissent among Jewish Americans.[42]  Marginalizing opposing Jewish views as antisemitic brushes these disagreements under the rug to suggest a false consensus around support for Israel.  When government puts its power behind these efforts, it interferes with the rights of Jews to engage in political speech and debate about the tenets of their religion, as well as the speech rights of others who oppose Israel's actions in Palestine.  Insisting that all Jewish Americans are Zionists imposes a stereotype, that if anything, risks increasing antisemitism, as opponents of Israel's actions who are not Jewish may wrongly paint all Jews with the same brush.[43]  And suppressing the speech of Jewish Americans critical

[40]  *See* Jewish Voice for Peace, *2024 / 5784 Annual Report* (2025) ("Our mass mobilizations were met with massive growth, as JVP's network of members and supporters grew to over 750,000 people."), https://www.jewishvoiceforpeace.org/resource/annual-report-2024/.

[41]  *See IfNotNow*, Why We Organize, https://www.ifnotnowmovement.org/why-we-organize ("We are IfNotNow, a movement of American Jews organizing our community for equality, justice, and a thriving future for all: our neighbors, ourselves, Palestinians, and Israelis.").

[42]  *See* Marjorie Feld, *The Threshold of Dissent: A History of American Jewish Critics of Zionism* (2024).

[43]  Legal scholars Itamar Mann and Lihi Yona note that while "antisemitism is often weaponized against Palestinians and their liberation struggle," there is "an additional layer of harm, imposed upon U.S. Jews," namely, that by "[c]onstructing Jewish identity along rigid and fixed lines, the contemporary legal definition of antisemitism imposes upon Jews a straitjacket of Zionism." Itamar Mann & Lihi Yona, *Defending Jews from the Definition of Antisemitism*, 71 UCLA L. Rev. 1150 (2024), https://www.uclalawreview.org/defending-jews-from-the-definition-of-antisemitism/.

of Zionism and the state of Israel fundamentally intrudes on the right of Jews to articulate and act on their ethical and religious values, values that they hold as Jews.

## IV.    <u>CONCLUSION</u>

Amici respectfully request that the Court grant Plaintiffs' motion for preliminary injunction, insofar as its enforcement would infringe on the protected forms of expression described herein.

Respectfully Submitted,

Dated: December 9, 2025                    By: /s/ *Yaman Salahi*                    

Yaman Salahi (SBN 288752)
yaman@salahilaw.com
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: 415.236.2352

Tanina Rostain (*pro hac vice* forthcoming)
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001
tr238@georgetown.edu

*Attorneys for Amici Curiae*

## APPENDIX A: LIST OF AMICI CURIAE

1. **Rebecca T. Alpert** is a Professor Emerita of Religion at Temple University, known for her work on 20th-century Judaism with a focus on issues of sports, race, and sexuality. She is one of the first American women ordained as a rabbi.

2. **Deborah Needleman Armintor** is a Principal Lecturer in English at the University of North Texas who specializes in eighteenth-century British literature, gender theory, and sexuality studies and teaches about representations of the Holocaust in literature.

3. **Leora Auslander** is the Arthur and Joann Rasmussen Professor of Western Civilization in the Departments of Race, Diaspora, & Indigeneity and History at the University of Chicago. She is also a member of the Greenberg Center for Jewish Studies and a signatory of the Jerusalem Declaration.

4. **Angelika Bammer** is Professor of Interdisciplinary Humanities and Affiliated Faculty in Jewish Studies at Emory University. She has spoken and published widely on Holocaust post-memory and is the author of Born After: Reckoning with the German Past (Bloomsbury Academic, 2019). She is also a signatory of the Jerusalem Declaration.

5. **Omer Bartov** is the Dean's Professor of Holocaust and Genocide Studies at Brown University. Born in Israel and educated at Tel Aviv University, his early research concerned the Nazi indoctrination of the Wehrmacht and the crimes it committed in World War II. He has published extensively on war, genocide, interethnic relations, and on the Israel-Palestine conflict. He is a signatory of the Jerusalem Declaration.

6. **Peter Beinart** is Professor of Journalism and Political Science at the City University of New York. He is also a Contributing Opinion Writer at The New York Times, an MSNBC Political Commentator, Editor-at-Large of Jewish Currents and a Non-Resident Fellow at the Foundation for Middle East Peace. He is the author of *The Crisis of Zionism* (2012) and *Being Jewish after the Destruction of Gaza: A Reckoning* (2025). He is a signatory of the Jerusalem Declaration.

7. **Joel Beinin** is the Donald J. McLachlan Professor of History and Professor of Middle East History, Emeritus at Stanford University, whose scholarship focuses on the social and cultural history and political economy of modern Egypt, Israel, and Palestine. He is a signatory of the Jerusalem Declaration.

8. **Joel Berkowitz** is Professor of English and Director of the Sam & Helen Stahl Center for Jewish Studies at the University of Wisconsin-Milwaukee. His primary scholarly focus is Yiddish theater and drama, and he also works on Jewish theater more broadly as well. He is currently writing a book on Yiddish drama after the Holocaust. He teaches courses on Jewish literature, culture, and history.

9. **Daniel Boyarin** is the Taubmann Professor of Talmudic Culture (emeritus) at the University of California, Berkeley.

10. **Judith Butler** is a Distinguished Professor in the Graduate School at the University of California, Berkeley, and a world-renowned philosopher and gender theorist whose work in feminist and queer theory has profoundly influenced contemporary social thought. They are also the author of the book, *Parting Ways: Jewishness and the Critique of Zionism*.

11. **Hasia R. Diner** is Professor Emerita at the Departments of History and the Skirball Department of Hebrew and Judaic Studies at New York University, and the Director of the Goldstein-Goren Center for American Jewish History. She is the former series editor for the Goldstein-Goren series in American Jewish History. Her books include, *Hungering for America: Italian, Irish and Jewish Foodways in the Age of Migration*, *The Jews of the United States, 1654 to 2000*, *We Remember with Reverence and Love: American Jews and the Myth of Silence After the Holocaust, 1945-162*, and *Immigration: An American History*, with Carl Bon Tempo. She is a signatory of the Jerusalem Declaration.

12. **Debórah Dwork** is the Founding Director of the Center for the Study of the Holocaust, Genocide, and Crimes Against Humanity at Graduate Center—CUNY. She is a Holocaust historian and has written a number of books on the subject, most recently *Saints and Liars: The Story of Americans Who Saved Refugees from the Nazis* (2025). She was a member of the American delegation to the International Holocaust Remembrance Alliance (IHRA) from 2011-2021, and served in leadership roles in the organization. Troubled by the IHRA definition of antisemitism, she repeatedly suggested that the IHRA appoint a committee to track its usage and effect. She is also a signatory of the Jerusalem Declaration.

13. **Marjorie Feld** is Professor of History at Babson College, where she teaches courses on U.S. gender, labor, and social history, food justice, and sustainability. Her most recent book in U.S. Jewish History focuses on the history of American Jewish dissent over Israel and Zionism.

14. **Keith Feldman** is an Associate Professor of Ethnic Studies at the University of California, Berkeley. He is a scholar of race, culture, and diaspora, with a focus on the entanglement of the United States and the Middle East. He authored *A Shadow over Palestine: The Imperial Life of Race in America*, and over twenty articles and book chapters in Middle East Studies, Jewish Studies, Black Studies, and American Studies.

15. **Sheer Ganor** is an Assistant Professor of History at the University of Minnesota, Twin Cities. She specializes in German-Jewish history and her research and teaching experience include Holocaust and Genocide history, Jewish diasporas, and Nazi Germany. She is an affiliate faculty member of the Center for Holocaust and Genocide Studies, the Center for Jewish Studies, the Human Rights Program and the Immigration History Research Center.

16. **Emmaia Gelman** is the Executive Director of the Institute for the Critical Study of Zionism. Her research focuses on ideas about race and rights and their deployment as political levers in transnational U.S. politics. She is the author of *The Anti-Defamation League and the Racial State* (UC Press, forthcoming 2026).

17. **Terri Ginsberg** is an Assistant Teaching Professor in the Cinema Department at Rutgers University and an internationally-recognized scholar of Arab, Palestinian, and German cinema. Her published works include, *Holocaust Film: The Political Aesthetics of Ideology* (2007);

*Visualizing the Palestinian Struggle* (2016); co-editing *A Companion to German Cinema* (2012) and *Historical Dictionary of Middle Eastern Cinema* (2020).

18. **Shai P. Ginsburg** is an Associate Professor in the Department of Asian and Middle Eastern Studies at Duke University. He is a scholar of Modern Jewish Culture and History, the author of *Rhetoric and Nation* (2014), and a signatory of the Jerusalem Declaration.

19. **Atina Grossman** is Professor of History at the Cooper Union in New York City where she teaches courses on modern Europe, Fascism and National Socialism, the Holocaust, refugees and migration in global context as well as gender and sexuality studies. Relevant publications include: *The Surviving Remnant: Documents on Jewish Displaced Persons in Postwar Germany 1945-1950* (with A.Kramen, A Patt, T. Lewinsky, Vandenhoeck and Ruprecht 2024); *Our Courage/Unser Mut: Jews in Europe after 1945* (with K. Bohus 2020), and *Shelter from the Holocaust: Rethinking Jewish Survival in the Soviet Union* (with M. Edele and S. Fitzpatrick 2017). Her current research focuses on "*Jewish Refugees from National Socialism in Iran and India: Between 'Orient' and European Catastrophe*," as well as the entanglements of family memoir and historical scholarship.

20. **Wolf Gruner** is the Shapell-Guerin Chair in Jewish Studies, Professor of History and Founding Director of the Center for Advanced Genocide Research at the University of Southern California. He is a signatory of the Jerusalem Declaration and member of the Academic Committee at the US Holocaust Memorial Museum. Among his eleven books on the persecution of the Jews in Nazi Germany, *Resisters: How Ordinary Jews fought Hitler's Persecution* (2023), was a finalist for the National Jewish Book Award and Yad Vashem International Book Prize.

21. **Liora Halperin** is Professor of International Studies and History, and Distinguished Endowed Chair of Jewish Studies, at the University of Washington. She is the author of *The Oldest Guard: Forging the Zionist Settler Past* (Stanford, 2021) and *Babel in Zion: Jews, Nationalism, and Language Diversity in Palestine, 1920-1948* (Yale, 2015). She is a signatory of the Jerusalem Declaration.

22. **Marianne Hirsch** is the William Peterfield Trent Professor Emerita of English and Comparative Literature and the Institute for the Study of Sexuality and Gender at Columbia University. Her publications include *The Generation of Postmemory: Writing and Visual Culture After the Holocaust* (Columbia University Press, 2012) and *Ghosts of Home: The Afterlife of Czernowitz in Jewish Memory*, co-authored with Leo Spitzer (University of California Press, 2010), among many others. She is also a signatory of the Jerusalem Declaration.

23. **Brett Ashley Kaplan** is the Director of the Initiative in Holocaust, Genocide, and Memory Studies at the University of Illinois at Urbana-Champaign. She is a signatory of the Jerusalem Declaration.

24. **Marion Kaplan** is a Professor Emerita of Modern Jewish History at New York University and a three-time winner of the National Jewish Book Award for her books: *The Making of the Jewish Middle Class: Women, Family and Identity in Imperial Germany* (New York, Oxford

University Press, 1991); *Between Dignity and Despair: Jewish Life in Nazi Germany* (Oxford University Press, 1998); and *Gender and Jewish History*, co-edited with Deborah Dash Moore (Indiana, 2011).  She is a signatory of the Jerusalem Declaration.

25. **Gabi Kirk** is an Assistant Professor in the Department of Geography Environment and Spatial Analysis at Cal Poly Humboldt.  She is a Jewish scholar of Palestine-Israel with a focus on critical human-environment geography.  Previously, she conducted years of reporting on the attacks on ethnic studies programs in California's K-12 schools for Jewish Currents Magazine by Israel advocacy organizations.

26. **Shira Klein** is an Associate Professor of History and Chair of the History Department at Chapman University.  Finalist for the 2018 National Jewish Book Award, she publishes on Holocaust history and antisemitism.

27. **Susan S. Lanser** is Professor Emerita of Comparative Literature, English, and Women's, Gender, and Sexuality Studies at Brandeis University.  A scholar of both cultural history and narrative, she is the author of three monographs, three edited volumes, and over eighty referred articles.  Her recent scholarship on narrative includes four articles published in peer-reviewed journals, three of them co-authored with Professor Shlomith Rimmon-Kenan of the Hebrew University of Jerusalem, who is also a signatory to the Jerusalem Declaration.  Lanser and Rimmon-Kenan are both recipients of the Wayne C. Booth Lifetime Achievement Award of the International Society for the Study of Narrative, which also awarded them recognition for one of their coauthored essays, "*Narratology at the Checkpoint: The Poetics and Politics of Entanglement*," published in 2019.  Their essay "*Topological Jerusalem*" is forthcoming in the journal Narrative.

28. **Mark Andrew LeVine** is a Professor of Modern Middle Eastern History at the University of California, Irvine, and the author and editor of over half a dozen scholarly volumes on Zionism, Israel and Palestine, and the founding Director of UC Irvine's Global Middle East program.  His research and teaching focus on the social, cultural, and urban histories of the Middle East, North and Sub-Saharan Africa, globalization and culture, African and Middle musics, migration and refugee studies, and popular cultures and theologies of Islam.

29. **Shaul Magid** is a Professor of Modern Jewish Studies in Residence at the Harvard Divinity School.  He is a distinguished scholar with a career that spans the academy and rabbinical seminaries alike, and his research bridges centuries and disciplines, exploring topics from sixteenth-century Kabbalistic mysticism and Hasidism, including its spiritual ties to Christianity, to contemporary American Judaism, and to Jewish identity, race, and critical theory.

30. **Charles H. Manekin** is a Professor of Philosophy (Emeritus) at the University of Maryland, whose area of specialization is Jewish philosophy.  For six years, Professor Manekin served as the Director of the Joseph and Rebecca Meyerhoff Center of Jewish Studies at the University of Maryland.

31. **Nicole Erin Morse** is an Associate Professor of Language, Literacy and Culture at the University of Maryland, Baltimore County, and an active member of two synagogues (Tzedek Chicago and Hinenu Baltimore).

32. **Atalia Omer** is a Professor of Religion, Conflict, and Peace Studies in the Keough School of Global Affairs at the University of Notre Dame. Her work focuses on the relationship between religion, nationalism, and peacebuilding, particularly in the context of the Israeli-Palestinian conflict.

33. **Elya Zissel Piazza** is an independent scholar of Talmudic literature and Yiddish language and culture who received their PhD in Near Eastern Studies with Designated Emphases in Jewish Studies and Gender and Women's Studies from the University of California, Berkeley.

34. **Benjamin Robinson** is an Associate Professor of Germanic Studies at Indiana University, Bloomington. His area of study is modern German literature, philosophy, and social theory, much formed in the context of fascism and in the wake of the Holocaust.

35. **Penny Rosenwasser** is an educator and activist who was a founding board member of Jewish Voice for Peace and a former chair of the National Women's Studies Association's Jewish Caucus. She teaches at City College of San Francisco and is known for her feminist and anti-racist Jewish social justice advocacy. Her work focuses on antisemitism, internalized antisemitism, and collective Jewish trauma. She is also a leader of racial justice work at Kehilla Community Synagogue (Oakland, California). Her most recent book is *Hope into Practice: Jewish women choosing justice despite our fears.*

36. **Douglas Rossinow** is a Professor of Ethnic, Gender, Historical, and Philosophical Studies at Metro State University. He is the author of a forthcoming history of American Zionism, "*Promised Land: The Worlds of American Zionism, 1942-2025*" (Oxford University Press 2027).

37. **Alice Rothchild, MD** is a retired Assistant Professor at Harvard Medical School, and the author of books and essays related to the issues in this brief, including *Broken Promises, Broken Dreams: Stories of Jewish and Palestinian Trauma and Resilience* and a contributor to *Reclaiming Judaism from Zionism: Stories of Personal Transformation.*

38. **Cathy Lisa Schneider** has written and taught on democracy, dictatorship and resistance: racial, ethnic and religious discrimination; racially targeted military and police violence and comparative social movements. Her research and publications are based on ethnographic research in Latin America, the United States and Europe.

39. **Daniel A. Segal** is the Jean M. Pitzer Professor Emeritus of Anthropology and Professor Emeritus of History at Pitzer College of the Claremont Colleges; his scholarly work focuses on the social construction of race and the building of state power in post-Columbian world history.

40. **Raz Segal** is Associate Professor of Holocaust and Genocide Studies and Endowed Professor in the Study of Modern Genocide at Stockton University in New Jersey. An Israeli-American historian, his research focuses on the Holocaust, modern genocide, and state violence, particularly in central and southeast Europe and Palestine/Israel. He is a signatory of the Jerusalem Declaration.

41. **Joshua Shanes** is the Emanuel Ringelblum Professor of Jewish History at the University of California, Davis. He is a scholar of modern Jewish religion and politics as well as

antisemitism with many publications on these subjects. He is a member of the Nexus task force and one of the signatories of the Jerusalem Declaration.

42. **Victor Silverman** is Emeritus Professor of History at Pomona College. His scholarship includes works on Jewish-American history, Jewish identity, and Sephardic migration. He taught multiple courses on the history of the Israel-Palestine conflict.

43. **Santiago Slabodsky** is the Kaufman Endowed Chair in Jewish Studies and the Director of the Program in Jewish Studies at Hofstra University-New York. He is also a signatory of the Jerusalem Declaration.

44. **Marla Stone** is a Professor of History at Occidental College. She is a scholar of fascism and genocide. She has published and lectured on a variety of topics in European history, including Italian Fascist politics and culture, Italian Holocaust memory culture, and interwar cultural diplomacy.

45. **Jessie Stoolman** is a postdoctoral researcher at the Universitat Autònoma de Barcelona. Her publications have examined strategies of Jewish heritage preservation in Morocco and Spain ("Resistance, Normalization, and Morocco" in *Public Anthropology*), North African Jewish diasporas ("Southern California 'Spanish Revival' By Way of Tunis"), and global histories of anthropology ("Decolonizing US Anthropology" in *American Anthropologist* and "The 'Ethnographic Letter': David Hart's North African Ethnography Revisited" in *Hespéris-Tamuda*). She has also collaborated on several archival projects dedicated to preserving Jewish and North African histories.

46. **Estelle Tarica** is a Professor of Latin American Literature and Culture at the University of California, Berkeley. Her research concerns Jewish memory cultures in Latin America, the Guatemalan genocide and the Cold War, and Holocaust consciousness through a global and comparative frame. Her most recent book is *Holocaust Consciousness and Cold War Violence in Latin America* (SUNY Press 2022).

47. **Barry Trachtenberg** is the Michael R. and Deborah K. Rubin Presidential Chair of Jewish History at Wake Forest University, specializing in modern European and American Jewish history and Holocaust studies. He is a signatory of the Jerusalem Declaration.

48. **Howard Winant** is Distinguished Professor of Sociology Emeritus at the University of California, Santa Barbara. He is the author of numerous books and articles about race and racism, including antisemitism. Dr. Winant is Jewish and the child of Holocaust survivors.

49. **Mir Yarfitz** is an Associate Professor of History at Wake Forest University. His research and teaching bridge the fields of Latin American history, migration studies, gender and sexuality, and Jewish studies.

50. **Orian Zakai** is an Associate Professor of Hebrew/Israeli Literature and Culture at George Washington University, where she coordinates the Hebrew program and specializes in modern Hebrew literature, gender, and nationalism.