JENIN YOUNES* (*pro hac vice*)
DEYAR JAMIL (*pro hac vice*)
AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE
910 17th Street Northwest, Suite 1000
Washington, DC 20006
Telephone: (202) 244-2990
jyounes@adc.org
*Designated Counsel for Service*

THOMAS B. HARVEY (CA Bar #287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

MICHAEL BRACAMONTES (CA Bar # 242655)
BRACAMONTES & VLASAK
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 835-6777
mbracamontes@bvlawsf.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| **ANDREA PRICHETT;** ) | |
| **JONAH OLSON;** ) | |
| **DUNIA HASSAN;** ) | **Case No. 5:25-cv-9443** |
| **KAUSER ADENWALA;** ) | |
| **LA EDUCATORS FOR** ) | |
| **JUSTICE IN PALESTINE;** ) | |
| **ABDULRAHMAN JARRAR,** ) | **Second Amended Complaint** |
| on behalf of his minor child, **J. J.;** ) | **for Declaratory and Injunctive** |
| **LINDA KHOURY-UMILI,** on ) | **Relief** |
| behalf of her minor children, **Y. U.** ) | |
| and **L. U.; ALICE FINEN,** on ) | |
| behalf of her minor child, **G. F.;** ) | |

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 5:25-cv-9443

1

*Plaintiffs*,                              )
                                           )
                                           )
        v.                                 )
                                           )
**GAVIN NEWSOM,** Governor of the State    )
of California, in his official capacity;   )
**ROB BONTA,** Attorney General of         )
California, in his                         )
official capacity; and                     )
**TONY THURMOND**, California              )
Superintendent of Public Education, in     )
his Official Capacity; and                 )
**NICK MADUROS,** Secretary of the         )
the Government Operations Agency,          )
in his official capacity,                  )

        *Defendants*.


## INTRODUCTION

1.      This case is about how a hastily written and adopted law fails to define key terms, meaning that those subject to its mandate cannot know what could subject them to punishment under it, while it appears to expand the definition of antisemitism so far that its threatened application violates the First Amendment rights of teachers to teach and students to learn about Palestine, Israel, and the Middle East, in every public school across the state of California.

2.      In October of 2025, Governor Gavin Newsom signed Assembly Bill 715 ("AB 715") into law, amending California's Education Code. AB 715 purports to strengthen antidiscrimination protections for Jewish students specifically.

3.      Despite its emphasis on protecting Jewish students from discrimination, AB 715 does not define the term "antisemitism." Because California's Education Code already prohibits discrimination on the basis of race, religion, ethnicity, and national origin, the only plausible inference to be made is that the new law seeks to alter or expand the definition.

4.      Courts have rejected similar attempts to prohibit contested intellectual frameworks in public education where the governing body failed to define the prohibited concept with sufficient clarity. *See Mae M. v. Komrosky,* 111 Cal. App. 5th 198, 332 Cal. Rptr. 3d 682 (Cal. Ct. App. 4th Dist., Div. 3 May 19, 2025) (invalidating a school board's ban on "Critical Race Theory," in part on vagueness grounds, and recognizing that California teaching standards already require educators to facilitate discussion of race, cultural perspectives, bias, and multiple viewpoints). California law likewise prohibited discrimination in public schools on the basis of race, religion, ethnicity, and national origin long before AB 715, and educators were therefore already obligated to prevent unlawful discrimination and maintain inclusive learning environments. Rather than clarifying or strengthening these neutral protections, AB 715 overlays this existing framework with an undefined and contested concept of "antisemitism," coupled with new complaint-driven investigative and corrective mechanisms. As in *Mae M.*, AB 715 injects ideological ambiguity into an area already governed by comprehensive regulations, leaving teachers without clear notice of what conduct is prohibited and inviting arbitrary enforcement.

5.      This supposition is supported by AB 715's requirement that school districts follow former President Joseph Biden's National Strategy to Combat Antisemitism ("Biden National Strategy"), stating that it "shall be *a* basis" for enforcement.  The Biden National Strategy also does not expressly define antisemitism but instead refers to the International Holocaust Remembrance Alliance's ("IHRA") definition as the most prominent, implying that it guides implementation of the strategy.

6.      Both the IHRA definition of antisemitism and the Biden National Strategy conflate criticism of the State of Israel, as well as the political philosophy known as Zionism, with antisemitism. *See Woodcock v. University of Kentucky*, 2026 U.S. Dist. LEXIS 12345, at \*6–7 (E.D. Ky. Jan. 23, 2026) (relying on the fact that antisemitism was defined narrowly as hostility toward Jews and that Israel-

related examples were expressly excluded from the operative policy—confirming that courts distinguish antisemitism from criticism of Israel and treat such examples as nonbinding interpretive aids). AB 715, by contrast, embeds these contested frameworks into state law while authorizing enforcement based on undefined standards.

7.    California's Education Code, as amended by AB 715, requires schools to take remedial action if a teacher uses written materials in the classroom that "subject a pupil to unlawful discrimination."

8.    Plaintiffs are teachers ("Teacher Plaintiffs") and students ("Student Plaintiffs") in California public schools who teach and seek to learn about, respectively, subjects related to Palestine, Israel, and the Middle East.

9.    By failing to explicitly define antisemitism, while requiring schools to follow the Biden National Strategy in order to identify, respond to, prevent, and counter it, the law leaves Plaintiffs with inadequate guidance as to what constitutes unlawful discrimination under the AB 715 amendments. At the same time, the new law leaves Teacher Plaintiffs fearing they will be charged with engaging in unlawful discrimination and disciplined accordingly if they expose their students – in or outside the classroom -- to ideas, information, and instructional materials that may be considered critical of the State of Israel and the philosophy of Zionism. That fear felt by Teacher Plaintiffs in turn deters them from speaking freely on these subjects, and leads to a less robust, balanced, critical and well-rounded education for the Student Plaintiffs.

10.    Furthermore, AB 715 requires teachers to provide students with only "factually accurate" information.  Because "factually accurate" instruction, in their opinions and experiences, includes ideas and information that may be interpreted as critical of or unfavorable to the State of Israel and the project of Zionism, teachers cannot simultaneously adhere to the factual accuracy requirement while refraining from providing historical and contemporary information – especially in

the context of contested narratives and constructs -- that falls under the Biden National Strategy's understanding of what constitutes antisemitism.   This exacerbates AB 715's lack of clarity problem, because it imposes yet another requirement on Teacher Plaintiffs that they are left unsure how to navigate.

11.     The AB 715 amendments also do not explain what is meant by the prohibition of instructional materials that "subject a pupil to unlawful discrimination," while threatening Teacher Plaintiffs with discipline for running afoul of this requirement.

12.     It is unclear how a textbook or other written material can discriminate against a student, and whether this standard is intended to apply to fiction taught in the classroom, for example classic novels such as *The Great Gatsby* that, by modern standards, portray Jewish and other minority characters in a stereotypical and offensive manner.

13.     Similarly, many widely taught works of modern literature contain negative or stereotypical portrayals of Palestinians or other Middle Eastern characters. For example, novels such as *The Little Drummer Girl* by John le Carré and *The Terrorist* by John Updike depict Palestinian characters primarily through the lens of militancy or extremism, while other works present bleak or one-dimensional portrayals of Palestinian resistance and identity. Under AB 715's undefined prohibition on instructional materials that may "subject a pupil to unlawful discrimination," educators lack any meaningful guidance as to whether assigning or discussing such works could expose them to complaints, investigation, or discipline. This uncertainty underscores the statute's vagueness and demonstrates how AB 715 risks chilling the teaching of complex historical and literary material across a wide range of topics, perspectives, and communities.

14.     Because the AB 715 amendments fail to make clear what constitutes antisemitic discrimination for its purposes, Teacher Plaintiffs remain unsure and are deprived of advance notice as to precisely what conduct, expression and instructional materials and communications they must

avoid in order to comply with the law's requirements. This lack of clarity also opens the door to arbitrary and uneven enforcement, and confers a high degree of subjective ad hoc discretion upon those the law delegates to apply and enforce the law, altogether rendering it unconstitutionally vague.

15.     AB 715 does not limit its application to regulating classroom instruction, or any kind of formal instruction. By its plain terms, the statute governs a broad and unbounded range of expressive and associational conduct by educators and students, including mandatory professional development and trainings, investigatory mechanisms, and participation in school-sponsored associations and activities. It does nothing to confine its regulation to classroom communication or instruction or even curriculum, and leaves teacher expression published or created and shared outside the classroom, including on social media and on-campus and off-campus – which can be considered part of the learning environment -- also subject to the broad subjective discretion of authorities empowered to enforce AB 715's diffuse prohibitions. This excessive reach by the anti-discrimination law, untethered to a clear definition of what content is prohibited, can and will "allow() for what can best be described as a means of 'legalistic ambush.'" *Cal. Teachers Ass'n v. Bd. of Educ.*, 271 F.3d 1141, 1159 (9th Cir. 2001) (Tashima, J., , dissenting) (quoting *Cohen v. San Bernardino Valley College*, 92 F.3d 968-972 (9th Cir. 1996).

16.     The statute authorizes any member of the public to file complaints, anonymously if desired, triggering investigations and corrective action regardless of whether a student from a protected class was present or harmed. The Superintendent of Public Instruction is empowered to initiate investigations, mandate corrective action plans, require changes to instructional materials or practices, and impose financial penalties on local educational agencies. Nothing in the new law distinguishes between teacher expression imparted in the classroom from that imparted outside the classroom.

17. Through these mechanisms, AB 715 operates as a content- and viewpoint-based enforcement regime that embeds contested definitions of antisemitism into California education law and authorizes sanctions based on political and personal expression rather than neutral pedagogical standards, in violation of the First Amendment. U.S. Const. Amend I. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

18. These enforcement mechanisms apply not only to formal classroom instruction, but to expressive activity occurring outside the classroom, including educator participation in student organizations, advising clubs, professional trainings, social media postings, on-campus expressive activities, and associational conduct. This overbroad mechanism threatens Plaintiff Teachers' constitutional rights. *See*, e.g., *Los Angeles Teachers Union, etc. v. Los Angeles City Board of Education*, 71 Cal.2d 551 (1969).

19. Courts have recognized that educators retain First Amendment protection for political expression occurring outside classroom instruction, even when such speech offends coworkers or prompts complaints. *See Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782–83 (9th Cir. 2022) (holding that a teacher's display of a MAGA hat at staff trainings constituted protected political speech, that coworker offense alone did not establish disruption, and that threatening discipline in response violated the First Amendment, underscoring that complaint-driven enforcement regimes like AB 715 cannot constitutionally penalize educators' non-instructional political expression).

20. By regulating educators in these contexts, AB 715 reaches speech undertaken outside assigned instructional duties and implicates educators' rights as citizens speaking on matters of public concern. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529–30 (2022); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979); *Dodge*, 56 F.4th at 782-83.

21.     To the extent the AB 715 amendments leave administrators and teachers with the reasonable perception that they could be punished for alleged antisemitic discrimination if they express certain opinions about the State of Israel and the philosophy of Zionism, the law is overbroad and viewpoint discriminatory.

22.     The Ninth Circuit recently clarified that First Amendment overbreadth imposes a deliberately relaxed standard. The court explained that while facial challenges generally require courts to weigh constitutional applications against unconstitutional ones, the overbreadth doctrine is "an even looser standard" and "requires a plaintiff to establish only that a statute 'prohibits a substantial amount of protected speech,' 'relative to [its] plainly legitimate sweep.'" *Northwest Ass'n of Indep. Schools v. Labrador*, No. 25-2491, slip op. at 10–11 (9th Cir. Feb. 12, 2026) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 754–55 (2024)).

23.     The relevant inquiry is whether AB 715 encompasses a substantial amount of protected expression relative to legitimate applications, not whether Plaintiffs can enumerate every unconstitutional enforcement scenario.

24.     AB 715 restructures educational governance at a statewide level by embedding and encouraging the use of complaint-driven enforcement mechanisms that predictably deter instruction and discussion of disfavored political viewpoints, including perspectives related to Palestine, Israel, and Middle Eastern history, leading to confusion and fear among teachers, who are left without guidance as to how to adequately teach the required curricular standards without running afoul of the new and vague law.

25.     While the Constitution tolerates some limitations on a teacher's classroom instruction, "[t]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *See Kennedy v. Bremerton*, 597 U.S. 507, 527 (2022) (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393

U.S. 503, 506 (1969)). Teachers necessarily enjoy the autonomy of their profession, to use their judgment, creativity and individual talents and personalities to impart instruction in accordance with required educational standards.

26.    As the Ninth Circuit recognizes, the First Amendment does not permit a state government to prohibit teachers from giving voice to certain viewpoints in public schools while elevating others by endowing them with protection under antidiscrimination law.  *See Cal. Teacher's Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1148 (9th Cir. 2001) (explaining that neither the Ninth Circuit nor the Supreme Court has "definitely resolved whether and to what extent a teacher's instructional speech is protected by the First Amendment" but assuming such speech is entitled to some First Amendment protection).  *See also Sheldon v. Dhillon*, 2009 US Dist. LEXIS 110275 (N.D. Cal. 2009) ("The Ninth Circuit has previously recognized that teachers have First Amendment rights regarding their classroom speech, albeit without defining the precise contours of those rights.").  *See also  Mae M. v. Komrosky* 111 Cal.App.5th 198, 209 (2025) (Injunction granted against School Board resolution prohibiting use of Critical Race Theory, in part because the resolution was unconstitutionally vague).

27.    By apparently deeming certain perspectives on Israel and Palestine antisemitic under its Education Code as amended by AB 715, California has unlawfully singled out for punishment "particular views … on a subject." *Rosenberger*, 515 U.S. at 829 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)).  That conflicts with the constitutional requirement that government "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (citing *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 46 (1983)).

28.    Students suffer present injury through this programmatic suppression of protected viewpoints, not merely speculative future harm. *Arce v. Douglas*, 793 F.3d 968, 977–78 (9th Cir. 2015); *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 871–72 (1982).

29.    Student Plaintiffs reasonably believe they will be prevented from learning about differing perspectives on Israel, Palestine and the Middle East. Because AB 715 empowers anyone to file a complaint claiming classroom content and instructional materials criticize Israel and Zionism, and are therefore antisemitic, Student Plaintiffs believe their teachers will be deterred from freely discussing these critical issues, for fear of discipline and threats of discipline.  This suppression of academic freedom undermines Student Plaintiffs' rights to receive information, which the Supreme Court recognizes are encompassed in the First Amendment's free speech protections.  *See Monteiro v. Tempe Union School District*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1989) ("The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting."). *See also Parents v. Liberated Ethnic Stud.*, 2024 US Dist. LEXIS 216929, slip op. at 65 (C.D. Ca. 2024) (noting that the Supreme Court has recognized "the importance of protecting the 'robust exchange of ideas'" in the context of a public-school education) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 600 (1967)).

30.    These injuries arise not only from curricular disputes, but from a statutory enforcement scheme that reaches educator speech and association beyond the classroom and conditions public employment and student access to ideas on ideological compliance.

31.    Finally, AB 715 violates the Equal Protection Clause by expressly creating an Antisemitism Prevention Coordinator while consigning protections for students of other faiths and identities to speculative future legislation. Although Senate Bill 48, the companion bill to AB 715, states legislative intent to eventually establish additional coordinators, including a religious discrimination prevention coordinator and a race and ethnicity discrimination prevention coordinator, those positions are not created by AB 715 and may be delayed indefinitely or never implemented at all.

32.    By contrast, AB 715 immediately establishes a dedicated Antisemitism Prevention Coordinator and associated statewide oversight mechanisms for antisemitism alone. This structure creates a two-tier system of religious protection: Jewish students receive guaranteed, specialized institutional attention, while Muslim, Christian, Sikh, Hindu, and other religious communities are relegated to a conditional and uncertain framework dependent on future legislative action. Plaintiffs—including Plaintiff J.J., a Palestinian Muslim student, and Plaintiffs Y.U. and L.U., Palestinian Christian students--are therefore denied the same level of statutory protection, governmental concern, and remedial resources afforded to Jewish students.

33.    An actual and justiciable controversy exists between Plaintiffs and Defendants concerning the meaning, scope, and constitutionality of AB 715, including its undefined and expansive treatment of "antisemitism." Plaintiffs are currently altering their speech, teaching practices, and educational activities due to a reasonable fear of investigation, discipline, or other adverse action under the statute. Injunctive and declaratory relief is necessary to resolve this controversy and to prevent ongoing and irreparable harm.

## JURISDICTION AND VENUE

34.    This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, because the federal law claims arise under the Constitution and statutes of the United States.

35.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiffs Dunia Hassan and Kauser Adenwala reside in and teach in this district.

36.    This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-02.

## PARTIES

37.     Plaintiff Andrea Prichett is a middle-school history teacher at a public school in Berkeley, California.

38.     Plaintiff Jonah Olson is a middle-school science teacher at a public school in Adelanto, California.

39.     Plaintiff Dunia Hassan is a high-school Spanish teacher at a public school in Santa Clara, California.

40.     Plaintiff Kauser Adenwala is a high-school civics and economics public school teacher in Santa Clara, California, who previously taught history.

41.     Plaintiff Los Angeles Educators for Justice in Palestine (LA EJP) is a group comprised of teachers, academic counselors, school psychologists, and out-of-classroom educators.

42.     Plaintiff Abdulrahman Jarrar brings this suit on behalf of his daughter, J.J., a 16-year-old high-school student in Granite Bay, California.

43.     Plaintiff Linda Khoury-Umili brings this suit on behalf of her minor children, Y.U. and L.U., the former of whom attends public school and the latter of whom will begin Kindergarten in 2026 at the same school in the San Francisco Bay Area of California.

44.     Plaintiff Alice Finen brings this suit on behalf of her minor child, G.F., who attends a public charter school in Arcata, California.

45.     Defendant Tony Thurmond is the California State Superintendent of Public Instruction, charged with overseeing implementation of state antidiscrimination law in public schools. He is sued in his official capacity, and his official address is 1430 N. Street, Sacramento, CA 95814.

46.     Defendant Nick Maduros is Secretary of California's Government Operations Agency, which will house the Office of Civil Rights. He is sued in his official capacity, and his official address is 1304 O Street, Suite 300; Sacramento, California 95814.

## STATEMENT OF FACTS

### I.    ASSEMBLY BILL 715 (AB 715)

47.    AB 715, which amends California's Education Code governing Elementary and Secondary education, underwent multiple amendments before its final passage.

48.    On October 7, 2025, Governor Gavin Newsom signed AB 715 into law, after it passed both houses of the state legislature on September 12, 2025

49.    The legislative record supports an inference that AB 715 was enacted to suppress political expression regarding Israel and Palestine rather than to address unlawful discrimination. During legislative debate, the bill's authors emphasized protecting Israeli students on multiple occasions, while referencing discrimination affecting Black, Brown, Indigenous, and AAPI students only once.

50.    In California, bills signed by the governor take effect on the first day of the new year unless stated otherwise.  Thus, AB 715's revisions to existing California Education Law apparently took effect January 1, 2026, although the bill is unclear on the timing since it requires "[c]orrective action … be implemented as soon as possible and no later than the beginning of the next school year[,]" Ca. Educ. Code § 60151(a)(4), suggesting that districts may have begun implementing changes even before the new year.

51.    The stated purpose of AB 715 is to buttress existing anti-discrimination law in order to combat antisemitism in the State of California, which according to the Attorney General's 2025 hate crime report, has skyrocketed in recent years.  *See* Cal. Asm. Bill No. 715 (2025-26 Reg. Sess.) (legislative counsel's digest). [1]

---

[1]  The data collection methods underlying the claims about skyrocketing antisemitism are also based on a conflation of antisemitism and criticism of Israel and Zionism. The California Legislature relies on Anti-Defamation League (ADL) statistics to evaluate the prevalence of antisemitic hate crimes in our nation. The ADL considers negative attitudes and speech about Israel and Zionism to constitute antisemitism. *See FBI cuts ties with two advocacy groups that track US extremism after rightwing backlash*, THE GUARDIAN (Feb. 18, 2026), available at https://tinyurl.com/59e7mvex (last visited Oct. 15,

52.     The preamble acknowledges that existing law "afford[s] all persons in public schools, regardless of … nationality, race or ethnicity, religion … or any other specified characteristic, equal rights and opportunities in the educational institutions of the state." *See id.*

53.     According to the Legislature, additional protections are needed because of a surge of antisemitic discrimination, harassment, and bullying in schools that includes the *use of antisemitic tropes and conspiracy theories*; *discriminatory slurs, symbols and expressions*; physical and verbal assaults; *discrimination by proxy and through the use of coded language*; collective blame and vilification of Jews and Israelis; and *distortions of Jewish religion, ancestry, history and identity.  See id.*, §1(d) (emphases added).

54.     The Legislature claims that this discrimination has included "the use of inappropriate instructional materials and instruction," without further explanation or providing examples.

55.     AB 715 was enacted without the type of extended pilot programs, agency studies, or formal educational outcome analyses that accompanied prior major education reforms. Unlike measures such as AB 705, which followed years of study and data collection, AB 715 proceeded during an ongoing period of political controversy following October 2023 and was advanced on an accelerated timeline. *See* USC Race & Equity Center, *AB 705 2020 Report*, https://tinyurl.com/56w7era5 (last visited Feb. 14, 2026); *see also* Jewish Federation of Greater Los Angeles, *Open Letter Regarding AB 715 LA Antisemitism Roundtable*, https://tinyurl.com/59zzsdmz (last visited Feb. 14, 2026).

---

2025) (explaining that FBI stopped collaborating with ADL for these purposes in October of 2025; *Audit of Antisemitic Incidents 2024*, Center on Extremism (April 22, 2025), https://www.adl.org/resources/report/audit-antisemitic-incidents-2024 (last visited Feb. 18, 2026) (stating that the majority of antisemitic incidents reported were related to Israel or Zionism).  *See also* Shane Burley, *Examining the ADL's Antisemitism Audit,* JEWISH CURRENTS (June 17, 2024), https://tinyurl.com/2denyay3 (last visited February 18, 2026) (determining that ADL audits demonstrate that their methodology involves creating a false equivalence between political expression (including criticism of Israel or Zionism) with antisemitic sentiment and conduct).

56. Public reporting at the time described the legislation as moving rapidly through the process, and legislators acknowledged that aspects of the bill might require later revision although of course once signed by the Governor, its requirements carry the force of law. The statute was enacted without documented statewide findings demonstrating systemic unlawful discrimination in instructional materials that existing law did not already address. *See Assembly Floor Analysis: AB 715*, https://tinyurl.com/yuuzbuma; *see also* Code Pink, *AB 715 Passes*, https://tinyurl.com/25fbv2ps.

57. AB 715 contains no acknowledgment of Palestinian-American students, and the final version removed references to "Palestine" and "Palestinian," despite objections raised during the legislative process. *See* Code Pink, *AB 715 Passes*, https://tinyurl.com/25fbv2ps (last visited Feb. 14, 2026).

58. Earlier versions of AB 715 included explicit restrictions on ethnic studies, including provisions limiting decolonization frameworks and barring discussion of "Israeli settler colonialism." Although those provisions were ultimately removed, their initial inclusion demonstrates the bill's ideological trajectory. *See id.* (last visited Feb. 14, 2026).

Earlier versions of AB 715 also incorporated key elements of the working definition of antisemitism adopted by the International Holocaust Remembrance Alliance (IHRA), including expanded ancestry-based protections and Israel-specific curricular restrictions. Although some of this language was later removed or reframed, the statute ultimately preserved the same enforcement architecture by directing officials to follow the Biden Administration's National Strategy to Counter Antisemitism, which expressly embraces IHRA standards. *See* Legiscan, AB 715 Amended Text (Feb. 14, 2025), https://tinyurl.com/3xwp6zns (last visited Feb. 17, 2026); *see also* Centre for Israel and Jewish Affairs, IHRA Definition of Antisemitism, https://tinyurl.com/2ewa4hpc, (last visited Feb. 17, 2026).This legislative progression from explicit curricular controls to reliance on IHRA-informed federal guidance supports the inference that AB 715 was enacted to suppress political expression regarding

Israel and Palestine rather than to address unlawful discrimination. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977) (explaining that courts may examine the historical background of a law, the sequence of events leading to its enactment, and contemporaneous statements by lawmakers to determine whether official action was motivated by impermissible considerations).

59. Floor statements further underscore AB 715's enforcement-oriented purpose. Coauthor Dawn Addis invoked the need for "boots on the ground" in advocating for the Antisemitism Prevention Coordinator and cited classroom discussions of Zionism as justification. *See id.* (last visited Feb. 14, 2026).

60. During Senate floor debate, Senator John Laird stated that he had met with Palestinians who opposed AB 715 and that his office received emails objecting to the bill by approximately an eight-to-one margin. He also warned that the statute risked bankrupting school districts statewide. *See id.* (last visited Feb. 14, 2026).

61. AB 715 focuses exclusively on antisemitism enforcement and Israeli student concerns, without acknowledging discrimination affecting Palestinian students or addressing Palestinian perspectives in public education.

62. AB 715 in its final form does not define antisemitism.

63. However, it instructs school districts to rely on the 60-page United States National Strategy to Counter Antisemitism, published by the Biden Administration on May 25, 2023, in guiding efforts to "identify, respond to, prevent and counter antisemitism" ("Biden National Strategy"). *See id.* § 1(i) (referring to White House, *The U.S. National Strategy to Combat Antisemitism* (May 2023), https://tinyurl.com/3n4sc9ca (last visited Oct. 24, 2025).

64. While AB 715 does not say that the National Strategy is the only source that may be followed, it is the only specific source that is mentioned ("shall be a basis…").

a.    Notably, the Biden National Strategy addresses combatting antisemitism in all aspects of public life, including on social media and abroad. It is not only about antisemitism in educational settings.

b.    The Biden National Strategy conflates antisemitism with antipathy towards or criticism of the State of Israel.  For example, it states that Jewish students and educators face "derision and exclusion on college campuses" "because of their real or perceived views about the State of Israel." *Id.* at 9.

c.    In another instance, the Biden National Strategy provides as evidence of increasing antisemitism the fact that over half of Jewish students feel they pay a social cost for supporting the existence of Israel as a Jewish state.  *The U.S. National Strategy to Combat Antisemitism* at 40.

d.    Foundational to the Biden National Strategy is an "unshakeable commitment to the State of Israel's right to exist, its legitimacy, and its security" and recognition of the "deep historical, religious, cultural, and other ties many American Jews and other Americans have to Israel." *Id.* at 11.

e.    The Biden National Strategy tasks the State Department with "combat[ting] antisemitism abroad and in international fora–including efforts to *delegitimize the State of Israel.*" *Id.* at 11 (emphasis added).

f.    The Biden National Strategy does not mention Palestinians or Palestine, or Palestinians' or Palestinian Americans' ties to the land in question, their identity, their legitimacy, or their security.

g.    The Biden National Strategy includes additional examples of First Amendment protected speech it considers antisemitic: for example, comparisons between the Holocaust and public health measures during the Covid-19 pandemic. *Id.* at 9.

h.        The Biden National Strategy also surreptitiously utilizes the IHRA definition of antisemitism.  *See id.* at 13 ("The most prominent [definition of antisemitism] is the non-legally binding 'working definition' of antisemitism adopted in 2016 by the 31-member states of the [IHRA], which the United States has embraced.").[2]

i.        The IHRA defines antisemitism broadly as, "a certain perception of Jews, which may be expressed as hatred toward Jews.  Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."

j.        This definition includes a number of examples of attitudes and speech that may be antisemitic, including:

1.  "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interest of their own nations."

2.  "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor."

3.  "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation."

4.  "Drawing comparisons of contemporary Israeli policy to that of the Nazis."

65.        AB 715 acknowledges that "[e]xisting law prohibits the governing board of a school district, a county board of education, or the governing body of a charter school, from adopting or approving the use of any textbook, instructional material, supplemental instructional material, or

---

[2] Notably, even Kenneth Stern, who crafted the IHRA definition of antisemitism, believes that it should not carry the force of law. *See, e.g.*, Eyal Press, *The Problem with Defining Antisemitism*, THE NEW YORKER (Mar. 13, 2024) (explaining that Stern himself testified at a congressional hearing that he "believed that enshrining [the IHRA definition] into law would have dangerous consequences" and a bill proposing to do that posed "a clear threat to academic freedom.").

curriculum if its use would subject a pupil to unlawful discrimination[.]" *See* Cal. Asm. Bill No. 715 (2025-26 Reg. Sess.) (legislative counsel's digest); Ca. Educ. Code § 244(a)(1), (b)(1).

66.    But AB 715 adds to the prohibition by providing for the Board to "investigate and remediate" the situation in the event the above requirement is violated; remedial measures may include but are not limited to the implementation of restorative justice practices.  *See* Ca. Educ. Code § 244 (a)(2), (b)(2).

67.    Any member of the public, regardless of whether that member suffered injury or has firsthand knowledge of any alleged offense, may file a complaint with the Superintendent alleging a violation of AB 715's strictures, provided there is some substantiating evidence; complaints may be anonymous.  *See* Ca. Educ. Code § 244(d).

68.    AB 715 also amends existing education law to establish an Office of Civil Rights ("OCR") to "prevent and address discrimination and bias[.]" *See* Ca. Educ. Code. § 33800.

69.    The OCR is to employ an "Antisemitism Prevention Coordinator," appointed by the Governor and confirmed by the Senate, who must follow the Biden National Strategy in identifying, responding to, preventing, and countering antisemitism.  Ca. Educ. Code §§ 33803.1(a), 33803.6(c)

70.    AB 715 provides no comparable coordinators addressing discrimination affecting Latino, Black, Indigenous, AAPI, immigrant, or Palestinian students.  Through companion SB 48, the Legislature made vague overtures about the future possible appointment of other coordinators,  such as  a  Religious  Discrimination  Prevention  Coordinator,  a  Race  and  Ethnicity  Discrimination Prevention  Coordinator,  a  Gender  Discrimination  Prevention  Coordinator,  and  an  LGBTQ Discrimination  Prevention  Coordinator.   No  timeline  is  given  for  the  appointment  of  these coordinators.

71.    Muslim  students  in  California  experience  documented  and  disproportionate discrimination in public schools. A 2025 statewide study conducted by the Council on American-

Islamic Relations (CAIR) surveyed 1,802 Muslim students across more than 48 California counties and found that 50% experienced bullying based on religious identity; nearly one-third experienced offensive or inappropriate conduct by school staff, and more than two-thirds declined to report incidents due to fear, marginalization, or lack of trust in school processes. *See* Council on American-Islamic Relations–California, 2025 Bullying Report (Oct. 29, 2025), https://tinyurl.com/yc68bsyf, (last visited Feb. 19, 2026).

72.    These rates far exceed national averages, where approximately 19% of K–12 students report being bullied. Despite this documented vulnerability, AB 715 provides antisemitism-specific enforcement infrastructure while declining to extend comparable procedural protections to Muslim or Arab students, reinforcing the statute's unequal allocation of governmental protection. *Id.*

73.    Parallel data underscore similar risks for Arab students. U.S. Census data published in September 2023 indicate that approximately 740,219 individuals in California identify as Middle Eastern or North African, including an estimated 373,012 Arab Americans, with roughly 26% under the age of eighteen. *See* Count All Kids, *What the 2020 Census Tells Us About Middle Eastern North African (MENA) Children* (Dec. 20, 2023), https://tinyurl.com/bdz83n2a (last visited Feb. 20, 2026). Although comprehensive quantitative data on pro-Palestinian expression in K–12 schools is limited, multiple credible sources document chilling effects, harassment, and administrative responses tied to speech about Israel and Palestine.

74.    Since October 2023, the U.S. Department of Education has opened dozens of Title VI investigations involving allegations of discrimination based on shared ancestry in K–12 schools, many of which arise in the context of Palestine-related speech. *See* U.S. Dep't of Educ., *Discrimination Based on Shared Ancestry or Ethnic Characteristics*, https://tinyurl.com/ytatv7th (last visited Feb. 20, 2026). Local reporting from large districts, including Los Angeles Unified School District, further reflects parental concerns about bullying and harassment connected to classroom discussions of the Middle

East conflict. These patterns support a finding of disparate impact under both Equal Protection and First Amendment doctrines. *See* Tiernan Ray, *Muslim Parents Say Kids Bullied After LAUSD Issues Pro-Israel Statement*, Los Angeles Times (Oct. 24, 2023), https://tinyurl.com/4xe7tj54 (last visited Feb. 20, 2026). Furthermore, the AB 715 amendments—in contrast to preexisting law—provide for a finding of discriminatory bias in instruction absent a showing of direct harm to members of a protected group; indeed, members of a protected group need not even be present during an alleged unlawful incident. *See* Ca. Educ. Code § 51500(a)(2).

75. While existing law requires educational materials used in schools to be "factually accurate," *see* Ca. Educ. Code § 60200(c)(3), AB 715 amends the law to require teachers' *instruction* to be "factually accurate." *See* Ca. Educ. Code § 51500(b).

76. AB 715 also provides for the Superintendent to evaluate complaints of discrimination, and for the applicable department to notify the local educational agency that it must take corrective action within 60 days. Otherwise, the department may use any means authorized by law to effectuate compliance. Ca. Educ. Code § 60151(a)(1).

77. AB 715 further authorizes complaints to be filed directly with the Superintendent and permits him to intervene without awaiting investigation by a local educational agency. Ca. Educ. Code § 244(c).

78. Corrective action may include but is not limited to the following:

a. Requiring the local educational agency to regularly report to OCR and use alternative instructional materials;

b. Requiring the local educational agency to develop and implement an improvement plan to address discrimination and bias at its school sites, in consultation with the OCR. If the violation involves antisemitism, the local agency must consult with the

Antisemitism Prevention Coordinator in creating an improvement plan. Ca. Educ. Code § 60151(a)(2)(B), (C).

79.     AB 715 also authorizes the Superintendent to enforce the statute against outside organizations and vendors providing instructional materials. If the Superintendent determines that an organization violated Section 244, he may require corrective action, mandate reimbursement of all funds received, and compel disclosure of the violation to other local educational agencies. Ca. Educ. Code § 60152(a)–(b).

80.     If the agency fails in the above, the Superintendent is to impose financial penalties. Ca. Educ. Code § 60151(a)(4)(b). The amount of such penalties remains unspecified but not to exceed the agency's total expenditure on written educational materials. *Id.*

81.     In addition to these enforcement powers, AB 715 assigns the Superintendent ongoing implementation responsibilities. The Superintendent must maintain a statewide antisemitism resources webpage and oversees the Office of Civil Rights, which operates in consultation with the Department and provides technical assistance on discrimination complaints at the Superintendent's request. Ca. Educ. Code §§ 280(b), 33802.

82.     Finally, AB 715 provides for the severability of its provisions in the event one or more is deemed invalid. *See id.*, § 11.

83.     Through these provisions, AB 715 places complaint intake, investigations, corrective action, financial penalties, vendor regulation, and statewide implementation directly under the Superintendent's authority.

## II.     THE PLAINTIFFS

*A. Teachers*

Andrea Prichett

84. Andrea Prichett is a middle-school United States history teacher in Berkeley, California. Her school takes pride in its efforts to combat racism and create a welcoming environment for all students, and aims to prepare them for culturally diverse environments and to understand their own cultural histories so that they can better understand other people's.

85. In teaching U.S. history, Ms. Prichett includes discussions of the thirteen original American Colonies, the actions of Christopher Columbus, colonialism, and the process by which people from one place arrive in another and take over other people's land. Ms. Prichett has explained to her students that this framework can be applied to Puerto Rico, India, Alaska, and Palestine.

86. Ms. Prichett's approach to teaching U.S. history is consistent with how teachers are expected to provide a framework whereby students learn to analyze what is being taught and to arrive at their own conclusions.

87. Ms. Prichett also sponsors the culture fair, which is part of the eighth-grade history curriculum about race and culture. As part of the fair, Ms. Prichett encourages students to understand the cultural influences that shape their identities.

88. The skills developed through participation in this project are part of California's research and oral history standards which, for example, require students to analyze the aspirations and ideals of the people of the new nation of the United States, including territorial expansion.

89. Ms. Prichett has many students of Palestinian origin, as well as from other Arab countries. As part of a class project, many of these students—just like their classmates who are not from Arab backgrounds—interview their parents and do research around events that impacted the migration of their families.

90. This project often gives rise to conversations about settlement, colonization, and genocide, including in Palestine.

91.    Many of Ms. Prichett's students are directly impacted by events in the Middle East because they have family there.

92.    Ms. Prichett has been an activist in the movement for justice in Palestine for many years. She has traveled to Palestine twice and witnessed the Israeli system of segregation imposed on the West Bank, and how Israeli settlers steal Palestinian land and threaten Palestinians' lives on a daily basis.

93.    She is aware that Palestinian citizens of Israel do not have equal rights to travel, build homes, and access legal protections as Jewish citizens, and that Palestinians in the West Bank and Gaza under Israeli occupation have very limited rights.

94.    Her passion for this issue has led her to be active in the community, including by urging the city council to support a ceasefire resolution. She feels compelled to raise her voice in support of Palestinian human and civil rights and to oppose the crushing occupation.

95.    Ms. Prichett helped to create the "Watermelon Society" at her school, a voluntary club for students who need a safe space to talk about their feelings regarding Israel and Palestine, learn factual information about history and current events, and share cultural traditions.

96.    Plaintiff's participation in the Watermelon Society and related student discussions occurs outside formal classroom instruction, was not tied to any course credit or curricular requirement, and did not arise from her assigned teaching duties.

97.    The school's principal told her that some parents were uncomfortable with the creation of the club–even before its first meeting–and to avoid using words like "genocide" and "colonization." Ms. Prichett responded that these are commonly used descriptors in public discourse and historical analysis and explained that the group exists to allow students to discuss current events and express their views, not as part of any graded coursework. Ms. Prichett believes that the pro-Israel community has targeted her with unfounded complaints because of her activism. Ms. Prichett

understands that AB 715 exposes educators to employment-related consequences, including mandatory retraining, corrective action plans, and discipline based on the content of their speech. She reasonably fears that continued engagement with Palestine-related topics, whether in class or in student groups, could jeopardize her professional standing and career.

98.     The Watermelon Society no longer meets, but for reasons not related to parents' articulated discomfort.  Ms. Prichett would revive the club in the future if students wanted it.

99.     Ms. Prichett has had two formal complaints levied against her–the only complaints she has ever received in her career–including once when a student raised Israel and Palestine as examples of modern-day colonialism.  She stated that there are Israeli settlements in Palestine, which is an indicator of colonization.

100.     A parent of a student in the class filed a complaint accusing Ms. Prichett of teaching a one-sided, biased narrative on Israel-Palestine. Another complaint was made by a student who was not present during class when Israel and Palestine were discussed. Ms. Prichett is not aware of any comparable complaints or investigations arising from classroom discussion of other historical injustices or colonial contexts. In her experience, only speech relating to Palestine and Israel has triggered complaints, investigations, and administrative intervention.

101.     After a months-long investigation, in which Ms. Prichett's students were interviewed by a civil rights investigator, the allegations were deemed meritless.  This was unsurprising to Ms. Prichett, because she makes a point of teaching appropriately and respectfully of all parties regardless of her political opinions.

102.     Following passage of AB 715, Ms. Prichett reasonably fears that similar complaints—previously dismissed as unfounded—now carry the risk of formal findings of discrimination, mandatory corrective action, and professional discipline under state law. She understands that AB 715

authorizes investigations, required trainings, changes to instructional practices, and potential financial penalties triggered by allegations of antisemitism.

103.    In Ms. Prichett's view, the fact that these complaints are made and investigated because teachers provide their students with historical facts has the effect of silencing other teachers; no one wants to endure the stress of an investigation, so many simply avoid discussing these subjects in class.

104.    A civil rights complaint was also launched by the Louis D. Brandeis Center for Human Rights Under Law (Brandeis Center) and the Anti-Defamation League (ADL) against the school where Ms. Prichett teaches.

105.    The complaint was based on the allegation that the district failed to adequately stem antisemitism as demonstrated by the personnel complaints against Ms. Prichett and at least one other teacher.  This resulted in the superintendent being hauled to Washington, D.C. to answer questions about alleged antisemitism.

106.    Ms. Prichett says, "[o]ur district takes a lot of pride in teaching diversity and the ills of racism.  It was a slap in the face to have our district and superintendent hauled before Congress to answer to charges such as those filed by the Brandeis Center and ADL."

107.    This unprecedented event contributed to the chilling effect on teachers and students.

Jonah Olson

108.    Mr. Olson teaches seventh grade science at a public school in Adelanto, California.

109.    Mr. Olson is Jewish, but not Zionist.  He distinguishes between the two concepts and believes that Zionism is a political ideology based on the idea that Jews are superior to non-Jews, and that they have a right to a majority in a land that was inhabited primarily by Palestinians for hundreds of years and to occupy Palestine in order to preserve that majority.

110.    As someone who has been active in the movement for Palestinian freedom, Mr. Olson is keenly aware of the ways in which pro-Israel individuals have perceived any call for Palestinian freedom as antisemitic.

111.    The seventh-grade curriculum in California includes a science fair where students develop their own projects based on real-world problems and try to solve them using the scientific method. Each student is required to discuss why they selected a particular question.  Often, research questions are inspired by topics students have seen on social media.

112.    One of Mr. Olson's current students is working on a science project designed to preserve food in war-torn areas, a subject she chose after seeing images of moldy food delivered to hungry Palestinians in Gaza.

113.    Last year, another student chose to work on distilling water after seeing social media posts about a Palestinian woman in Gaza being forced to distill her own water for lack of access to clean water during the war.

Dunia Hassan

114.    Ms. Hassan, a High School Spanish teacher in Santa Clara County, was born and raised in Spain to a Spanish mother and a Palestinian father.

115.    Ms. Hassan's father ended up in Spain because her father was driven out of Haifa, Palestine in 1948 when Israeli Haganah forces occupied his village, destroyed its homes and agriculture, and demolished what remained.

116.    Like many other children of Nakba survivors, Ms. Hassan has been impacted by her family history of lost lives and land, and their experiences as refugees.

117.    As a child, Ms. Hassan grew up hearing stories of her father's life in a refugee camp where two of his sisters died as young children.  Ms. Hassan's father's life changed when the United

Nations Relief and Works Agency for Palestine Refugees in the Near East (UNRWA) brought shoes and schools to the refugee camp where he lived.

118. Ms. Hassan's background and knowledge of her family's experiences have helped her to become a better educator. She has learned to practice empathy and have compassion for students who struggle to get to school, whose families face fear in this country or their country of origin, and who feel they do not belong because of their identities.

119. Following the October 2023 Hamas attack on Israel, Ms. Hassan's students began seeing horrific images of violence and destruction in Gaza and the West Bank. At the same time, a significant pro-Israel bias infiltrated her school district.

120. As an advisor to the Muslim Students Association (MSA), Ms. Hassan supported and advised students when they organized activities, including bringing a Palestinian to speak to students about life in the occupied territories of Palestine.

121. Ms. Hassan's participation in the MSA and related student activities occurs outside formal classroom instruction, is not tied to any course credit or curricular requirement, and does not arise from her assigned teaching duties.

122. Although the speaker was to limit his remarks to his personal journey as a Palestinian refugee, Israeli community members complained, speculating that the speaker would portray Israel negatively. His very existence was perceived as a threat to pro-Israel parents. The event was thereby postponed.

123. The postponement resulted from community pressure based solely on the anticipated political content of the speaker's personal story as a Palestinian refugee, rather than any concern regarding student safety or educational suitability.

124. When the event finally took place, students were respectful and engaged.

125. Shortly after that, the Jewish Culture Club invited a former Israeli Defense Forces ("IDF") soldier to speak at the school. This soldier had stated on social media (referring to Gaza), that "every school, mosque, hospital, kindergarten –all– without exception is a terror camp."

126. Although the event ended up being canceled, the statement prompted discussions with students, many of whom found the statements dehumanizing. Ms. Hassan observed that while Palestinian students and speakers were subjected to heightened scrutiny and administrative resistance, pro-Israel perspectives, including those expressed by a former Israeli soldier, were permitted access to school platforms, demonstrating disparate treatment based on viewpoint. Ms. Hassan believes that one reason AB 715 was enacted was to prevent these kinds of discussions from occurring in classrooms. She has seen how Palestinians discussing their experiences has been deemed "antisemitism."

127. Following passage of AB 715, Ms. Hassan reasonably fears that similar Palestine-related discussions, previously met with informal resistance, now expose her and her students to formal complaints, investigations, and corrective action under state law.

128. Every year, Ms. Hassan's Advanced Placement ("AP") Spanish course explores how identity shapes us, with an emphasis on the experiences of Spanish speakers. Students particularly enjoy this unit, which addresses concepts such as alienation, assimilation, and ethnic and national studies.

129. As part of this project, students prepare a presentation under the prompt "My Name, My Identity." Students discuss their families, countries they left behind, new languages they struggle to learn, and the experience of being singled out because of appearance, clothes, or accent.

130. After January 2026, Dunia Hassan has already curtailed certain discussions and student activities concerning the role of international organizations in addressing violations of human rights and international law due to concerns that topics relating to Palestine could lead to complaints or

disciplinary action. This restricts students' ability to openly discuss global issues and challenges across cultures.

Kauser Adenwala

131. Ms. Adenwala is a public high school teacher in California. She currently teaches Honor Civics, Honors Economics, and Financial Literacy to students who are dually enrolled in high school and community college. In the past, she has taught U.S. History, World History, and AP European History.

132. Ms. Adenwala is a Muslim woman who wears a hijab as an expression of her faith, identity and commitment to living with integrity and compassion. The genocide in Palestine has impacted her deeply on a personal level as a painful reminder of the suffering and injustice that persist in our world.

133. Despite her feelings, Ms. Adenwala is committed to upholding professional standards and adhering to the district's adopted curriculum. Her role as an educator is, in her view, not to impose beliefs, but to cultivate critical thought, understanding, and empathy.

134. She also believes that education should not be separate from reality; current events often provide opportunities to help students understand human suffering and injustice more broadly. Ms. Adenwala strives to guide discussions around these issues with sensitivity, balance, and intellectual honesty, helping students to process complex issues and to understand the broader historical and moral contexts behind them.

135. In December of 2023, Ms. Adenwala assigned a project to her World History class designed to raise awareness about modern human rights violations. Students had been asking questions about Palestine, so she addressed the situation there as an example of modern human rights violations.

136.    The standards governing California public schools include teaching about "the significance and effects of the location and establishment of Israel on world affairs."  Further framework for this standard states that students should learn about the competing interests involved in the creation of Israel.

137.    In March of 2024, a student Ms. Adenwala did not know filed a complaint against her, alleging that she had used images and text in a slide deck that were "horrifying" and constituted religious and/or ethnic discrimination.  The slide deck included an image of the apartheid wall Israel built in the West Bank to segregate Palestinians from Jewish settlers.

138.    The investigation concluded in June of 2024, finding that there was insufficient evidence of unlawful discrimination, but that Ms. Adenwala had violated a requirement to teach diverse perspectives on controversial current events.  Ms. Adenwala has no issue with offering diverse perspectives, but she is concerned with the omission of certain perspectives.

139.    Ms. Adenwala is not aware of comparable complaints arising from classroom discussion of other historical injustices or humanitarian crises. In her experience, only speech related to Palestine or Israel has triggered repeated complaints and investigations.

140.    Following introduction of AB 715 at the beginning of 2025, there was increased anxiety about false allegations of antisemitism among public educators.  Ms. Adenwala believes that has impacted how complaints against her have been handled and the district felt pressure to appease a parent group that was unhappy she had not been fired.  The district provided antisemitism training, which left teachers confused.  For example, a question was posed about whether a teacher criticizing Israel would constitute discrimination, and the answer was that "it depends."  This vague standard leaves teachers unsure what could subject them to discipline, incentivizing them to avoid the topic entirely for fear of backlash. Ms. Adenwala understands that AB 715 authorizes investigations, mandatory trainings, changes to instructional practices, and employment-related discipline based on

allegations of antisemitism. She reasonably fears that continuing to address Palestine-related topics, even in historically grounded or human rights contexts, could jeopardize her professional standing.

141.    Another complaint was made against Ms. Adenwala in September of 2024. During a lesson about the Holocaust, Ms. Adenwala played a short video of an 87-year-old Holocaust survivor protesting Israel's actions in Gaza, saying that she was inspired by her Jewish ancestry to engage in this activism. The point of the video was that Jewish people should not be held accountable for Israel's actions, just as Muslims should not be held responsible for the actions of Muslim countries.

142.    The complaint accused Ms. Adenwala of blaming all Jews for what was happening in Gaza, which shocked her, because that was precisely the opposite of the point she sought to make. The complaint was not sustained.

143.    Despite the dismissal of prior complaints, Ms. Adenwala experienced escalating administrative scrutiny and mounting pressure from outside advocacy groups seeking punitive action based on the political content of her classroom materials.

144.    In April of 2025, two staunchly pro-Israel groups, StandWithUS and Bay Area Jewish Coalition, filed a Title VI complaint against the school district for failing to adequately combat antisemitism. The video that Ms. Adenwala showed to the class was mentioned as an example. The complaint described it as "horrifically equat[ing] the Holocaust to the events in Gaza in 2024 and called it "blood libel-type messaging."

145.    This resulted in yet another investigation into showing of the video. After multiple investigative meetings with the district's attorneys, Ms. Adenwala grew frustrated with apparently never-ending tactics to force her to quit, and in fact considered leaving teaching entirely. Although ultimately the investigation concluded that Ms. Adenwala had caused no harm to students, she was found to have violated multiple board policies because the video "promote[d] a discriminatory bias toward Jewish students."

146. StandWithUs took credit for the outcome, putting a post on Facebook with the headline: "Advocacy Win!  School District Reprimands Teacher Following StandWithUs Complaint."

147. Ms. Adenwala understood this public declaration as confirmation that politically motivated third parties could successfully enlist state enforcement mechanisms to discipline educators for protected speech, reinforcing her fear that AB 715 will further empower such campaigns.

148. As a result of repeated complaints, investigations, and administrative findings tied to Palestine-related instruction, Ms. Adenwala has curtailed classroom discussions and now avoids certain topics altogether. She has seriously considered leaving teaching, depriving students of an experienced educator and limiting their access to discussion of current events and human rights.

Los Angeles Educators for Justice in Palestine (LA EJP)

149. LA EJP is a professionally and ethnically diverse group of around 100 teachers, academic counselors, school psychologists, and other individuals who hold out-of-classroom positions in school districts across Los Angeles.  There are many Jewish members of LA EJP.

150. LA EJP's mission is to unify educators in the region to defend their academic freedom, raise awareness about Palestine, and educate the public about ongoing human rights violations in Gaza.  LA EJP is committed to ensuring that educators are protected from retaliation for exercising their rights to academic freedom and free speech. LA EJP's activities include organizing educators, participating in community advocacy, and supporting student and teacher expression outside formal classroom instruction. Much of this work occurs independently of any graded coursework or curricular mandate.

151. Many LA EJP members have been targeted for these efforts, and for teaching various curricula in English and Social Sciences that discuss Palestinian culture, Middle East history, and the factual events surrounding the 1948 creation of the state of Israel and the ongoing UN-recognized genocide in Gaza. In LA EJP's experience, educators are not targeted for teaching controversial topics

generally, but specifically for engaging in speech or association relating to Palestine, Zionism, or Israeli government conduct.

152. The expressive activity regulated by AB 715 includes discussion of Israel and Palestine, cultural identity, human rights, colonial history, and contemporary geopolitical events—topics that are the subject of widespread public debate.

153. Plaintiffs and LA EJP members have addressed these issues in classrooms, student clubs, professional settings, and informal discussions with students. AB 715 places all such expression at risk of complaint and sanction, incentivizing educators to avoid these subjects altogether.

154. That is particularly so for history and ethnic studies teachers, who engage in critical dialogue around genocide and colonialism across the world, including Israel. For educators who teach historical times as an ongoing axis rather than a chronological timeline, the genocide in Palestine and modern histories of apartheid are windows into the legacy of colonial projects that contribute to the ongoing equalities and histories of oppression.

155. As one example of many, LA EJP member Ron Gochez is an ethnic studies educator within the Los Angeles Unified School District (LAUSD). In 2023, a coworker accused him of antisemitism for attending a protest against Israel's actions in Gaza. That co-worker filed additional complaints accusing Gochez of antisemitism for teaching students about Palestine, and taking students to protests in his car.

156. Ultimately, Gochez was vindicated—the investigators found that he did not take any students to protests and did not violate any district policies. However, his students were negatively affected because they lost over a week of instruction. Although the complaints were ultimately dismissed, the investigation itself disrupted classroom instruction and reinforced a pattern in which Palestine-related expression triggers administrative intervention, even absent any policy violation.

157. Gochez was also doxxed multiple times by a coworker and another LAUSD employee. He received more than 100 hate calls and death threats via email, social media messages, and through regular mail.

158. Other LA EJP members have had personal information about them and their families posted online. Administrators of their schools have received threats directed at specific educators from anonymous callers, and they have experienced different forms of doxxing on local, state, and national levels, up to and including death threats. Despite repeated reports of harassment and threats, LA EJP members have received little protection from school districts, while facing heightened scrutiny and investigation for Palestine-related expression.

159. In LA EJP's experience, over the past two years, Public Record Act (PRA) requests to school districts have been weaponized by non-education groups such as the pro-Israel StandWithUs to demand that Ethnic Studies teachers across the state hand over any lesson plans or materials that use certain words, including "Palestine," "Palestinians," "Islam," "Nakba," and "Zionism."[3] Lupe Cardona, an ethnic studies teacher, has been the target of such requests, as well as doxxing efforts by pro-Israel individuals that have left her frightened.

160. LAUSD has complied with these legal requests, leading educators who are targets to fear disciplinary action from administrators and district supervisors. These coordinated Public Records Act requests and complaint campaigns have been used to pressure school districts into scrutinizing and disciplining educators based on the political content of their classroom teaching and advocacy outside the classroom. LA EJP reasonably fears that AB 715 will further institutionalize this dynamic by inviting anonymous complaints and mandating state-level enforcement tied to allegations of

---

[3] StandWithUS identifies itself as the "Israel Emergency Alliance dba StandWithUs" an international and non-partisan Israel education organization.

antisemitism, including allegations based largely or solely on protected speech published by teachers in their capacities as citizens.

*B. Students*

Abdulrahman Jarrar, on behalf of J.J.

161.    J.J. is a 16-year-old high school student in Granite Bay, California.

162.    Both of her parents are Palestinian, and her ethnic background is central to her identity.  As a Palestinian, she is aware that her mere existence is considered antisemitic or offensive to some, because it requires an acknowledgment that Palestinians lived in what is now Israel before creation of the modern state, and recognition that her ancestors were expelled against their will to create a Jewish majority state.

163.    J.J. strives to be well-educated on politics, especially those relating to populations that have been the subject of discrimination, including Palestinians.  She wears a Palestine flag pin and presents herself as open to talking about Palestine and sharing sources of information.

164.    J.J. understands that AB 715 establishes a complaint and investigation process for alleged antisemitism in schools, including complaints arising from speech about Israel and Palestine. She reasonably fears that openly identifying as Palestinian or discussing Palestinian history may expose her, her teachers, or her school to formal complaints and potential discipline.

165.    Her schoolmates approach her to discuss the matter, because they are interested in her unique perspective as a Palestinian, and because they do not hear from Palestinians in mainstream media.  She has had conversations with pro-Israel students and is happy that through these discussions, they are able to reach common ground.

166.    J.J. is enrolled in the International Baccalaureate ("IB") program, in which students are required to learn about other cultures and new ideas, to become more open-minded and contribute to greater academic thought.

167.    J.J. also takes a speech and debate class, which is both a class and an extracurricular activity.  She is the only Palestinian student in the class.

168.    Students prepare speeches to be given at competitions outside of school, and they are encouraged to select controversial topics to demonstrate their ability to take a stance on a specific issue.  Past topics have included rape, racism, gun control, and modern-day slavery. Participation in speech and debate involves both classroom instruction and extracurricular competition, and requires students to publicly defend controversial viewpoints. J.J. fears that selecting Palestine-related topics, previously encouraged, now places her at risk of administrative scrutiny under AB 715.

169.    This class allows students to engage in meaningful discussions without having to worry about getting in trouble.

170.    Last year, J.J. competed in speech at a national level.  She has chosen topics relating to Palestine for multiple competitions.  This year, she chose the dehumanization of Palestinians and other non-white groups.  In discussing this topic, she addressed the history of Palestine, suffering of the Palestinian people, colonization, and Israel as a colony on the land of Palestine.

171.    In her AP World History course, J.J.'s teacher screened a documentary about the creation of Israel, including how the country was created on a land inhabited by other people, and that the United Kingdom ("UK") gave the land away without the consent of the Palestinians living there. J.J. observed that while classroom discussion of other historical injustices is treated as ordinary academic inquiry, material addressing Palestinian history prompts heightened sensitivity and concern about potential complaints.

172. In English class, J.J. is reading *The Great Gatsby*–an American classic that has been taught in high school for decades. The novel addresses important topics such as the struggle between rich and poor, capitalism, and the moral decay of society.

173. There is a Jewish character in the novel who engages in unethical behavior. In class, students discussed whether the character is depicted as a stereotype and whether the author had antisemitic intent when he wrote the novel.

<u>Linda Khoury-Umili, on behalf of Y.U. and L.U.</u>

174. Ms. Khoury-Umili is a Palestinian-American mother of two children, 7-year-old Y.U., who currently attends public elementary school in San Mateo country and L.U., who is 4 years old and will begin Kindergarten next year at the same school as his sister.

175. Growing up Palestinian-American, Ms. Khoury-Umili always felt hesitant and uncomfortable discussing her Palestinian ancestry, since her homeland did not even appear on maps used in school.

176. She also encountered feelings of marginalization, especially after the September 11, 2001, attacks on the Twin Towers in New York City, because she realized many of her classmates and teachers saw all of the Middle East as a blur of sand and terrorists, and wondered if they felt that way about her.

177. She had been hopeful that ethnic studies courses would change things for her children.

178. In fact, Arab heritage month was included in the list of holidays observed as part of an effort to expand ethnic studies.

179. For Arab heritage month, Ms. Khoury-Umili did a presentation for her daughter's class that included wearing traditional Palestinian attire, serving traditional Palestinian food, and teaching the children Debkeh, a traditional Levantine folk dance. The students and teacher loved the presentation, and they all even ended up dancing at the end.

Alice Finen, on behalf of G. F.

180.    Alice Finen is the mother of G.F., a tenth grader at a public charter school in Arcata, California.   Her good friend has children of Palestinian origin.

181.    Before graduating high school this past May, Ms. Finen's daughter Madison delivered a presentation in her class about the apartheid regime in the West Bank of Palestine.  The presentation was received negatively by the teacher and school secretary, who apparently held different views on the subject of Israel and Palestine.

182.    In Ms. Finen's experience, textbooks in California schools already have a pro-Israel bias and do not discuss the region prior to 1948, when the modern state of Israel was created.

183.    Recently, her son's friend was shown a speech in class by Israel's Prime Minister Benjamin Netanyahu, while no voice was given to the opposing Palestinian perspective.  When Ms. Finen and the friend's parents discussed their concerns with the teacher, she appeared not to recognize that Palestine was a distinct entity from Israel, as she responded only that she would be teaching about Israel in the spring.

184.    Last year, at her daughter's high school graduation, Ms. Finen and her daughter were part of a group who wore keffiyehs, a symbol of support for Palestinians.

185.    The next day, the school principal called her to say that the police department had received a report of protestors disrupting the graduation ceremony, which shocked her because no such disruption had occurred.  The group had peacefully and lawfully exercised their right to show solidarity with the Palestinian people during a genocide.

186.    G.F. would like to learn about the Palestinian-Israeli conflict from not only the Israeli perspective, but the Palestinian one as well.  He would like to give presentations along the lines of the one his sister gave last year.

### III.    AB 715'S CHILLING EFFECT ON PLAINTIFFS

*A.    Teacher Plaintiffs*

187.    AB 715 will severely curtail Teacher Plaintiffs' ability to teach their students.

188.    Teacher Plaintiffs have no way of knowing what they may and may not say under AB 715.  For example, Ms. Prichett is under the impression that, since AB 715 instructs schools and teachers to adhere to Biden's National Strategy, anti-Israel sentiment is now considered antisemitism, although she also finds the law confusing because it does not explicitly define the term and prohibitions entailed by the new law, and does not confine its reach to classroom instruction..

189.    Given what she has endured, Ms. Prichett will be reluctant in the future to teach about Israel and Palestine now that AB 715 is officially in effect.  Likewise, based on her past experiences, Ms. Adenwala believes that the new law is an attempt to expand the tactics used against her to more teachers, so as to entirely censor conversation about Israel, Palestine and Gaza, both in and outside the classroom.

190.    Ms. Prichett also does not know what to make of the requirement that she teach only "factually accurate" information.  For example, Palestinian citizens of Israel do not have equal rights as Jewish citizens, and Palestinians in the West Bank have almost no rights at all under Israeli occupation.  The international consensus is that Israel is illegally occupying Palestine.  That is factually accurate, but also could be deemed antisemitic under AB 715, as illustrated by her previous experiences fielding complaints for saying similar things.

191.    As another example, most international human rights organizations have concluded that Israel is committing genocide in Gaza, but because some pro-Israel Jewish individuals find that description offensive and antisemitic, Ms. Prichett does not know how to square the two requirements (factually accuracy and AB 715's expanded scope of what can be deemed antisemitism).

192. In her own words, "unless I create an exception to the use of standard definitions or simply abandon the topic completely, I will be at risk under the new law AB 715."

193. She further observes that: "An exception to how Israel, Palestine, and the Middle East are taught, for fear of offending pro-Israel students, parents, and community members, would damage teacher credibility because the analytical framework applied to all other subjects would be disregarded for this specific one."

194. Ms. Prichett explains that this will make her less effective as a teacher, because when students sense that their teachers are not being honest, they lose respect for them and start disregarding everything they say.

195. Because teachers do not know exactly what AB 715 prohibits but believe it will subject them to discipline for discussions inside and outside the classroom that are critical of Israel and Zionism, Teacher Plaintiffs explain that they will not be able to assign historically required projects to students.

196. For example, Ms. Hassan is not sure if she will have students do the "My Name, My Identity" presentation that she has assigned in the past.

197. Under AB 715, Palestinian students' participation in this activity could be considered antisemitic discrimination, because it often involves discussing how the creation of Israel has harmed Palestinians and deprived them of their rights to self-determination.

198. Additionally, Ms. Hassan finds that students often ask questions based on Spanish-language news they have listened to, including on Israel, Palestine, and Gaza. Though Ms. Hassan believes it is valuable for students to hear her perspective, her honest responses to their questions could expose her to discipline under AB 715.

199. Similarly, Mr. Olson's ability to perform his job as a teacher will be negatively impacted by AB 715's enactment. Often, science projects such as those discussed above—for instance the

students who designed science experiments revolving around food preservation and water distillation—are prompted when students ask questions about current events, including Palestine and Gaza. But under AB 715, Mr. Olson will be afraid to allow discussion of these topics because it could be deemed antisemitic by pro-Israel individuals.

200. Teaching in a rural, largely Christian community, students often ask Mr. Olson what it means to be Jewish, and Mr. Olson responds that his Judaism does not include support for the State of Israel. Mr. Olson believes that under AB 715, he might be in violation of the law for answering this question in the manner to which he is accustomed.

201. LA EJP is convinced that the law will prevent student inquiry about historical events that lead to critical classroom discussions about the Israeli government's actions, and chill honest classroom conversations about Palestinian and Arab history and cultures.

202. The fact that *anyone* can allege antisemitism in a complaint filed under AB 715, reporting educators to an "Antisemitism Prevention Coordinator" also means that, in the views of Teacher Plaintiffs, AB 715 provides individuals and organizations who seek to silence negative discussion of Israel with more tools to misuse the public school system for their political purposes—as evidenced by the complaint initiated by StandWithUs after AB 715 was introduced.

203. In the words of LA EJP, "[t]his law will violate the academic freedom of educators across the state and spread fear of job loss, the loss of the protected right to teach an age-appropriate curriculum, and embolden those who threaten violent retaliation against educators and their families."

204. And AB 715 has implications outside of the classroom, because it applies to professional development materials and training, and the broad educational environment, too.

205. Ms. Prichett has expressed concern that the new law will discourage teachers from offering or participating in such trainings for similar reasons discussed in the context of classrooms: factual accuracy and "antisemitic discrimination" under AB 715 may be at odds with each other.

Likewise, Ms. Adenwala found that following a prior training, that likely was conducted due to the legislature's introduction of AB 715, teachers were left confused because they were told only "it depends" whether they could be disciplined for unlawful discrimination for criticizing Israel.

206. In short, AB 715 will negatively impact Teacher Plaintiffs' ability to perform their jobs as educators, which includes candidly answering students' questions about their backgrounds and perspectives, allowing students to share their own backgrounds and experiences, and permitting free and open discussion on topics including colonization, systemic oppression, Israel, Palestine, allegations of genocide against the Palestinians of Gaza, and the political influence of pro-Israel organizations.

207. As Ms. Prichett explains, given what happened to her in the absence of AB 715, "I have almost no doubt that I would be a target under the new law."

208. Ms. Adenwala believes she was found to have engaged in unlawful discrimination for showing her class a video of a Holocaust survivor condemning Israel's actions though an earlier complaint made on the same basis had been dismissed. Because AB 715 had been introduced in the state legislature when the complaint was made for a second time, the district felt more pressure to appease the parents who complained. In fact, StandWithUS—the group that took credit for getting her disciplined—advocated for passage of AB 715. Had AB 715 been in effect and not only introduced in the legislature at the time, Ms. Adenwala believes she would have been disciplined yet more harshly.

209. Likewise, LA EJP members, based on, *inter alia*, their past experiences fielding complaints regarding their teachings on Israel and Palestine, view AB 715 as part of a larger effort to silence honest discussions on the topic and censor academic discussion of Palestine in a democratic atmosphere of open inquiry.

210. Members like Ms. Cardona and Mr. Gochez who have already been the subject of doxxing, complaints, and records act requests fear that AB 715 will be yet another tool weaponized against them for advocating for Palestinian human rights and teaching facts surrounding the circumstances of Israel's creation, the occupation of Palestine, and the genocide in Gaza.

211. LA EJP explains that educators are professionals who have been trained to facilitate difficult conversations with students. But the law will create an environment in which teachers (including Jewish teachers), are afraid to perform their professional responsibilities and students (including Jewish students) will fear engaging in dialogue with their peers—an essential component of civil life and the educational environment. LA EJP members do not believe the new law will make anyone safer, including Jewish students and educators who have criticized AB 715 as inaccurately representing them as an exception to a monolith.

212. Given what Ms. Adenwala has already endured, AB 715 has created a fearful environment for her (and other teachers). She says that she has been "left with a profound sense of disillusionment," as AB 715 "deprives students of the chance to think critically by punishing teachers who simply attempt to address the complex questions their students bring forward."

*B. Student Plaintiffs*

213. J.J. believes that AB 715 will significantly impede the ability of both students and teachers to freely discuss Israel and Palestine.

214. She states that students who are interested in politics and world affairs believe that AB 715 is designed to discourage conversation about Israel and Palestine because the law does not clearly state what antisemitism is. Without a clear understanding, students will avoid discussions and communications, including historical facts, that could be deemed antisemitic.

215.    J.J. also thinks that students will stop asking her questions about her Palestinian background and identity, and she and others will be uncomfortable freely answering questions on the subject, because they will fear legal action or other forms of retaliation.

216.    For example, the documentary she watched in AP World History depicted some negative aspects of Israel's creation, including the commensurate displacement of at least 700,000 Palestinians.  Knowing that a complaint could be launched and potentially substantiated under AB 715 means that many teachers will simply refrain from showing or even encouraging students to see films like this.

217.    In J.J.'s words, AB 715's strictures will inhibit "meaningful discussions that are necessary to learn about different perspectives so that common ground can be reached."

218.    She also believes that AB 715 will lead schools to prohibit debates such as the ones she has participated in about Israel and Palestine (again, both in and outside of class) depriving her and her classmates of an important tool for learning.

219.    The deprivation of these experiences will harm her education.  J.J. considers the discussions she has had at school about Israel and Palestine to have played an important role in her intellectual development and education, especially because such open discussions allow students to better respect one another even when they do not agree.

220.    And in J.J.'s opinion, AB 715 will have impacts beyond discussions about Israel and Palestine.  It will allow for the censorship of lessons, books, films and events because some people find them offensive, meaning that even students who are not interested in politics will be deprived of valuable learning experiences.

221.    She refers to her experience reading *The Great Gatsby*, which could be found to expose students to antisemitic discrimination under AB 715 because it has a Jewish character who is depicted in a stereotypical manner.

222. Because AB 715 prohibits instructional materials that include stereotypes about protected groups, J.J. reasonably fears that teachers may avoid assigning literature that addresses prejudice or contains depictions of discrimination, including works such as *The Great Gatsby* or the writings of James Baldwin, even where those works are taught to examine and critique stereotypes.

223. Ms. Khoury-Umili also believes that AB 715 will have a significant, negative impact on her children's education. For example, she will be worried about offering the presentation she gave to her daughter's class last year once the AB 715 amendments go into effect. Because speech about Palestinian identity is frequently conflated with antisemitism in public discourse, Ms. Khoury-Umili reasonably fears that cultural presentations or classroom discussions relating to Palestine may trigger complaints under AB 715.

224. In fact, Ms. Khoury-Umili is aware of two cases, one in Marin County and one in Santa Clara, in which a teacher and parent, respectively, were targeted for wearing Palestinian cultural attire.

225. The parent's booth at the fair was vandalized by pro-Israel parents and the school administration took no action, while the teacher was targeted with a flurry of complaints.

226. Given these circumstances, it is reasonable to assume that under AB 715, her children's teachers will be too afraid to permit such a presentation in class, which included Ms. Khoury-Umili wearing traditional Palestinian dress, for fear of receiving complaints and being disciplined. Ms. Khoury-Umili's concerns arise directly from AB 715's authorization of anonymous complaints, investigations, and corrective action based on allegations of antisemitism, which reasonably lead educators to avoid Palestinian cultural expression altogether.

227. Furthermore, Ms. Khoury-Umili would be reluctant to submit her children to controversy in the classroom that would single them out from their peers.

228.    Ms. Finen believes that under AB 715, her son, G.F., would not be able to give a presentation like the one his sister gave last year, because it could be deemed critical of Israel and thereby hostile to Jewish students, subjecting the teacher to discipline.

229.    Ms. Khoury-Umili, Ms. Finen, and Mr. Olson are extremely concerned about the ways in which AB 715 will negatively affect their children's abilities to learn factual information about Israel and Palestine, to express their own views, and to ask questions and engage in free-flowing discussions with their teachers and other students, when teachers and students alike are afraid they will be complained about, investigated, and possibly disciplined for discussions that could be perceived as antisemitic under the Biden National Strategy.

230.    Mr. Olson is also worried that the new law will negatively impact his young son's sense of identity.  He believes that his son should be able to express Jewish beliefs without support for Israel, but that AB 715 considers Jewish individuals a monolith who all endorse Israel's existence and its government's actions.  He does not want his son to be taught that being Jewish is synonymous with supporting Israel.

## IV.    THE OAKLAND TEACHER TRAINING

231.    Upon information and belief, on Thursday, December 4, 2025, a mandatory training on antisemitism took place in the Oakland Unified School District (OUSD) for around 300 OUSD administrators.

232.    Administrators were informed that the training was to instruct them about their legal obligations under the new California Law AB 715.

233.    Several administrators in attendance informed attorney Liz Jackson shortly after the training that it was non-sensical, vague, and contained discriminatory content.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
47                                    CASE NO. 5:25-cv-9443

234.     Although the training notice did not identify AB 715 compliance as a purpose or topic of the training, the administrators attested that the training included at least 10 slides covering obligations and corrective action under AB 715.

235.     The administrators expressed a strong desire to remain anonymous because they have a legitimate fear of retribution by proponents of AB 715. They are concerned about harassment, cyber-bullying, and false accusations resulting in adverse employment consequences at the hands of AB 715 proponents who have a demonstrated history of engaging in such intimidation tactics.

236.     The administrators were especially disturbed by the vague prohibitions in the slide in the AB 715 section titled, "What constitutes 'discriminatory bias'?" listing the following bullet points:

• Stating that the Israeli's are committing genocide?

• Stating that Zionism is "settler colonization"?

• Stating that there should be a two-state solution?

• Stating that Israel should be turned over to the Palestinian people?

• Hanging a Palestinian flag in the classroom?

• Displaying student "pro-Palestinian" work?

• Inviting AROC to present to staff?

• Emailing staff encouraging them to email the Board in support of a "pro-Palestinian" Board resolution?

237.     On information and belief (as the administrators attested to Ms. Jackson), the trainers provided no answers as to whether the bulleted examples listed with question marks under "discriminatory bias" are prohibited or permitted.

238.     The administrators informed Ms. Jackson that at least six district leaders requested in the webinar chat for the trainers to provide guidance. No guidance was given.

239.    The administrators expressed concern to Ms. Jackson that no answers were provided about how to identify discriminatory bias, especially in light of the four slides describing the consequences of failing to identify discriminatory bias, or "corrective actions" of AB 715.

240.    These slides alerted administrators in bold red font that corrective action may be required to address discriminatory bias.

241.    The administrators especially expressed concern about an instruction to always provide "factually accurate" information. On information and belief, multiple district leaders in the training asked how to identify correct facts given disputes about terms which many consider basic facts like "settler-colonialism" and "occupation."

242.    The administrators expressed concern that the trainers were avoiding direct answers; instead, they provided evasive responses to questions and instructed administrators to "keep these examples in mind" because they were all taken from actual complaints. The administrators said they believed that the bulleted examples of "'discriminatory bias'?" were presented as "open questions" in such a way that led district leaders to conclude that these examples could be prohibited conduct, but the trainers did not directly state such a prohibition.

243.    Administrators expressed concern about the training's instruction to ensure that any mention of a Palestinian perspective always be accompanied by the Israeli point of view, but the trainers did not provide clarity on what constitutes an acceptable standard of neutrality.

244.    The administrators expressed concern that the training and answers provided by trainers were so vague that they were unable to determine what words, statements or actions would be considered violations of AB 715. They believe that the only way to avoid running afoul of AB 715 is to avoid any criticism of Israel or reference to Palestinian history, identity or struggles.

245.     The administrators also expressed dismay that the training –and the examples of potentially prohibited discriminatory conduct– focused exclusively on restricting speech related to Palestinian human rights and/or restricting speech that celebrates Arab-American heritage.

246.     On information and belief, the first substantive slide in the training pictured an item of Palestinian cultural clothing called a Keffiyeh. The subject heading of the slide asked, "Is This Discrimination?"

247.     District leaders were sent to auto-generated breakout groups to discuss the issue, in the form of a warm-up. It was unclear to multiple participants whether it is prohibited conduct for an educator to wear Palestinian cultural clothing despite many participants asking for clarification.

248.     Upon information and belief, each of the administrators was disturbed that the opening frame of the training would question whether Palestinian clothing is discriminatory. The administrators attested that at no other time had they been asked to question whether the cultural garments of any other ethnicity or nationality should be prohibited.

## V.     RELEVANT HISTORY

249.     Prior to 1948, the area that now includes Israel, the West Bank, and Gaza, was known as Palestine. *See Israel and the Palestinians: History of the conflict explained*, BBC (Oct. 14, 2025), https://www.bbc.com/news/articles/ckgr71z0jp4o (last visited Oct. 24, 2025).

250.     Prior to 1948, the inhabitants of the land were primarily Christian and Muslim Palestinian Arabs.  A Jewish minority had also long inhabited the region, which fell under British rule after the Ottoman reign ended in 1917. *Id.*

251.     As a result of increasing antisemitism, European Jews began immigrating to Palestine in significant numbers in the 1920's, with ever more fleeing in the 1940's due to the murder of six million Jews during the Holocaust.  *Id.*

252.    In 1947, in light of growing violence between the Jewish immigrants and Palestinian Arab populations, the United Nations ("UN") proposed a partition plan:  an independent Arab state, an independent Jewish state, and the City of Jerusalem (under an international trustee).  *Id.*

253.    All Arab nations, and the Palestinians, opposed this plan because it gave Jewish inhabitants more land despite having a substantially smaller population.  *Id.*

254.    In May 1948, the British withdrew, and Israel declared statehood, leading to war with its neighboring Arab nations.  *Id.*

255.    Egypt was left occupying the Gaza Strip, while Jordan took control of the West Bank and East Jerusalem.  *Id.*  Altogether, these areas are currently home to about 5 million Palestinians.  *Id.*

256.     The fledgling Israeli army and paramilitary groups expelled over 700,000 Palestinians from what is now Israel in 1948 (the exact number is unknown but is estimated to be this or a greater number).

257.    Militarized forces massacred people, destroyed their villages, and poisoned their wells to keep Palestinians from returning.

258.    The surviving Palestinians lost their homes forever and became refugees in Gaza, the West Bank, and adjacent Arab countries, including Jordan, Syria and Lebanon.  *Id.*

259.    Palestinians call the violent dispossession and displacement that occurred on May 15, 1948, the "Nakba," which means "catastrophe" in Arabic, while Israel celebrates that date as its day of independence.

260.     In the midst of increasing tension with its neighbor, Egypt, Israel staged a preemptive strike that destroyed Egypt's air-force, which set off the 1967 six-day war.  *Id.*

261.    Within days, Israel had captured the Sinai Peninsula, Gaza, the West Bank, the Golan Heights, and East Jerusalem.  *Id.*

262.    Israel continues to occupy these areas. *Id.* While the Palestinian Authority runs day-to-day operations in most of the towns and cities in the West Bank, Israel maintains overall control. *Id.*

263.    About 700,000 Jewish people live in settlements in the West Bank and East Jerusalem. *Id.* These settlements are considered illegal under international law, but the Israeli government disputes this characterization and claims that the West Bank belongs to Israel. *Id.*

264.    Many human rights organizations, including Amnesty International, Human Rights Watch, and several Israeli organizations, consider the system in the West Bank to meet the legal definition of apartheid, since "Israeli authorities maintain a two-tiered legal system: methodologically privileging Israelis, who have the same rights and privileges wherever they live, while repressing Palestinians to varying degrees wherever they live." Lama Fakih and Omar Shakir, *Does Israel's treatment of Palestinians rise to the level of apartheid?* LOS ANGELES TIMES (Dec. 5, 2023), https://tinyurl.com/3vk7pyhz (last visited Oct. 28, 2025).

265.    One feature of this system is that Israel may demolish the homes of Palestinians arbitrarily, for any or no reason. *Id.*

266.    Another such feature is that Palestinians (but not Jewish Israelis) may be held in administrative detention indefinitely without charge and without having committed an offense on the grounds that they may break the law in the future. *See Administrative Detention*, B'TSELEM, https://www.btselem.org/administrative_detention (last visited Oct. 28, 2025).

267.    At the end of last year, Israeli Prison Services ("IPS") was holding 3,327 Palestinians in administrative detention, including 112 minors. *See Statistics on administrative detention in the Occupied Territories*, B'TSELEM, (Mar. 3, 2025), https://www.btselem.org/administrative_detention (last visited Oct. 28, 2025).

268.    While Israel physically withdrew from Gaza territory in 2005, it maintains control of the borders, airspace, and sea, giving it near total power over the movement of people and goods. *See Israel and the Palestinians*, BBC, https://www.bbc.com/news/articles/ckgr71z0jp4o.

269.    Even before October 7, 2023, Gaza had one of the highest unemployment rates in the world and many people lived below the poverty line. *Id.*

270.    In January of 2006, during the last election held in Gaza, Hamas gained a significant majority of seats and came to govern the territory. *Id.*

271.    Since withdrawing from Gaza in 2005, Israel has engaged in numerous military assaults on the blockaded enclave, including in 2008, 2012, and 2014; every time, the vast majority of casualties were Palestinians. *Id.*

272.    The year 2023 was the deadliest year on record for Palestinian children, with at least 38 children in the West Bank and 6 in Gaza killed by Israeli forces from January 1 to September 18, 2023. *See 2023 Marks Deadliest Year on Record for Children in the Occupied West Bank*, SAVE THE CHILDREN (Sept 18, 2023), https://www.savethechildren.net/news/2023-marks-deadliest-year-record-children-occupied-west-bank (last visited Nov. 2, 2025) (explaining that 2023 was the second year in a row designated deadliest for Palestinian children, indicating that violence by Israel against Palestinian children is escalating).

273.    On October 7, 2023, Hamas launched an attack across the border from the Gaza Strip, resulting in the deaths of around 1,200 Israelis, including nearly 300 soldiers and 900 civilians, as well as the taking of around 250 Israelis hostage. *Id.*

274.    In response, Israel declared a state of war and launched a massive military operation in Gaza that has continued for more than two years.

275.    At least 70,000 Palestinians, mostly civilians, have been killed to date, although that number is almost certainly a significant undercount since it is derived from recovered bodies, and

there are countless bodies trapped beneath the rubble. *See* United Nations Office for the Coordination of Humanitarian Affairs, *Humanitarian Situation Update #329*: *Gaza Strip*, UNITED NATIONS OFFICE FOR COORDINATED HUMANITARIAN AFFAIRS (Oct. 9, 2025), https://tinyurl.com/2hkbsayb (last visited Oct. 21, 2025); Seham Tantesh and William Christou, *My Heart Is Broken: Palestinians Begin Searching the Gaza Rubble for Their Dead*, THE GUARDIAN (Oct. 12, 2025), https://tinyurl.com/5n746ehb (last visited Oct. 21, 2025).

276.    Israel's actions in retaliation for October 7, 2023, have been categorized as a genocide by many human rights organizations and scholars, including the United Nations Special Committee, the International Association of Genocide Scholars, Amnesty International, and Israeli human rights organizations B'Tselem and Physicians for Human Rights Israel.  Other groups object to this label. *See Gaza Genocide*, WIKIPEDIA, https://en.wikipedia.org/wiki/Gaza_genocide (last visited Oct. 24, 2025); *Israel/OPT: Israeli organizations conclude Israel committing genocide against Palestinians in Gaza in another milestone for accountability efforts*, AMNESTY INTERNATIONAL (Jul. 28, 2025), https://tinyurl.com/yy5bpbuf (last visited Oct. 24, 2025).

277.    In December of 2023, South Africa brought a case in the International Court of Justice ("ICJ"), accusing Israel of committing genocide against the Palestinians of Gaza.  The ICJ ruled that the allegation is plausible and allowed the case to move forward on that basis.  *Id.*

278.    On October 10, 2025, Israel and Hamas reached a ceasefire agreement, and in accordance with its terms, Hamas returned all living hostages to Israel.  *See* Cachella Smith, *Israel launches strikes on Gaza after Netanyahu orders 'powerful' attacks*, BBC (Oct. 28, 2025), https://www.bbc.com/news/live/c891ex72nj7t (last visited Oct. 29, 2025).

279.    Just weeks later, on October 28, 2025, Israel carried out a heavy airstrike on Gaza in alleged retaliation for mishandling of body parts of a deceased hostage.  The strikes killed 104 people, including 46 children.  *Id.*

280.    The historical facts described above, including Palestinian displacement, military occupation, settlement expansion, administrative detention, and conditions in Gaza, are routinely discussed in academic settings, journalism, and human rights reporting. They form the basis of classroom instruction, student debate, and educator advocacy concerning colonialism, displacement, and international law.

281.    Under AB 715, however, discussion of these subjects risks being reframed as antisemitic discrimination, subjecting educators and schools to complaints, investigations, corrective action, and discipline. As a result, factual instruction and political expression concerning Palestinian history and Israeli government conduct are treated as presumptively suspect.

282.    This enforcement framework suppresses one set of viewpoints while protecting another: while discussion of antisemitism and Jewish historical suffering is permitted and encouraged, discussion of Palestinian history, displacement, and state violence is chilled. Plaintiffs challenge AB 715 because it institutionalizes this asymmetry by embedding contested antisemitism frameworks into California education law and authorizing sanctions based on political perspective rather than neutral pedagogical standards.

## CONSTITUTIONAL PRINCIPLES

### I.    DUE PROCESS OF LAW AND VOID-FOR-VAGUENESS DOCTRINE

283.    "It is well settled that 'the starting point for interpreting a statute is the language of the statute itself.'" *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987)).

284.    Due Process of law requires clear definitions of legal prohibitions. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

285.    Vague laws may trap the innocent by failing to provide adequate warning, and lead to arbitrary and discriminatory enforcement, resulting in delegations of basic policy to police officers, judges and juries. *Id.* at 109.

286.    A law is unconstitutionally vague if it "does not give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108-09.

287.    Vague laws are of particular concern in the First Amendment context because they "operate to inhibit the exercise of" the freedoms safeguarded by it. *Id. See also Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) (explaining that when First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles). *See also Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005) ("A greater degree of specificity and clarity is required when First Amendment rights are at stake.").

288.    Where a statute "clearly implicates free speech rights," a facial vagueness challenge is appropriate, and a court may deem a law unconstitutionally vague. *Cal Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). *See also Roulette v. City of Seattle*, 97 F.3d 300, 305 (9th Cir. 1996) (explaining that a facial attack based on vagueness is proper if the challenged statute "is directed narrowly and specifically at expression or conduct commonly associated with expression.").

289.    In the vagueness inquiry, the requirement that laws be precise is aimed at preventing "chill," wherein rather than risk sanctions, individuals will steer far wider than necessary to avoid engaging in prohibited speech. *Hunt v. City of Los Angeles*, 601 F.Supp.2d 1158, 1169 (C.D. Cal 2009). *See  FCC v. Fox T.V. Stations Inc.*, 567 U.S. 239, 253-54 (2012) (explaining that the void-for-vagueness doctrine is designed to ensure that  regulated parties know what is required of them so they may act accordingly and that those enforcing the law do not act in an arbitrary or discriminatory way; "When

speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.").

290.    In order to succeed on such a challenge, a plaintiff must demonstrate that the challenged statute regulates and potentially chills speech which, in the absence of any regulation, receives some First Amendment protection. *Fox T.V.*, 567 U.S. at 253-54.

291.    AB 715 fails this standard. The statute incorporates contested definitions of antisemitism into education law without clearly identifying what speech or conduct may trigger discipline or investigation. Educators and students are left to guess whether discussion of Palestinian history, criticism of Israeli government actions, or expressions of identity will be deemed unlawful. This uncertainty has already caused widespread self-censorship.

292.    The Ninth Circuit has recognized that statutory language using the terms "includes" or "includes but not limited to" is expansive rather than limiting and signals that the Legislature has not defined the outer boundary of a statute's reach. *Northwest Ass'n of Indep. Schools v. Labrador*, No. 25-2491, slip op. at 17–21 (9th Cir. Jan. 29, 2026) (amended Feb. 12, 2026). The court explained that unlike a definition using "means," which is limiting, the term "includes" ordinarily "imports a general class, some of whose particular instances are those specified in the definition." *Id.* at 19. Although the statute in *Labrador* was ultimately sustained under a narrowing construction, the court acknowledged that the use of "includes" may permit regulation of a substantial amount of expressive activity at the overbreadth stage of analysis. *Id.* at 19–20.

293.    AB 715 repeatedly employs this same expansive structure. Remedial actions "may include, but are not limited to" restorative justice practices; state-directed corrective actions "may include, but not be limited to" targeted and intensive assistance for teachers, administrators, and staff; and required training modules "shall include, but not be limited to" complaint protocols and resolution procedures. *See* Cal. Educ. Code §§ 244, 33803.6. By declining to define the outer limits of permissible

enforcement and instead signaling open-ended regulatory authority, AB 715 leaves educators, students, and school districts without clear notice of what conduct may trigger investigation, discipline, or state intervention, thereby exacerbating the statute's chilling effect on protected speech and association. It also confers broad subjective discretion upon enforcing officials to determine what is and is not a violation.

## II.    THE FIRST AMENDMENT RIGHT TO FREE SPEECH

### A. Viewpoint Discrimination

294.    The First Amendment, incorporated against the States through the Fourteenth Amendment, prohibits the government from making laws that punish people for expressing certain viewpoints. *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.").

295.    "The First Amendment gives freedom of mind the same security as freedom of conscience … . And the rights of free speech and a free press are not confined to any field of human interest." *Thomas v. Collins*, 323 U.S. 516, 531 (1945).

296.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943).

297.    On these grounds, the government may not discriminate against speech based on the ideas or opinions it conveys. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995).

298.    The essence of viewpoint discrimination is when a law "[r]eflects the [g]overnment's disapproval of a subset of messages it finds offensive[.]" *Matal v. Tam*, 582 U.S. 218, 221 (2017).

299.    Viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional." *See Rosenberger.*, 515 U.S. at 829-30.

300.    The right to receive information is "an inherent corollary of the rights to free speech and press that are explicitly guaranteed by the Constitution" because "the right to receive ideas follow ineluctably from the sender's First Amendment right to send them." *Board of Educ., Island Trees Union Free Sch. Dist. Number 26 v. Pico*, 457 U.S. 853, 867 (1982). *See also id.* ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (quoting *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring)).

301.    As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

302.    The First Amendment safeguards minority perspectives, which are the views most in need of protection. *See Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.").

303.    "The First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton*, 597 U.S. 507 (2022) (quoting *Tinker v. Des Moines Independent Community School Dist.*,

393 U.S. 503, 506 (1969)).  *See also Keyshian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die.").

304.    While courts have restricted the rights of public school teachers when it comes to choosing curricula, *see, e.g., Mayer v. Monroe County Cmty. Sch. Corp.*, 474 F.3d 477, 478-80 (7th Cir. 2007), *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1014-17 (9th Cir. 2000) (describing its own decision as "narrow"), our courts do not tolerate a state government enacting laws designed to favor certain viewpoints and exclude others in public schools.  *See Epperson v. Arkansas*, 393 U.S. 97, 104-05 (1968) (holding that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom") (quoting *Keyshian*, 385 U.S. at 603).

305.    In fact, the Ninth Circuit has explicitly recognized that teachers' instructional speech is entitled to some degree of First Amendment protection, as teachers must be "given leeway to challenge students to foster critical thinking skills and develop their analytical abilities.  This balance is hard to achieve, and we must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." *C.F. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 988 (9th Cir. 2011).  *See also Cal. Teacher's Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1148 (9th Cir. 2001) (assuming that, under *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) a teacher's instructional speech receives some First Amendment protection); *Sheldon v. Dhillon*, 2009 US Dist. LEXIS 110275 (N.D. Ca. 2009) ("The Ninth Circuit has previously recognized that teachers have First Amendment rights regarding their classroom speech, albeit without defining the precise contours of those rights.").

306.    Importantly, our courts recognize that *students* have First Amendment rights both to express and receive different viewpoints, derived from the right to receive information as a corollary

to the right to speak. *See Arce v. Douglas*, 793 F.3d 968, 982-83 (2015) (observing that the First Amendment requires balancing students' rights with the state's authority in educational matters).

307. "The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting." *Monteiro v. Tempe Union School District*, 158 F.3d 1022, 1027 n. 5 (9th Cir. 1989) (citing *Pico*, 457 U.S. 853, 912-13 (1982) (plurality op.) ("[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom."). *See also Parents v. Liberated Ethnic Stud.*, 2024 US Dist. LEXIS 216929, at *65 (C.D. Ca. 2024) (quoting *Keyshian*, 385 U.S. at 603 (noting that the Supreme Court has recognized "the importance of protecting the 'robust exchange of ideas'" in the context of a public-school education).

308. Students suffer a cognizable First Amendment injury where the State restructures educational access in a manner that suppresses protected viewpoints, even absent individualized disciplinary action. *See Arce v. Douglas*, 793 F.3d 968, 982–83 (9th Cir. 2015) (holding that students had standing where a statute eliminated an ethnic studies program because the law operated to remove perspectives from the curriculum as a matter of state policy." *See also Pico*, 457 U.S. at 867 (holding that school officials may not remove materials simply because they "dislike the ideas contained in those books" or seek to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," and explaining that such actions amount to unconstitutional "official suppression of ideas").

309. The Ninth Circuit has recognized that the threat of legal consequences causes schools to self-censor and avoid controversial material. In *Monteiro v. Tempe Union High School District*, the court warned that fear of complaints or litigation would lead districts to "buy their peace" by steering away from books that might offend any group, instead favoring "safe" materials—producing a "significant chilling effect" on schools' willingness to assign works touching on contested social or political issues.

158 F.3d 1022, 1029–30 (9th Cir. 1998). AB 715 institutionalizes precisely this dynamic by inviting complaints and enforcement tied to politically charged subject matter, compelling educators to avoid discussions of Israel and Palestine altogether. "[T]he First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson*, 393 U.S. at 106.

310.    The Ninth Circuit interprets Supreme Court precedent to require that any "state limitations on school curricula that restrict a student's access to materials otherwise available may be upheld only where they are reasonably related to legitimate pedagogical concerns–especially … where the local school board has already determined that the material at issue adds value to its local school curriculum." *See Arce*, 793 F.3d at 983 (applying *Hazelwood*, 484 U.S. at 273).

### B.    Unconstitutional Overbreadth

311.    A law may be invalidated under the First Amendment overbreadth doctrine if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). *See also United States v. Hansen*, 599 U.S. 762, 769 (2023) ("litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

312.    This doctrine is based on a recognition that the First Amendment "provides breathing room for free expression." *Hansen*, 599 U.S. at 769-770. *See also Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (explaining that overbroad laws "deter or 'chill' constitutionally protected speech," silencing potential speakers and resulting in the loss of their contributions in the marketplace of ideas).

313.    To avoid potential chill and the commensurate harm to society, "the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as

society's broader interest in hearing them speak." *Hansen*, 599 U.S. at 769-70 (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)).

314.    "The first step in an overbreadth analysis is to construe the statute, as 'it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'" *Arce*, 793 F.3d at 984 (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011)).

315.    A statute that reaches speech should be found facially unconstitutional if its application is not limited to punishing unprotected speech but is "susceptible of application to protected expression." *Plummer v. Columbus*, 414 U.S. 2, 2-3 (1973) (*quoting Gooding v. Wilson*, 405 U.S. 518, 522 (1972)).

316.    If a plaintiff demonstrates that the statute "'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statue's lawful applications, and a court will hold the law facially invalid." *Hansen*, 599 U.S. at 770 (quoting *Williams*, 553 U.S. at 292).

## III. EQUAL PROTECTION OF THE LAW

317.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."

318.    Under the Equal Protection Clause, state and local governments and government officials may not arbitrarily discriminate among citizens, denying to some rights or benefits that are made available to other similarly situated citizens, without justification. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440-50 (1985).

319. The purpose of the Equal Protection Clause is to impose a "restriction on state legislative action inconsistent with elemental constitutional principles." *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

320. Thus, our courts treat "as presumptively invidious those classifications that disadvantage a 'suspect class' or that impinge upon the exercise of a 'fundamental right.'" *Id.* at 217.

321. Suspect class includes those based on race, religion, ethnicity, or national origin, *especially* where children are concerned. *See Regents v. Univ. of Cal. v. Bakke*, 438 U.S. 265, 290 (holding that racial and ethnic classifications are subject to the most rigid scrutiny); *Plyler*, 457 U.S. at 219-20.

322. If the classification involves a suspect class, then the State must show that the classification has been "precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 217.

323. Moreover, public education is not merely a benefit, and the Supreme Court recognizes that public schools serve a critical role in preserving democracy and upholding societal values. *See Ambach v. Norwick*, 441 U.S. 68, 76 (1979); *Abington School District v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring). *See also Plyler,* 457 U.S. 202 (holding that Texas could not deny public school enrollment to undocumented children under the Fourteenth Amendment).

324. The Equal Protection Clause is violated when the State structures its laws to make it more difficult for one group than others to seek aid from the government. *Romer v. Evans,* 517 U.S. 620, 633 (1996).

325. Even under rational basis review, differential treatment may not reflect selective protection or institutional favoritism. *Romer v. Evans*, 517 U.S. at 635; *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 447–50 (1985).

**CLAIMS FOR RELIEF**

**COUNT I: DUE PROCESS UNCONSTITUTIONAL VAGUENESS (ALL PLAINTIFFS)**

326.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth therein.

327.    Existing California education law prohibits discrimination on the basis of race, religion, national origin, and ethnicity.

328.    Logically, then, the Legislature intended for its definition of antisemitism to incorporate something beyond these concepts, or there would be no reason to amend Section 244 of California's Education Code.

329.    At the same time, AB 715 *contains no explicit definition of antisemitism.*

330.    The AB 715 amendments state that the Biden National Strategy "shall be a basis" in determining how to "identify, respond to, prevent and counter antisemitism."

331.    The Biden National Strategy is a 60-page document that discusses combatting antisemitism in myriad contexts, not only educational settings, for example abroad and on social media platforms. It is not clear which parts of the Biden National Strategy California schools must incorporate, and in which contexts.

332.    The Biden National Strategy refers to the IHRA definition of antisemitism as the most prominent such definition, falls short of explicitly adopting it.

333.    The Biden National Strategy itself conflates criticism of the State of Israel and political project of Zionism with antisemitism, for example by discussing Jewish people's connection to the land of Israel as a guiding principle in implementation, and the need to combat efforts to "delegitimize" Israel abroad.

334. Thus, the new law appears to include various forms of criticizing Israel and the political philosophy of Zionism in its understanding of antisemitic discrimination by instructing districts to follow the Biden National Strategy.

335. Another reason this appears to be so is that the law includes as examples of unlawful discrimination "distortions of Jewish … ancestry, history and identity," as well as use of "coded language," "expressions," and "antisemitic tropes and conspiracy theories." Those terms are undefined, while at the same time appear to be alluding to, *inter alia*, the position that Palestinians, rather than Ashkenazi (European) Jews, are indigenous to Palestine and Israel.

336. These vague concepts provide no meaningful guidance to educators and invite subjective enforcement.

337. A person of ordinary intelligence would not be certain what constitutes antisemitism under the new law since the concept appears unrestricted to traditional notions of nondiscrimination—that is, discrimination on the basis of race, religion, national origin, or ethnicity, especially because the term is not defined and because it instructs school districts to adhere to the Biden National Strategy, but falls short of expressly stating how they are to do so.

338. AB 715's vagueness is further compounded by its open-ended enforcement framework. The statute repeatedly provides that remedial and corrective measures "may include, but are not limited to" specified actions, including restorative justice practices, targeted assistance, and additional oversight. This drafting choice fails to define the outer limits of the State's authority and instead signals that enforcement may extend beyond the enumerated examples.

339. Because AB 715 does not make clear what it forbids, while suggesting it encompasses in its prohibitions constitutionally protected speech, Teacher Plaintiffs cannot know what they may and may not teach and say in class and what instructional materials they may use. *See Nw. Ass'n of Indep. Schools v. Labrador*, No. 25-2491, slip op. at 17-19 (9th Cir. Feb. 12, 2026) (determining that use

of the terms "includes" and "includes but not limited to" are legally expansive thereby failing to identity "the outer limits of the state's authority" under the challenged statute).

340.    They likewise do not know what they may or may not say in professional development trainings, during extracurricular activities, in response to students' questions (personal or otherwise), and even outside of work, creating uncertainty that extends beyond formal classroom instruction.

341.    AB 715's Amendments to California's education law have had and continue to have a strong chilling effect on Teacher Plaintiffs' speech in all of these areas of professional life, and have also caused educators to reasonably fear that non-instructional or off-campus political activity could trigger complaints or investigation.

342.    In fact, Ms. Adenwala has explained that she believes she has already been punished more harshly because of the mere introduction of AB 715, and she reasonably fears further consequences under the statute's enforcement framework. AB 715 also requires schools to take remedial actions if a teacher uses instructional materials in class that expose pupils to unlawful discrimination.

343.    Student Plaintiffs likewise lack notice of what speech, discussion, or expression—in the classroom, during lunch and extracurricular activities, may subject them to investigation or complaint under AB 715's undefined standards.

344.    Because the statute incorporates expansive and externally defined concepts of antisemitism without clear limiting principles, students cannot determine whether discussion of Palestinian history, criticism of Israeli government policy, or expressions of identity may be deemed unlawful. This uncertainty chills Student Plaintiffs' participation in classroom discussion and student activities.

345.    AB 715 further lacks objective enforcement standards governing when speech or instructional conduct constitutes unlawful discrimination. The Ninth Circuit has recognized that

statutes which fail to establish an objective benchmark and instead permit enforcement based on individualized assessments of "context" risk devolving into subjective, *ad hoc* determinations. *Labrador*, No. 25-2491, slip op. at 20–21 (9th Cir. Feb. 12, 2026). Where a statute effectively allows individual complainants or state officials to determine the scope of prohibited expression without clear limiting criteria, the danger of arbitrary enforcement is heightened. *Id.* at 32–33.

346.    AB 715 authorizes a complaint to be filed by any member of the public, including anonymously, and permits investigations to proceed based on undefined and externally referenced standards. *See* Cal. Educ. Code § 244(d). By empowering private complainants to trigger investigations without objective statutory criteria delimiting what constitutes antisemitic discrimination in instructional speech, AB 715 invites precisely the kind of subjective enforcement that the Due Process Clause forbids.

347.    California's Education Code does not explain what it means to subject a student to unlawful discrimination through instructional materials, since the concept of discrimination by use of written materials is not a commonly understood one.

348.    The law does not say whether this requirement applies to fiction such as *The Merchant of Venice* and *The Great Gatsby*, both of which launder in negative stereotypes through portrayal of fictional Jewish characters, or James Baldwin's literature, which contain negative stereotypes of Black people.

349.    Furthermore, AB 715's amendments require teachers to provide "factually accurate information."

350.    As Teacher Plaintiffs know from prior experience, some from being disciplined themselves for teaching factual information about Israel and Palestine, "factually accurate" information about Israel, Palestine, and Zionism, is considered antisemitic by some people.

351.    Teacher Plaintiffs are left to guess whether this requirement applies to the opinions of various international human rights organizations that Israel has committed genocide, or that the creation of Israel resulted in the displacement of three-quarters of a million Palestinians, or fiction that contains stereotypical depictions of minority groups.

352.    The tension between these two requirements further contributes to Teacher Plaintiffs' inability to conform their speech in the classroom and during professional development trainings to the law's strictures.

353.    The Ninth Circuit has further recognized that complaint-driven enforcement schemes operating under vague standards predictably generate unconstitutional chilling effects by forcing regulated parties to guess what speech is permissible and to self-censor to avoid investigation or liability. *Labrador*, No. 25-2491, slip op. at 21 (9th Cir. Feb. 12, 2026). Where statutes expose speakers to enforcement based on subjective complaints rather than objective criteria, informal and formal censorship becomes inevitable.

354.    AB 715 creates precisely this dynamic. By authorizing any member of the public, including anonymous complainants, to initiate investigations under undefined antisemitism standards, the statute compels educators and students to steer far wider than necessary to avoid professional or disciplinary consequences

355.    . As a result, Teacher and Student Plaintiffs reasonably self-censor classroom discussion and expression relating to Israel and Palestine, producing the very chilling effect the Due Process Clause is designed to prevent.

356.    For these reasons, the enactment of AB 715 violates Teacher and Student Plaintiffs' Fourteenth Amendment Due Process rights because it is unconstitutionally vague.

## COUNT II: FIRST AMENDMENT OVERBREADTH AND VIEWPOINT DISCRIMINATION (TEACHER PLAINTIFFS)

357.    Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth therein.

358.    The AB 715 amendments state that they are designed to address a rise in antisemitic discrimination.

359.    Preexisting California law already prohibited discrimination against Jewish students and educators.

360.    AB 715 does not define antisemitism but requires use of the Biden National Strategy to guide its enforcement.

361.    The Biden National Strategy, in turn, apparently relies on the IHRA definition of antisemitism, which includes various forms of criticism of the State of Israel and the project of Zionism, to guide inquiry.

362.    Moreover, the Biden National Strategy itself repeatedly mentions support for Israel as a foundational principle in its plan to combat antisemitism, and states that Jewish students and teachers facing pushback for their views on Israel constitutes antisemitism.

363.    The Biden National Strategy does not mention Palestine or Palestinians, nor does it contain any discussion of Palestinian rights or ties to the land of historic Palestine.

364.    Thus, it appears that the primary impetus behind AB 715 is to incorporate criticism of Israel and Zionism into antidiscrimination law.

365.    This may be inferred because otherwise there would be no purpose to AB 715, because preexisting law already prohibits discriminating against students because of their Judaism since it forbids discrimination on the basis of race, religion, ethnicity, or national origin.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 5:25-cv-9443

366.    Criticism of Israel and the political philosophy of Zionism is First Amendment protected speech and the ability to criticize governments, nations (including foreign ones), and political philosophies is at the heart of the First Amendment.  *See Stand with Us Center for Legal Justice v. Mass. Institute of Technology*, No. 24-1800, slip op. at 32 (1st Cir. 2025) ("We therefore reject plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic[]"; upholding dismissal of Title VI lawsuit against the university).

367.    The ability to criticize governments, nations, and political philosophies is also crucial to providing students with a solid education and helping to foster critical thinking skills.

368.    Individual Teacher Plaintiffs, and many LA EJP members, have addressed subjects involving Israel and Palestine in their courses as part of educating their students.

369.    That has included addressing colonialism in the context of Israel-Palestine, the conditions in Gaza resulting from Israel's military assaults, Israel's occupation of the West Bank and blockade of Gaza, and various lessons and projects that have addressed experiences of Palestinians.

370.    They have also answered questions their pupils posed about Israel, Palestine, and Zionism.  Ms. Hassan has answered questions students posed because of her experience as a Palestinian whose father fled during the Nakba and eventually arrived in Spain.

371.    In the past, Plaintiffs Prichett, Adenwala, and many members of LA EJP have had complaints lodged against them and been investigated for alleged antisemitism, for teaching about Israel and Palestine, and answering students' questions on the subjects.

372.    While many of these complaints were deemed meritless, enduring the investigative process and reputational damage has had a profound deterrent impact on these Plaintiffs and other teachers, who are aware of what they have been through and often end up staying silent rather than risk enduring the stress of investigations.

373.    Under AB 715's amendments appearing to conflate criticism of Israel and Zionism with antisemitism, the complaints against teachers are much less likely to be dismissed, and their speech may be deemed antisemitic discrimination and subject the districts to punishment, which in turn threatens their jobs and very livelihoods.

374.    Based on their own past experiences and the experiences of other teachers, under AB 715, Plaintiffs will be much more reluctant to discuss subjects related to Israel-Palestine, to answer students' questions on the subject, and to teach the Palestinian perspective on the conflict for fear of losing their jobs and harming their careers and reputations.

375.    While the law is not entirely decisive on where teachers' rights begin and end, it *is* clear that wherever that line ends up being drawn, AB 715's amendments fall squarely outside of it, since they operate to impose, through state government, viewpoint-based restrictions on teachers by conflating antisemitism with criticism of Israel and the philosophy of political Zionism, and failing to even mention Palestinians.

376.    These restrictions impede Teacher Plaintiffs' ability to provide factually accurate instruction related to Israel-Palestine based on their experience, education, and values, and to permit discussion of the Palestinian point of view on the conflict.

377.    As a result, Teacher Plaintiffs reasonably refrain from engaging in protected classroom discussion, answering student questions, or presenting Palestinian perspectives.

378.    Accordingly, AB 715 appears to outlaw speech that is critical to students' development, without a compelling pedagogical or other state interest, since there is no legitimate interest in prohibiting criticism of a government, a foreign country or a particular political philosophy.

379.    This enforcement framework imposes viewpoint-based restrictions on educators, privileging one political perspective while burdening another.

380.     Under AB 715, speech critical of Israel or Zionism is subject to discipline, while speech supportive of Israeli state narratives is insulated from scrutiny.

381.     For these reasons, the AB 715 amendments are overbroad, because they appear to forbid factually accurate information and the type of discussions that are crucial to students' intellectual development.

382.     Because they subject expression of one point of view to discipline while endowing another with protection under antidiscrimination law, they are viewpoint discriminatory.

383.     For both reasons, the AB 715 amendments violate Teacher Plaintiffs' First Amendment rights.

## COUNT III:  FIRST AMENDMENT OVERBREADTH AND VIEWPOINT-BASED DISCRIMINATION (STUDENT PLAINTIFFS)

384.     Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth therein.

385.     As discussed above, AB 715 does not explicitly define antisemitism, but appears to surreptitiously include criticism of the State of Israel and political philosophy of Zionism, and advocacy for Palestinian human rights in its definition.

386.     Student Plaintiffs' parents believe that, in order to receive a well-rounded education, their children must be exposed to multiple perspectives on Israel and Palestine in school, including the points of view of Palestinians, anti-Zionist Jews, and even Zionist Jews who disagree with the Israeli government's policies.

387.     In their opinions, that includes information about the Nakba, the occupation of the West Bank and blockade of Gaza, and the claims of numerous scholars and human rights organizations that Israel has committed war crimes in Gaza and the West Bank and genocide in Gaza.

388.    They object to one-sided narratives in the classroom that favor Israel's claims and silence Palestinians'.

389.    They also believe their children should be able to discuss these ideas and historical and current events with other students and their teachers, without anyone fearing repercussions.

390.    However, the AB 715 Amendments incentivize teachers to avoid discussing these subjects given the threat of professional consequences, as discussed above in Counts I and II.

391.    AB 715 therefore interferes with Student Plaintiffs' constitutionally enshrined rights to obtain information about this and other subjects and to receive an education free from political bias, and to be exposed to the perspectives of Palestinians.

392.    It does so for no legitimate reason, since there is no state interest in perpetuating one-sided narratives and silencing debate.

393.    As a result, Student Plaintiffs are deprived of access to protected viewpoints and meaningful discussion of matters of public concern.

394.    Moreover, AB 715 does not state whether it applies to fiction, for example whether students reading *The Great Gatsby* in class could be deemed antisemitic discrimination because the novel contains negative stereotypes about Jewish individuals and other minorities.

395.    In J.J.'s experience, reading *The Great Gatsby* and works of James Baldwin for class, though they contain offensive stereotypes, has been a valuable component of her education.

396.    Reading these books has helped her to learn about stereotypes and recognize the harm those stereotypes cause. She also believes that a well-rounded education includes reading classic novels, even if those novels involve depictions of characters and events that would be offensive by contemporary standards.

397.    She reasonably fears that under AB 715, classis such as *The Great Gatsby* would no longer be taught, and she would be deprived of crucial educational experiences.

398.    Through its statewide enforcement structure, AB 715 suppresses access to protected ideas and perspectives.

399.    Accordingly, AB 715 is overbroad and viewpoint discriminatory in violation of Plaintiffs Students' First Amendment rights to receive information in the context of their public-school education. *See Stand With Us*, No. 24-1800, at *33 (rejecting students' claims that criticizing Israel's actions rather than other countries', and accusing Israel of genocide, necessarily equates to antisemitism; noting that "even prominent Israelis have lodged the [genocide] accusation.").

### COUNT IV: EQUAL PROTECTION VIOLATION (J.J., Y.U., & L.U.)

400.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

401.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person the equal protection of the laws, including through statutory schemes that single out one religious group for preferential treatment while denying comparable protections to others.

402.    AB 715 expressly establishes an Antisemitism Prevention Coordinator within the California Department of Education's Office of Civil Rights, charged with statewide oversight, enforcement, and implementation of antisemitism-related policies and complaints.

403.    By contrast, AB 715 provides no comparable coordinators addressing discrimination affecting students of other faiths or identities. Instead, the statute offers only vague and nonbinding assurances that additional coordinators may be established at some undefined point in the future.

404.    Although Senate Bill 48, the companion bill to AB 715, states legislative intent to eventually create positions such as a Religious Discrimination Prevention Coordinator, Race and Ethnicity Discrimination Prevention Coordinator, Gender Discrimination Prevention Coordinator, and LGBTQ Discrimination Prevention Coordinator, those positions are not created by AB 715, are not mandatory, and may be delayed indefinitely or never implemented.

405.    As enacted, AB 715 immediately confers specialized statewide oversight, enforcement authority, and institutional resources to address antisemitism alone, while relegating all other forms of religious discrimination to a speculative and optional framework.

406.    This statutory structure creates a two-tier system of protection: Jewish students receive guaranteed, dedicated institutional safeguards, while Muslim, Christian, Sikh, Hindu, and other religious communities are collectively lumped into an undefined category of "other" discrimination without comparable coordinators, timelines, or enforcement mechanisms.

407.    Plaintiffs further experience discrimination based on religion. As Palestinian and Arab students, Plaintiffs are frequently assumed to be Muslim (and J.J. is in fact Muslim), and subjected to Islamophobic bias regardless of their actual faith. Discrimination based on perceived religion is no less actionable than discrimination based on actual religious affiliation. This unequal allocation of enforcement resources and institutional attention deprives Plaintiffs of equal protection under the law.

408.    Moreover, AB 715 appears to recognize and institutionalize Jewish students' emotional and historical connection to the region encompassing Israel and Palestine through its incorporation of the Biden Administration's National Strategy to Combat Antisemitism, while failing to acknowledge Palestinian students' parallel ties to the same land or provide any comparable protections for their identity-based harms.

409.    By formally prioritizing one religious group for specialized protection while denying equal structural safeguards to others, AB 715 discriminates on the basis of religion.

410.    This facial religious classification is subject to heightened scrutiny and cannot survive constitutional review.

411.    Even under rational basis review, AB 715's unequal treatment fails because the State already possessed comprehensive antidiscrimination protections applicable to all students, and

Defendants lack any legitimate governmental interest in creating a preferential enforcement regime for one religious group while withholding comparable protections from others.

412.    Defendants enacted and continue to enforce AB 715 under color of state law in a manner that denies Student Plaintiffs equal protection in violation of the Fourteenth Amendment.

413.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable constitutional injury.

414.    AB 715 does more than reflect legislative prioritization; it restructures access to the State's civil-rights enforcement machinery by embedding antisemitism-specific procedural protections, consultative requirements, reporting obligations, and enforcement pathways that are not triggered when unlawful discrimination targets other protected groups. The resulting disparity constitutes unequal access to governmental protection.

415.    When antisemitism is alleged, AB 715 mandates consultation with the Antisemitism Prevention Coordinator, antisemitism-specific tracking and statewide reporting of complaints, specialized training and education for school personnel, maintenance of a dedicated antisemitism resources webpage, engagement with the Jewish community, and reliance on the federal National Strategy to Combat Antisemitism. No parallel mandatory mechanisms exist when discrimination targets Muslim, Arab, or other protected students.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

A.    A declaration that the AB 715 amendments to California's Education Code violate Teacher Plaintiffs' rights to Due Process of Law under the Fourteenth Amendment to the United States Constitution because they are unconstitutionally vague;

B.    A declaration that the AB 715 amendments to California's Education Code violate Teacher Plaintiffs' rights under the First Amendment to the United States Constitution because they are overbroad and viewpoint discriminatory;

C.    A declaration that the AB 715 amendments to California's Education Code violate Student Plaintiffs' rights under the First Amendment to the United States Constitution because they are overbroad and viewpoint discriminatory;

D.    A declaration that the AB 715 amendments violate Plaintiffs J.J., Y.U., and L.U.'s rights to Equal Protection of the Law under the Fourteenth Amendment to the United States Constitution.

E.    An injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)) and each of them, from enforcing the AB 715 amendments;

F.    Attorney's fees pursuant to 42 U.S.C. § 1988; and

G.    Any other just and proper relief.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

March 2, 2026

Respectfully submitted,

/s/*Jenin Younes*
National Legal Director

/s/ *Deyar Jamil*

AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE
910 17th Street Northwest, Suite 1000
Washington, D.C. 20006
Telephone: (202) 244-2990

jyounes@adc.org

s/*Thomas B. Harvey*

THOMAS B. HARVEY (CA Bar #287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, #226
Thousand Oaks, CA 91360
Telephone: (805) 768-4440
tbhlegal@proton.me

/s/*Michael Bracamontes*

MICHAEL BRACAMONTES
BRACAMONTES & VLASAK
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 835-6777
mbracamontes@bvlawsf.com

*Attorneys for Plaintiffs*